### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF SOUTH CAROLINA
### GREENVILLE DIVISION

AIMEE MADDONNA,

                         *Plaintiff*,

        v.

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES;

ALEX AZAR, in his official capacity as
Secretary of the UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES;

ADMINISTRATION FOR CHILDREN AND
FAMILIES, UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES;

LYNN JOHNSON, in her official capacity as
Assistant Secretary of the
ADMINISTRATION FOR CHILDREN AND
FAMILIES;

HENRY MCMASTER, in his official
capacity as Governor of the STATE OF
SOUTH CAROLINA; and

MICHAEL LEACH, in his official capacity
as State Director for the SOUTH CAROLINA
DEPARTMENT OF SOCIAL SERVICES,

                         *Defendants*.

Civil Action No.:_____

**COMPLAINT**

## INTRODUCTION

1.     Children in foster care are vulnerable. The parents and families who choose to care for these children during often tumultuous periods of transition provide the children with an invaluable gift: a safe and loving home.

2.     Thus, when Aimee Maddonna and her family sought to volunteer with foster children in South Carolina, with the hope that they might soon welcome a child into their home, the only thing that should have mattered was whether they could provide a safe and loving environment for a child in need.

3.     But what mattered to the child-placement agency—licensed and funded by the government to care for foster children on behalf of the State—through which the Maddonnas sought to volunteer was whether Mrs. Maddonna and her family shared that agency's religious beliefs and attended the right kind of church. They do not, so the agency turned them away.

4.     That agency, Miracle Hill Ministries, refuses to recruit, license, train, allow to volunteer and mentor, or place foster children with any family that does not both affirm agreement with the agency's evangelical-Christian religious beliefs and belong to a Christian church of which the agency approves.

5.     The State of South Carolina licenses the agency to provide governmental foster-care services on its behalf; and in return, both the U.S. Department of Health and Human Services and the State fund the agency with federal and state dollars, thereby sponsoring and underwriting the agency's religious discrimination.

6.     In so doing, the federal and state governments violate the Establishment and Equal Protection Clauses of the U.S. Constitution.

7.     Compounding these violations, HHS and the State have also authorized all child-placement agencies that contract with the State of South Carolina to refuse to recruit, work with,

train, or place children with prospective foster parents who do not share the child-placement agencies' religious beliefs. The federal and state governments have done so by exempting the agencies wholesale from compliance with antidiscrimination laws and regulations and by refusing to enforce constitutional, statutory, and regulatory antidiscrimination requirements for the provision of government-funded services.

8.     HHS and the State have continued to fund, license, and authorize agencies' religious discrimination with full knowledge of the agencies' discriminatory practices in the provision of the government-funded state services.

9.     HHS's and the State's funding, licensing, and authorizing of child-placement agencies' religious discrimination comes at great cost to prospective foster parents like the Maddonnas—who are denied the opportunity to provide loving homes to children in need and who are subjected to the sting of discrimination based on their religious beliefs—and to the detriment of the vulnerable children in foster care in South Carolina—for whom the State is responsible, and who are denied access to loving families because the agencies to which the State assigns them for placement turn away qualified, suitable families based on the families' faith.

10.     Aimee Maddonna brings this action against Federal Defendants HHS, Secretary Azar, HHS's Administration for Children and Families, and the Assistant Secretary of ACF, and also against State Defendants Governor McMaster and the Director of South Carolina's Department of Social Services, seeking declaratory and injunctive relief prohibiting Defendants from financially supporting and otherwise facilitating child-placement agencies' use of discriminatory religious criteria when performing contracted-for governmental services for the children in state custody.

## JURISDICTION AND VENUE[1]

11.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States.

12.     This Court has remedial authority to grant the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202, and injunctive relief under, among other things, 28 U.S.C. §§ 1343(a)(3) and 2072, Federal Rules of Civil Procedure 57 and 65, and the Court's inherent equitable powers.

13.     This Court has additional remedial authority with respect to Federal Defendants under the Administrative Procedure Act, 5 U.S.C. §§ 551–706. Claims under the APA are ripe for judicial review because Federal Defendants' disbursement of funds to the South Carolina Foster Care Program, grant of an exception (i.e., exemption) under 45 C.F.R. § 75.102 from the religious antidiscrimination protections recognized by 45 C.F.R. § 75.300(c), and subsequent issuance of a notice of nonenforcement of § 75.300(c) are all "final agency action[s] for which there is no other adequate remedy in court." *See* 5 U.S.C. § 704.

14.     This Court has additional remedial authority with respect to State Defendants under 42 U.S.C. § 1983.

15.     Venue is proper in the Greenville Division of the United States District Court for the District of South Carolina under 28 U.S.C. § 1391 and Local Rule 3:01(A)(1) because Federal Defendants are subject to suit in any federal jurisdiction; State Defendants are similarly subject to the jurisdiction of the federal courts in this state; a substantial part of the events giving rise to the claims occurred within this division; Plaintiff resides in this division; and no real property is involved in this action.

---

[1] Mrs. Maddonna is refiling this action following the dismissal without prejudice of her first lawsuit. Order, *Maddonna v. U.S. Dep't of Health & Human Servs.*, No. 6:19-cv-00448-TMC (D.S.C. Nov. 13, 2019), ECF No. 68.

## PARTIES

16.     **Plaintiff Aimee Maddonna** and her husband and their three children are residents of Simpsonville, South Carolina, and observant Catholics.

17.     Mrs. Maddonna and her family suffer harms as alleged in this Complaint because, by funding and licensing child-placement agencies, including Miracle Hill, that exclude prospective foster parents and volunteer mentors who do not affirm the agencies' religious beliefs, and by authorizing the agencies' discrimination—including the discrimination that Mrs. Maddonna directly experienced from Miracle Hill—Defendants have erected a barrier to Mrs. Maddonna and her family's participation in publicly funded governmental foster-care services on the same terms as other prospective foster families.

18.     Mrs. Maddonna and her family also suffer harms as alleged in this Complaint because, by funding and licensing child-placement agencies, including Miracle Hill, that exclude prospective foster parents and volunteer mentors who do not affirm the agencies' religious beliefs, and by authorizing the agencies' discrimination, Defendants have subjected Mrs. Maddonna to the stigma of religious discrimination.

19.     Mrs. Maddonna and her family also suffer harms as alleged in this Complaint because, by funding and licensing child-placement agencies, including Miracle Hill, that exclude prospective foster parents and volunteer mentors who do not affirm the agencies' religious beliefs, and by authorizing the agencies' discrimination, Defendants impermissibly condition participation in a governmental service on the profession of and adherence to certain religious beliefs, thereby unconstitutionally coercing Mrs. Maddonna and her family to profess and adhere to those beliefs.

20.     **Defendant United States Department of Health and Human Services** is the federal agency that is charged by Congress with the authority and duty to enhance and protect

Americans' health and well-being via the provision of health programs and social services. HHS oversees the federal Administration for Children and Families.

21.     **Defendant Alex M. Azar II** is sued in his official capacity as Secretary of the United States Department of Health and Human Services, where he oversees HHS and is responsible for all aspects of HHS's operations, management, and final agency actions.

22.     **Defendant Administration for Children and Families** is the sub-agency of HHS that is responsible for administering federally appropriated Title IV-E Foster Care program funding to states to provide safe foster-care placements for children who cannot remain in their homes as a result of maltreatment, lack of care, or lack of supervision. ACF is charged with ensuring that those funds are used for the care of children in a manner that comports with federal law and professional standards, including protecting the children's civil rights.

23.     **Defendant Lynn Johnson** is sued in her official capacity as Assistant Secretary for the Administration for Children and Families.

24.     **Defendant Governor Henry McMaster** is sued in his official capacity as Governor of South Carolina. Under Article IV, Section 15, of the South Carolina Constitution, the Governor is required to "take care that the laws be faithfully executed" and is thus responsible for ensuring that all South Carolina executive departments and agencies, including the Department of Social Services, comply with governing federal and state constitutional requirements, statutes, and regulations. At all times relevant to these allegations, Governor McMaster was and is acting under color of state law for purposes of 42 U.S.C. § 1983.

25.     **Defendant Michael Leach** is sued in his official capacity as State Director for the South Carolina Department of Social Services. Leach oversees the South Carolina Department of Social Services and its programs, reporting directly to Governor McMaster. The South Carolina

Department of Social Services is the state agency responsible for overseeing the South Carolina Foster Care Program, licensing and supervising private foster-care child-placement agencies, and administering federal Title IV-E Foster Care and Adoption Assistance program funds to those private agencies. At all times relevant to these allegations, Leach was and is acting under color of state law for purposes of 42 U.S.C. § 1983.

## FACTUAL ALLEGATIONS

### Foster Care in South Carolina

26.    Approximately 4,800 children are currently in South Carolina's foster-care system.[2]

27.    There are more children in foster care in Greenville County, where Mrs. Maddonna and her family live, than in any other county in the State. And South Carolina's Region 1, which includes Greenville County, is home to more than one third of all children in foster care in the State.

28.    The number of children in foster care in South Carolina has spiked over the last several years, in part because of the opioid epidemic.

29.    As the number of children in foster care in South Carolina has risen, the number of foster-care home placements has remained relatively flat—leaving a shortfall of nearly 2,000 homes.[3]

30.    To fulfill its duty to care for these children, who are in the legal custody of the State, the South Carolina Department of Social Services contracts with private child-placement agencies, which are organizations that receive licenses from the State to facilitate the placement of foster

---

[2] See S.C. Dep't of Soc. Servs., *Children in Foster Care by Their County of Origin/Licensed Foster Homes by Location—As of November 1, 2019*, https://bit.ly/2rnMEF9.

[3] *Id.*; *see also The Numbers*, Care2Foster, https://bit.ly/35rFdvX.

children with foster parents and families and receive reimbursements from state and federal funds for the services that they perform. *See* S.C. Code § 63-9-30(5); S.C. Code Regs. § 114-4910.

31.    DSS issues a standard, one-year license to qualifying foster-care child-placement agencies that satisfy its regulatory requirements, and then DSS monitors these licensed agencies to ensure their continued compliance with federal and state laws and regulations. *See* S.C. Code Regs. §§ 114-4920(E), 114-4930(E).

32.    If a child-placement agency is temporarily unable to comply with a state foster-care licensing regulation, DSS is authorized to grant the agency a temporary license if the agency provides to DSS a written plan detailing how the agency will correct the areas of noncompliance within a probationary period. *See* S.C. Code Regs. § 114-4930(F).

33.    DSS may deny or revoke a child-placement agency's license if DSS determines that the agency cannot comply with state regulations or if the agency provides false information during the application or relicensing process. *See* S.C. Code Regs. §§ 114-4930(G)(1)(d)–(e).

34.    Licensed child-placement agencies conduct a variety of services on behalf of the State: They conduct initial and relicensing foster-home investigations consistent with the regulations established by DSS; make recommendations that DSS uses to determine whether a foster-family license should be issued, denied, reissued, or revoked; license foster homes on behalf of the State and monitor those homes for compliance with the foster-home regulations established by DSS; investigate complaints about possible violations of foster-home regulations; and provide DSS with written reports of their findings, conclusions, and any anticipated actions affecting the investigated homes' licenses. *See* S.C. Code Regs. §§ 114-550(C), (D), (E), (K), 114-4980(A).

35.    Child-placement agencies also exercise substantial control over foster children's time in the system, developing written case plans for all children assigned to them and determining

which foster home is appropriate for a child's placement based on the agency's assessments of foster families' and children's needs and strengths. *See* S.C. Code Regs. §§ 114-4980(B)–(C).

36.    DSS policy forbids licensed child-placement agencies from discriminating in the provision of foster-care services, including on the basis of religion.

37.    The DSS Human Services Policy and Procedure Manual provides that "[t]he unnecessary consideration of . . . religion . . . when making decisions regarding a child's placement can result in unfair outcomes for prospective families and substantial delays in permanency for children." DSS Manual § 710. It therefore commits DSS and its programs to providing "equal opportunities to all families and children, without regard to their . . . religion." *Id.*

38.    The DSS Manual further provides: "No individual shall be denied the opportunity to become a foster or adoptive parent on the basis of . . . religion . . . ." *Id.*

39.    South Carolina regulations prohibit child-placement agencies from establishing additional requirements for the families that they serve beyond the requirements set forth by the State itself. S.C. Code Regs. § 114-4980(A)(2).

40.    Title IV-E of the Social Security Act authorizes the U.S. Department of Health and Human Services to provide funding to states to support their foster-care services. HHS thus funds DSS, which directs the federal funding to South Carolina's licensed child-placement agencies for the governmental foster-care services that the agencies provide under contract with the State.

41.    In order to receive these federal funds, DSS and its subgrantee licensed child-placement agencies must comply with federal law and requirements.

42.    Currently, HHS regulations concerning grants awarded under Title IV-E require that "no person otherwise eligible will be excluded from participation in, denied the benefits of, or

subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as . . . religion." 45 C.F.R. § 75.300(c).

43.    Under 45 C.F.R. § 75.101(b)(1), the antidiscrimination provisions of § 75.300 follow federal grant dollars through grantees, such as South Carolina, to subgrantees, including the child-placement agencies that DSS licenses and contracts with.

44.    Neither federal nor state law disallows religiously affiliated organizations from becoming licensed child-placement agencies or receiving public funding for providing governmental foster-care services as long as the religiously affiliated organizations adhere to all applicable laws and requirements, just as their nonreligious counterparts are required to do. *See* 45 C.F.R. § 87.3.

45.    HHS regulations prohibit religiously affiliated agencies from "support[ing] or engag[ing] in any explicitly religious activities (including activities that involve overt religious content such as . . . proselytization) as part of the programs or services funded with direct financial assistance from the HHS awarding agency." 45 C.F.R. § 87.3(b).

46.    Further, whatever other federal and state laws and regulations govern the funding and administration of foster-care services, HHS and the State—and therefore also their subgrantee child-placement agencies performing state foster-care services—are always bound by the requirements of the U.S. Constitution, which prohibits the government from funding religious discrimination.

### *Miracle Hill Ministries*

47.    Miracle Hill Ministries is a foster-care child-placement agency based in Greenville, South Carolina, that provides government-funded services under contract with the State to those interested in being licensed by DSS as foster parents in the South Carolina Region 1 counties of

Abbeville, Anderson, Cherokee, Greenville, Greenwood, Laurens, Newberry, Oconee, Pickens, and Spartanburg.

48.    Miracle Hill is the largest placement agency in Region 1, and the largest in the State as a whole.

49.    As a licensed child-placement agency, Miracle Hill assists prospective foster parents and families in obtaining state foster-care licenses, provides home studies and assessments that DSS relies on in making foster-care licensing decisions, determines the foster families with whom the children in foster care should be placed, and helps prospective foster parents assess the fit of a child with a particular home and family when a potential placement arises.

50.    Miracle Hill is one of three[4] nongovernmental nontherapeutic[5] foster-care child-placement agencies working with foster parents in Greenville County,[6] and it is the largest nontherapeutic foster program in the State. Recently obtained state records show that, over the last five years, more than 90% of all children in foster care statewide that have been assigned to private child-placement agencies by DSS have been entrusted to Miracle Hill.

51.    Unlike the Department of Social Services, Miracle Hill permits children as well as adults to volunteer with children and teenagers awaiting placement in a foster home, allowing for families like the Maddonnas to volunteer *as a family*.

---

[4] Recently obtained state records suggest that there may be one more agency operating in Greenville County, but it appears that DSS has assigned that agency just one child in Greenville County over the last five years.

[5] Foster-care agencies in South Carolina are divided into those offering "Regular [i.e., nontherapeutic] Foster Care" and "Therapeutic Foster Care." *See Greenville Fostering Information*, CARE2FOSTER, https://bit.ly/2PcQqJX. Children in therapeutic foster care have complex needs and require a higher level of care than children in nontherapeutic foster care. *Id.*

[6] The other two nongovernmental nontherapeutic agencies, one of which began offering foster-care licensing only in 2017, are based more than forty miles outside of Greenville.

52.    Volunteering helps families establish the types of relationships with children in foster care that lead to long-term foster placements or even adoption.

53.    Miracle Hill is a religiously affiliated organization that administers its foster-care services "in a Christ-centered environment."[7]

54.    Miracle Hill believes that "foster parents are in a position of spiritual influence over the children in their homes."[8]

55.    Therefore, Miracle Hill requires prospective foster parents and volunteer mentors to attest on its foster-care-inquiry form that they "have read and agree with Miracle Hill's doctrinal statement."[9]

56.    The doctrinal statement reads:

We Believe . . .

- The Bible to be the only inspired, infallible, inerrant and authoritative Word of God. *2 Tim. 3:16; 2 Pet 1:20-21*

- That there is one God, creator of heaven and earth, eternally existent in three distinctive persons: the Father, Son, and Holy Spirit. *1 Tim. 2:5; Gen 1:1; Mt. 3:16-17; Mt. 28:19; 2 Cor. 13:14; John 10:30*

- In the deity and humanity of Jesus Christ; that He was born of a virgin; that we are redeemed by His atoning death through His shed blood; that He bodily resurrected and ascended into Heaven and that He will come again in power and great glory to judge the living and the dead. *Eph. 1:7-10; Acts 1:9-11; Mt. 1:23-25; 1 Cor. 15:1-8; 2 Tim. 4:1*

- In the value and dignity of all people created in God's image, but alienated from God and each other because of our sin and guilt and justly subject to God's wrath. *Gen. 1:26-27; Psalm 139:13; Mt. 22:37-39; Rom. 12:20-21; Gal. 6:10; Eph. 2:1-3; Rom. 5:12*

- That regeneration by the Holy Spirit by grace through faith is essential

---

[7] *Requirements for Miracle Hill's Foster Families*, MIRACLE HILL MINISTRIES, https://bit.ly/33kiOys.

[8] *Foster Care Inquiry Form*, MIRACLE HILL MINISTRIES, https://bit.ly/35HiKeb.

[9] *Id.*

for the salvation of lost and sinful people. *Tit. 3:4-7; Eph. 2:8-9; 2 Cor. 6:2*

- In the forgiveness of sins, the resurrection of the body, and life everlasting solely through repentance and faith in Jesus Christ. *Col. 1:13-14; 1 Thess. 4:16-17; John 3:16*

- That the Holy Spirit unites all believers in the Lord Jesus Christ and that together they form one body—the church. *1 Cor. 12:12-13; 1 Cor. 12:27*

- God ordained the family as the foundational institution of human society. It is composed of persons related to one another by marriage, blood or adoption, and that God's design for marriage is the legal joining of one man and one woman in a life-long covenant relationship. *Gen. 1:26-28; Eph. 5:21-6:4; Mt. 19:4-6*

- God creates each person as either male or female, and these two distinct, complementary sexes, together reflect the image and nature of God. *Gen. 1:27; Gen. 2:18*[10]

57. And because "[a]ll children entrusted to [Miracle Hill's] care are to be cared for in an atmosphere that is conducive to spiritual growth," the foster-care-inquiry form also requires applicants to identify the church that they attend and provide a "personal testimony of [their] faith/salvation in Jesus Christ."[11]

58. Until recently, Miracle Hill categorically barred all prospective foster parents and volunteer mentors except those who are active members of and in good standing with certain Protestant churches of which Miracle Hill approved and who "agree[] without reservation with [Miracle Hill's] doctrinal statement," "have a genuine concern for the spiritual welfare of children entrusted to their care," and "have a lifestyle that is free of sexual sin (to include pornographic materials, homosexuality, and extramarital relationships)."

---

[10] *What We Believe: Our Doctrinal Statement*, MIRACLE HILL MINISTRIES, https://bit.ly/34m0OVM.

[11] *Foster Care Inquiry Form*, *supra*.

59.    In July 2019, Miracle Hill altered its religious requirement in a limited fashion, by putatively lifting its formal prohibition against Catholics and Orthodox Christians while still retaining the strict requirement that all prospective foster parents and volunteer mentors "be followers of Jesus Christ" who are "active in and accountable to a Christian church" and "agree in belief and practice" with Miracle Hill's evangelical-Christian doctrinal statement.[12] In other words, though Miracle Hill says that it no longer formally bars those who identify as Catholic or Orthodox Christians (while still formally barring Jews, other religious minorities, and nonbelievers), it still functionally bars them if they adhere to and practice the tenets of their own faith and do not subscribe and strictly adhere instead to Miracle Hill's preferred form of evangelical Protestant Christianity.

### *Defendants' Continued Funding and Enabling of Miracle Hill's Discrimination*

60.    When reviewing Miracle Hill's application to renew its child-placement-agency license for 2018, DSS determined that Miracle Hill was using religious information that it gathered about prospective foster parents and families to refuse to provide services as a licensed child-placement agency to families who did not adhere to its evangelical-Christian beliefs and those that did not attend Miracle Hill-approved Christian churches.

61.    DSS determined that Miracle Hill's policies and practices constitute discrimination on the basis of religion in contravention of federal and state law and that Miracle Hill was violating

---

[12] *Id.*; *see also* Press Release, Miracle Hill Ministries Strengthens Christian Identity by Opening Foster Program to Catholic Foster Parents (July 5, 2019). This so-called policy change came on the heels of media attention directed at Miracle Hill after Mrs. Maddonna first challenged the government's funding and licensing of Miracle Hill's discriminatory provision of foster-care services. *See id.* ("[A] . . . lawsuit filed by Aimee Madonna [sic] gave the impression that Miracle Hill was in a dispute with other followers of Jesus Christ.").

its own nondiscrimination policies submitted to DSS as part of the organization's license-renewal process.

62.     For these reasons, on January 26, 2018, DSS issued Miracle Hill a temporary (rather than regular) child-placement-agency license and requested that Miracle Hill issue, within thirty days, a written plan for resolving the legal violations that DSS had identified and for complying with applicable laws, regulations, and policies.

63.     On knowledge and belief, Miracle Hill has never issued a written plan of compliance.

64.     Rather than require Miracle Hill to comply with federal and state law—and thereby ensure that the State's continued funding and licensing of Miracle Hill does not violate the Constitution—on March 13, 2018, Governor McMaster issued Executive Order No. 2018-12, exempting all faith-based foster-care child-placement agencies in South Carolina from complying with state antidiscrimination requirements.

65.     The executive order directs that, "to the fullest extent permitted by state and federal law," "DSS shall not deny licensure to faith-based CPAs solely on account of their religious identity or sincerely held religious beliefs."

66.     The executive order expressly permits faith-based child-placement subgrantees to associate only with "foster parents and homes who share the same faith" as the subgrantee "in recruiting, training, and retaining foster parents."

67.     The executive order also directs DSS to "review and revise its policies and manuals in accordance with this Order and ensure that [DSS] does not directly or indirectly penalize religious identity or activity in applying" the State's requirements for licensure for foster care.

68.    Additionally, Governor McMaster solicited from HHS's Administration for Children and Families a waiver of HHS's requirement that federal funds for state foster-care programs be withheld or returned in case of violations of federal antidiscrimination requirements by subgrantee agencies. In other words, Governor McMaster sought official permission from HHS for all child-placement agencies under contract with South Carolina to discriminate in the operation and provision of governmental services funded under Title IV-E of the Social Security Act.

69.    HHS may grant exceptions from the federal antidiscrimination regulation "on a case-by-case basis for individual non-Federal entities." 45 C.F.R. § 75.102(b). The regulation does not authorize HHS to grant exemptions across the board or on a class-wide or statewide basis.

70.    On January 23, 2019, HHS granted South Carolina the exemption that Governor McMaster had requested from the federal religious-antidiscrimination requirement of 45 C.F.R. § 75.300(c).

71.    In the letter granting the exemption, ACF expressly stated that Miracle Hill and all other South Carolina subgrantee agencies would be permitted to use "religious criteria in selecting among prospective foster care parents," including criteria based on the religious identity and practices of the prospective foster parents.

72.    DSS subsequently replaced Miracle Hill's temporary, probationary CPA license with a regular license, thus allowing Miracle Hill to continue offering publicly funded foster-care services on behalf of the State in a discriminatory manner.

73.    On November 19, 2019, HHS issued a notice of proposed rulemaking that would replace the operative language of 45 C.F.R. § 75.300(c) with the following: "It is a public policy requirement of HHS that no person otherwise eligible will be excluded from participation in,

denied the benefits of, or subjected to discrimination in the administration of HHS programs and services, to the extent doing so is prohibited by federal statute." Health and Human Services Grants Regulation, 84 Fed. Reg. 63,832, 63,835 (proposed Nov. 19, 2019).

74.    Because, apart from the regulatory requirement that HHS proposes to abolish, the pertinent legal prohibition against federal funding of religiously discriminatory foster-care programs is constitutional rather than statutory, the effect of the proposed amendment to the regulation would be to remove from the regulation the prohibition against religious discrimination and thereby to tell recipients of federal funds (such as South Carolina) and their subgrantees (such as Miracle Hill) that they are no longer prohibited by federal regulations from discriminating on the basis of religion.

75.    Such discrimination, however, would still contravene federal constitutional mandates.

76.    Along with the notice of proposed rulemaking, HHS issued a notice of nonenforcement of 45 C.F.R. § 75.300(c), stating that HHS had "determined to exercise its enforcement discretion not to enforce the regulations until they have been repromulgated." Notification of Nonenforcement of Health and Human Services Grants Regulation, 84 Fed. Reg. 63,809, 63,809 (Nov. 19, 2019). In other words, rather than waiting for the completion of notice-and-comment rulemaking, HHS decided as a policy matter to refuse immediately and categorically to enforce the existing rule, thus effectively nullifying the rule.

### Plaintiff Aimee Maddonna

77.    Aimee Maddonna lives with her husband and three children in Simpsonville, South Carolina, just outside Greenville.

78.     Mrs. Maddonna grew up alongside both biologically related and foster siblings. Her father's own experiences in the foster-care system as a child led him as an adult to take in and care for foster children so that he could provide them with the type of foster family that he wished he had.

79.     Mrs. Maddonna's parents thus instilled in her the importance of providing a safe, loving home to children in need of a foster family. She intends to share with and pass on to her own children these fundamental values of charity and service.

80.     In furtherance of that aim, and building on her own experience growing up with foster siblings, Mrs. Maddonna contacted Miracle Hill to see whether her family could volunteer to work with foster children.

81.     Through volunteering, Mrs. Maddonna hoped that her family would get to know and develop relationships with children who might be good matches for foster placement in her home, and that the family would ultimately provide a loving home for a child in need. And because the Maddonna children have special needs, it was and is important to Mrs. Maddonna to ensure that any foster child that the family would welcome into their home would be a good fit with the whole family, so volunteering *as a family* was especially important to the Maddonnas.

82.     Mrs. Maddonna first contacted Miracle Hill in September or October 2014 to inquire about opportunities to volunteer with foster children.

83.     After corresponding with a Miracle Hill representative over the course of a few weeks, Mrs. Maddonna was asked to provide the name of her church and did so, giving the name of her Catholic parish. The representative promptly informed Mrs. Maddonna that she and her family were no longer welcome to volunteer because Miracle Hill would not accept Catholics as volunteer mentors for children in foster care. The representative expressed disappointment

because, but for the Maddonnas' Catholic faith, the family would have been a great fit with the program.

84.    A different Miracle Hill representative subsequently confirmed that only Christians who attended the right type of Protestant church were permitted to volunteer and work with the children that DSS had assigned to Miracle Hill.

85.    On February 12, 2019, Mrs. Maddonna reached out to Miracle Hill to revisit the possibility that her family be accepted as volunteer mentors to foster children in its care with the ultimate hope of fostering a child.

86.    On February 20, 2019, a representative of Miracle Hill sent Mrs. Maddonna an e-mail that once again rejected the Maddonna family as volunteer mentors.

87.    The representative informed Mrs. Maddonna that because "mentors play an important role in providing spiritual as well as emotional support, guidance, and counsel," Miracle Hill requires them to "agree with [Miracle Hill's] Protestant statement of faith" and "share [its] distinctly Protestant beliefs and convictions."

88.    The representative told Mrs. Maddonna that she could go someplace else to become a mentor or that the Maddonnas could do other charitable work through Miracle Hill but could not mentor or foster any children assigned to Miracle Hill by DSS.

89.    Mrs. Maddonna clearly understood that she and her family were turned away by Miracle Hill because they do not share Miracle Hill's evangelical-Christian beliefs and cannot affirm its statement of faith.

90.    When Mrs. Maddonna and her family were rejected initially, and when they were rejected the second time, and at all times between and since, Miracle Hill has been licensed by the

State and has been receiving federal and state funds to carry out foster-care services on behalf of South Carolina.

91.    When Mrs. Maddonna requested in February 2019 that her family be permitted to volunteer, Miracle Hill had not yet lifted its formal bar on Catholics' participating in its foster-care services; and the requirement that prospective foster parents agree and live in accordance with Miracle Hill's Protestant statement of faith—which Miracle Hill highlighted in its e-mail rejecting Mrs. Maddonna—was then and still is a prerequisite to Mrs. Maddonna and her family's volunteering with foster children assigned to Miracle Hill by the State.

92.    Mrs. Maddonna has reviewed Miracle Hill's doctrinal statement.

93.    The doctrinal statement is inconsistent with Mrs. Maddonna's religious beliefs and her understanding of her faith. Were she to attest belief in and agree to practice in accordance with the doctrinal statement, she would be forced either to misrepresent her faith and falsely affirm commitments to religious beliefs that are not her own, or else abandon her own beliefs to adopt the religious beliefs and practices that Miracle Hill favors.

94.    For Mrs. Maddonna, affirming the doctrinal statement would be tantamount to forsaking her faith and leaving the Catholic Church.

95.    Because of the religious requirements that Miracle Hill inserts into its provision of foster-care services, the Maddonnas were prevented from becoming volunteer mentors to children in the State's care that DSS assigned to Miracle Hill and were thereby deprived of the opportunity to open their loving home to a child in need.

### Effects of Defendants' Funding and Enabling of Religious Discrimination

96.    By funding, licensing, and otherwise enabling child-placement agencies that use religious tests to exclude prospective volunteers and foster parents who do not share the agencies'

20

preferred religious beliefs, Defendants deny South Carolina's children in foster care access to safe and loving homes.

97.    Defendants' funding, licensing, and enabling of agencies' religious discrimination results in the exclusion of many otherwise-eligible prospective foster parents who are willing to open their homes to children in need, at a time when the number of children in need of good homes far outpaces the number of available foster families.

98.    And Defendants' funding and enabling of Miracle Hill's religious discrimination with respect to volunteering with children in foster care is likewise detrimental to the children's well-being not just in the immediate sense of denying them access to caring volunteer mentors but also by making it less likely that they will receive suitable home-placements (or else may increase the time spent in a group home or temporary placement before receiving a suitable, potentially long-term home-placement). That is because volunteering with and mentoring foster children is what allows prospective foster parents and children to get to know and trust each other and thereby develop a connection that may ripen into a home placement or even an adoption, when otherwise the children are likely to be nothing more than faces on a billboard or in an infomercial.

99.    Individuals and families who volunteer with and mentor foster children are more likely to open their homes to the children, providing the children with the stable environments and individualized care that they, and all children, desperately need.

100.    When prospective volunteers and foster parents are turned away by a child-placement agency because of their religious beliefs, they may be deterred from fostering a child through other channels as well, because, for example, the would-be mentors or foster parents fear that they will again be subjected to the sting of discrimination, or because there are no agencies in

the area that have comparable resources or provide comparable services and support to foster parents.

101.    DSS itself recognizes that "[t]he unnecessary consideration of . . . religion . . . when making decisions regarding a child's placement can result in . . . substantial delays in permanency for foster children." DSS Manual § 710. Hence, DSS has committed itself "to the exercise of non-discriminatory practice," *id.*, but for Governor McMaster's executive order to the contrary.

102.    Defendants' funding and enabling of agencies' discrimination thus impermissibly deprives prospective volunteers and foster parents like the Maddonnas of the opportunity to participate in or partake of government-funded services on equal footing with those who share Miracle Hill's religious beliefs, and Defendants' actions thereby deter the prospective volunteers and foster parents from seeking such services elsewhere.

103.    Defendants' funding, licensing, and enabling of child-placement agencies' religious discrimination also impermissibly deprives children of the opportunity to be placed with foster families who share their faith and deprives those children's biological parents of their statutory right to direct their children's religious upbringing.

104.    In that regard, South Carolina law requires that religious education be provided to children in foster care "in accordance with the expressed wishes of the child's natural parents . . . ." *See* S.C. Code Regs. § 114-550(H)(11).

105.    Accordingly, child-placement agencies must, for example, provide Catholic children with religious education in the Catholic faith if requested by a child's biological parents.

106.    But by assigning *children* of all faiths to faith-based child-placement agencies while permitting an agency to accept only those foster *parents* who share and affirm the agency's own religious beliefs and agree to undertake a position of "spiritual influence over the children in their

22

homes,"[13] Defendants authorize a scheme under which children who do not share the religious beliefs of the agency to which they are assigned may be denied the opportunity to be placed with foster families who share their, or their biological family's, faith, thereby not only infringing the children's religious freedom but also effectively terminating the biological parents' statutory rights to direct their children's religious upbringing.

107.    Nor have Defendants considered how faith-based child-placement agencies' discriminatory recruitment, training, and placement policies will affect LGBTQ youth, who are over-represented in foster-care systems throughout the United States and whose very identities are at odds with the religious doctrinal statement to which Miracle Hill, for example, requires prospective foster families and volunteers to attest and follow.

108.    Allowing faith-based child-placement agencies to close the door to willing and fully qualified foster parents like Aimee Maddonna because of their religious beliefs not only opens the door to, and expressly licenses, government-funded discrimination, but it also deprives vulnerable children of safe, affirming, and loving homes, thus only worsening South Carolina's foster-care crisis.

## CLAIMS FOR RELIEF

### Count I—All Defendants
### (First Amendment—Establishment Clause)
### U.S. Const. amend. I

109.    Plaintiff Aimee Maddonna incorporates the foregoing allegations as if fully set forth here.

110.    The Establishment Clause of the First Amendment to the U.S. Constitution forbids government to favor one religion over another, or religion over nonreligion.

---

[13] *Foster Care Inquiry Form*, *supra*.

111.    Violations of the Establishment Clause by persons acting under color of state law are subject to redress under 42 U.S.C. § 1983.

112.    In violation of the Establishment Clause, as incorporated by the Fourteenth Amendment, State Defendants have delegated to child-placement agencies the responsibility for providing foster-care services to children in state custody, including the tasks of recruiting, screening, and training prospective foster parents, while authorizing and allowing the agencies to perform those functions in a religiously discriminatory manner.

113.    Also in violation of the Establishment Clause, Federal and State Defendants have provided and continue to provide federal and state funds to child-placement agencies that discriminate based on religion in recruiting and training foster parents and volunteer mentors and in determining foster-care placements for children entrusted to the State's care.

114.    Defendants were and are on notice that child-placement agencies that receive federal and state funds, including Miracle Hill, provide services in a discriminatory manner based on religion.

115.    In further violation of the Establishment Clause, Defendants have sanctioned, enabled, and facilitated faith-based child-placement agencies' use of federal and state funds for their own religious purposes, including to exclude, based on religious beliefs, members of the public from participating in and partaking of the agencies' foster-care services

116.    State Defendants have sanctioned, enabled, and facilitated faith-based child-placement agencies' use of public funds for their own religious purposes by issuing and implementing an executive order permitting subgrantee child-placement agencies to discriminate on the basis of religion in the agencies' provision of governmental foster-care services, including

in recruiting, training, and placing children with only those foster parents and families who share the agencies' preferred religious beliefs.

117.    Federal Defendants have sanctioned, enabled, and facilitated faith-based child-placement agencies' use of public funds for their own religious purposes, abdicating altogether the Federal Defendants' constitutional duty to ensure nondiscrimination in the provision of federally funded foster-care services, by allowing the child-placement agencies to use federal funds to discriminate on the basis of religion; by granting a blanket religious exemption for all subgrantees in South Carolina's foster-care program to allow them to violate the religious-antidiscrimination requirement of 45 C.F.R. § 75.300(c); and by issuing a notice of nonenforcement of § 75.300(c) to underscore that HHS will not be enforcing religious-nondiscrimination requirements (which are not just regulatory but constitutionally mandated).

118.    Defendants have violated the Establishment Clause of the First Amendment because, among other reasons, Defendants' actions, policies, practices, and procedures:

a.    have the primary purpose of favoring, preferring, and endorsing certain religious beliefs and certain religious denominations over others and over nonreligion;

b.    have the primary effect of favoring, preferring, and endorsing certain religious beliefs and certain religious denominations over others and over nonreligion;

c.    have the purpose and effect of preferring the religious beliefs of some people and institutions over the religious beliefs and fundamental rights of others;

d.    endorse the religious beliefs of faith-based child-placement agencies;

e.    entangle government with religion;

f.    are not neutral among religious denominations and beliefs or between religion and nonreligion;

g. delegate governmental authority to child-placement agencies, permitting these agencies to create religious requirements for gaining access to governmental programs, services, and resources;

h. fund child-placement agencies with public money that the agencies put to religious and discriminatory uses;

i. make third parties—including the Maddonnas, other prospective foster families, children in foster care, and those children's biological parents—bear the costs, harms, and burdens of faith-based child-placement agencies' religious beliefs and religious practices;

j. exempt all subgrantee agencies from generally applicable antidiscrimination requirements without showing that the requirements impose substantial government-imposed burdens on religious exercise for the individual subgrantees receiving the exemption, and without providing adequate safeguards to ensure that only subgrantees whose religious exercise is substantially burdened may avail themselves of the religious exemption;

k. coerce prospective foster parents and volunteer mentors to affirm and adhere to the specific religious beliefs of faith-based child-placement agencies in order to become a foster parent or volunteer mentor and thereby participate in or partake of government-funded services through the agency; and

l. permit agencies to coerce vulnerable and impressionable children in the State's care that have been assigned to faith-based child-placement agencies into believing and practicing the agencies' preferred faiths without regard to the children's or their biological parents' own faiths.

119.    Through the actions described above, Defendants have harmed and continue to harm Mrs. Maddonna, her family, and other prospective foster parents and volunteers like them by underwriting and enabling child-placement agencies' religious discrimination, thereby denying these families the chance to participate in a governmental program on the same footing as those who satisfy the agencies' religious tests, subjecting these families to the stigma of discrimination, and coercing them to affirm and adhere to religious beliefs that they do not share.

120.    Through the actions described above, Defendants harm children in the foster-care system by allowing otherwise-qualified foster families to be turned away on religious grounds by child-placement agencies, thus depriving the children of opportunities to be placed in loving homes—an especially grave harm at a time where there such a critical shortage of available foster families in South Carolina.

121.    Through the actions described above, Defendants have deprived and continue to deprive Aimee Maddonna and her family of their rights protected by the Establishment Clause of the First Amendment to the U.S. Constitution.

### Count II—Federal Defendants
### (Fifth Amendment—Equal Protection)
### U.S. Const. amend. V

122.    Plaintiff Aimee Maddonna incorporates the foregoing allegations as if fully set forth here.

123.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from denying equal protection of the laws.

124.    Federal Defendants have discriminated and continue to discriminate against individuals and families, including the Maddonnas, based on religion, by funding the administration of services that they are on notice are being administered in a non-neutral manner that disfavors those who share certain religious beliefs and identities.

125.    By denying to individuals and families, including the Maddonnas, participation in government-funded programs based solely on their religious beliefs, Federal Defendants have deprived and continue to deprive these individuals and families of the equal dignity, liberty, and autonomy guaranteed by the Fifth Amendment and brand them as inferior by discriminating against them based on their religious beliefs and identities.

126.    Federal Defendants' actions impermissibly subject those who do not subscribe to evangelical-Christian beliefs, including Catholics such as the Maddonnas, to different and unfavorable treatment based on religion.

127.    Discrimination based on religion—a suspect classification—is presumptively unconstitutional and subject to strict scrutiny.

128.    There is no constitutionally adequate justification for Federal Defendants' actions.

129.    Federal Defendants' actions fail to advance any legitimate governmental interest, much less an important or compelling one. On the contrary, the government-supported religious test at issue is antithetical to the government's responsibility to ensure that the best interests of the children in foster care determine the children's placement with foster parents.

130.    Through the actions described above, Federal Defendants have deprived and continue to deprive Mrs. Maddonna and her family of their rights protected by the equal-protection component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

### Count III—State Defendants
### (Fourteenth Amendment—Equal Protection)
### U.S. Const. amend. XIV

131.    Plaintiff Aimee Maddonna incorporates the foregoing allegations as if fully set forth here.

132.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution prohibits states and state officials from denying equal protection of the laws.

133.    Violations of the equal-protection guarantee by persons acting under color of state law are subject to redress under 42 U.S.C. § 1983.

134.    State Defendants have discriminated and continue to discriminate against individuals and families, including the Maddonnas, based on religion, by funding the administration of services that State Defendants are on notice are being administered in a non-neutral manner that disfavors those who share certain religious beliefs and identities.

135.    State Defendants have deprived and continue to deprive individuals and families, including the Maddonnas, of equal dignity, liberty, and autonomy, and have branded them as inferior, by discriminating against them based on their religious beliefs and identities.

136.    State Defendants' actions impermissibly subject those who do not subscribe to evangelical Christian beliefs, including Catholics such as the Maddonnas, to different and unfavorable treatment based on religion.

137.    Discrimination based on religion—a suspect classification—is presumptively unconstitutional and subject to strict scrutiny.

138.    There is no constitutionally adequate justification for State Defendants' actions. State Defendants' actions fail to advance any legitimate governmental interest, much less an important or compelling one. On the contrary, the government-supported religious test at issue is antithetical to State Defendants' responsibility to ensure that the best interests of the children in the South Carolina Foster Care Program determine the children's placement with foster parents.

139.    Through the actions described above, State Defendants have deprived and continue to deprive Mrs. Maddonna and her family of their rights protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## Count IV—Federal Defendants
### (Administrative Procedure Act—Contrary to Constitutional Rights)
### U.S.C. § 706(2)(B)

140.    Plaintiff Aimee Maddonna incorporates the foregoing allegations as if fully set forth here.

141.    Federal Defendants' disbursements of funds to the South Carolina Foster Care Program are contrary to constitutional rights, powers, privileges, or immunities and therefore violate 5 U.S.C. § 706(2)(B) because they violate the Establishment and Equal Protection Clauses for the reasons explained in Counts I and II above.

142.    The exemption from 45 C.F.R. § 75.300(c) granted by Federal Defendants to the South Carolina Foster Care Program under 45 C.F.R. § 75.102(b) is contrary to constitutional rights, powers, privileges, or immunities and therefore violates 5 U.S.C. § 706(2)(B) because it violates the Establishment and Equal Protection Clauses for the reasons explained in Counts I and II above.

143.    The notice of nonenforcement of 45 C.F.R. § 75.300(c) is contrary to constitutional rights, powers, privileges, or immunities and therefore violates 5 U.S.C. § 706(2)(B) and must therefore be set aside because it violates the Establishment and Equal Protection Clauses for the reasons explained in Counts I and II above.

## Count V—Federal Defendants
### (Administrative Procedure Act—Arbitrary, Capricious,
### Abuse of Discretion, and Not in Accordance with Law)
### 5 U.S.C. § 706(2)(A)

144.    Plaintiff Aimee Maddonna incorporates the foregoing allegations as if fully set forth here.

145.    Federal Defendants' disbursement of funds to the South Carolina Foster Care Program constitutes final agency action under the Administrative Procedure Act.

146.     The disbursement of funds is arbitrary, capricious, an abuse of discretion, and contrary to law under 5 U.S.C. § 706(2)(A) because:

    a.     Federal Defendants have awarded the funds without requiring their grantees and sub-grantees to comply with the constitutional requirement that the funds not be used in a religiously discriminatory fashion; and

    b.     Federal Defendants have awarded the funds without considering the harms to prospective foster parents and families and the best interests of foster children.

147.     The exemption from 45 C.F.R. § 75.300(c) granted by Federal Defendants to the South Carolina Foster Care Program under 45 C.F.R. § 75.102(b) constitutes final agency action under the Administrative Procedure Act.

148.     The exemption is arbitrary, capricious, an abuse of discretion, and contrary to law under 5 U.S.C. § 706(2)(A) and must therefore be set aside because:

    a.     HHS failed to follow the procedure for granting exemptions under 45 C.F.R. § 75.102(b) by granting an unlawful class-wide exemption rather than deciding whether to grant exemptions for "individual non-Federal entities on a case-by-case basis";

    b.     in issuing the exemption, HHS failed to consider relevant factors such as harm to prospective foster parents and families, the best interests of foster children, and possible alternatives to the exemption; and

    c.     the exemption is not warranted by HHS's stated reasons in ACF's January 2019 letter.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Aimee Maddonna respectfully requests that the Court:

    a.     declare that Federal Defendants have violated and continue to violate the First and Fifth Amendments to the U.S. Constitution and the Administrative Procedure Act by

providing federal funds to foster-care child-placement agencies that use discriminatory religious criteria to perform contracted-for governmental services;

b.    declare that State Defendants have violated and continue to violate the First and Fourteenth Amendments to the U.S. Constitution by funding foster-care child-placement agencies that use discriminatory religious criteria to perform contracted-for governmental services;

c.    declare that the exemption from the religious-antidiscrimination requirement of 45 C.F.R. § 75.300(c) granted by Federal Defendants to South Carolina on January 23, 2019, was issued in violation of, and violates, the Administrative Procedure Act and the First and Fifth Amendments to the U.S. Constitution;

d.    declare that South Carolina Executive Order No. 2018-12 was issued in violation of, and violates, the First and Fourteenth Amendments to the U.S. Constitution;

e.    enter a permanent injunction prohibiting all Defendants from expending or providing public funds to foster-care child-placement agencies that use discriminatory religious criteria to perform contracted-for governmental services;

f.    enjoin all Defendants from implementing, enforcing, or relying on the exemption from the religious-antidiscrimination requirement of 45 C.F.R. § 75.300(c), as well as the notice of nonenforcement of § 75.300(c) to the extent that it seeks to circumvent the injunction entered herein and authorize conduct declared here unlawful;

g.    enjoin State Defendants from implementing, enforcing, or relying on South Carolina Executive Order No. 2018-12;

h.    award such further and additional relief as the Court deems just and proper, including reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, the Equal Access to Justice Act, any other applicable statutes, or the Court's inherent powers.

Respectfully submitted this 20th day of December, 2019.

s/      *Aaron J. Kozloski*
Aaron J. Kozloski (D. S.C. Bar No. 9510)
CAPITOL COUNSEL, L.L.C.
P.O. Box 1996
Lexington, SC 29071-1996
Tel: (803) 465-1400
Fax: (888) 513-6021
*aaron@capitolcounsel.us*

Richard B. Katskee*
Kenneth D. Upton, Jr. **
Carmen N. Green*
Sarah R. Goetz*
AMERICANS UNITED FOR SEPARATION OF CHURCH
    AND STATE
1310 L Street NW, Suite 200
Washington, DC 20005
Tel: (202) 466-3234
Fax: (202) 466-3353
*katskee@au.org*
*upton@au.org*
*longoriagreen@au.org*
*goetz@au.org*

*Counsel for Plaintiff Aimee Maddonna*

*        *Pro hac vice* application forthcoming.

**      Licensed in Oklahoma and Texas only. Supervised by Richard B. Katskee, a member of the D.C. Bar. *Pro hac vice* application forthcoming.