**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| Aimee Maddonna, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| United States Department of Health and | ) |
| Human Services; Alex M. Azar, II, in his | ) |
| official capacity as Secretary of the United | )　　　　6:19-cv-3551-TMC |
| States Department of Health and Human | ) |
| Services; Administration for Children and | ) |
| Families; Lynn Johnson, in her official | ) |
| capacity as Assistant Secretary of the | )　　　　　　**ORDER** |
| Administration for Children and Families; | ) |
| Henry McMaster, in his official capacity | ) |
| as Governor of the State of South Carolina; | ) |
| and Michael Leach, in his official capacity | ) |
| as State Director of the South Carolina | ) |
| Department of Social Services, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

Plaintiff Aimee Maddonna ("Maddonna") filed this suit alleging various constitutional

violations based on her inability to volunteer with foster children and serve as a foster parent

through a non-governmental child-placement agency, Miracle Hill Ministries ("Miracle Hill"),

because of her Catholic faith.[1] (ECF No. 1).  Plaintiff contends that Miracle Hill receives

government funding and, therefore, should not be able to discriminate and deny her the ability to

volunteer or foster with its programs based on her religious beliefs. *Id.*  Pertinent to this action,

---

[1] The court notes that Miracle Hill is not a party to this action.

Plaintiff alleges that Defendant Henry McMaster ("McMaster") and Defendant Michael Leach ("Leach") (collectively the "State Defendants") enabled, sanctioned, and failed to implement adequate safeguards against such alleged discrimination by seeking a waiver from the Department of Health and Human Services ("HHS") to permit South Carolina's faith-based child-placement agencies ("CPAs") to discriminate in violation of 45 C.F.R. §§ 75.300(c) and (d), while still receiving government funding and by McMaster issuing Executive Order No. 2018-12, directing the South Carolina Department of Social Services ("DSS") to permit faith-based CPAs to associate "only with 'foster parents and homes who share the same faith' as the subgrantee 'in recruiting, training, and retaining foster parents'" and to not deny licensure to faith-based CPAs on such basis. *Id.* at 23–24. Plaintiff further contends that Defendants HHS, Alex Azar ("Azar"), and the Administration for Children and Families (collectively the "Federal Defendants") have enabled, sanctioned, and failed to provide adequate safeguards against such alleged discrimination by granting the South Carolina Foster Care Program an exemption from the religious anti-discrimination component of 45 C.F.R. § 75.300(c). *Id.* at 25.

This matter is before the court on various motions to dismiss. (ECF Nos. 19, 21, 34). The State Defendants filed separate motions to dismiss.[2] (ECF Nos. 19, 21). Plaintiff filed a joint response in opposition to both motions, (ECF No. 24), and the State Defendants filed separate replies.[3] (ECF Nos. 30, 31). The Federal Defendants filed a joint motion to dismiss. (ECF No. 34). Plaintiff filed a response (ECF No. 38), and the Federal Defendants replied (ECF No. 42). After carefully reviewing the record and the parties' extensive briefings, the court concludes a hearing is

---

[2] Leach indicates that he should be dismissed from the case for the same reasons as stated in McMaster's motion and that he "incorporates by reference" McMaster's motion to dismiss (ECF No. 19) and its attachments (ECF Nos. 19-1; 19-2; 19-3). (ECF No. 21).

[3] In Leach's reply, he relies upon McMaster's reply (ECF No. 30) and incorporates it by reference. (ECF No. 31).

unnecessary to decide this matter. *See* Local Rule 7.08 (D.S.C.). For the reasons set forth below, the court grants Defendants' motions as to Plaintiff's equal protection claim for religious discrimination and denies the motions as to Plaintiff's remaining claims pursuant to the APA and for violation of the Establishment Clause.

## I.     BACKGROUND AND PROCEDURAL HISTORY[4]

South Carolina has faced an increasing need for foster homes over the past several years, but has been unable to meet the demand, leaving almost two thousand children without home placement. *See* (ECF No. 1 at 7). In an attempt to meet these growing needs, DSS contracts with private CPAs, who receive licenses from the state, as well as state and federal funding, to recruit prospective foster parents and screen them for their suitability to obtain a foster care license. *Id.* at 7–8.  Pursuant to Title IV-E of the Social Security Act, South Carolina receives reimbursement from HHS for a portion of the state's foster care expenditures, which the state then uses to partially reimburse CPAs for their services. *Id*. at 7–8, 9; *see also* S.C. Code Ann. § 63-9-30(5); S.C. Code Regs. § 114-4910.

DSS typically issues one-year licenses to CPAs that meet all regulatory and DSS requirements. (ECF No. 1 at 8 (citing S.C. Code Regs. § 114-4930(E)). DSS then monitors those CPAs to ensure that they continue to comply with federal and state law requirements and regulations. *Id.* (citing S.C. Code Regs. § 114-4920(E)). If a CPA is temporarily unable to comply with a state foster-care regulation, DSS may grant the agency a temporary license if the CPA provides DSS with "a written plan detailing how the agency will correct the areas of

---

[4] These facts are taken from Plaintiff's Complaint, as the court must accept Plaintiff's factual allegations as true for purposes of motions to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), nor must the court "accept as true unwarranted inferences, unreasonable conclusions, or arguments," *E. Shore Mkts. Inc. v. J.D. Assocs., LLP*, 213 F.3d 175, 180 (4th Cir. 2000).

noncompliance within a probationary period." *Id.* (citing S.C. Code Regs. § 114-4930(F)). Further, if a CPA fails to comply with licensing regulations and DSS concludes that compliance cannot be accomplished within a set or reasonable time, DSS may deny or revoke the CPA's license. *Id.* (citing S.C. Code Regs. § 114-4930(G)).

DSS's Human Services Policy and Procedure Manual (the "DSS Manual") sets forth its recruitment polices and requirements. *See id.* at 9. In particular, the Manual provides that "[t]he unnecessary consideration of . . . religion . . . when making decisions regarding a child's placement can result in unfair outcomes for prospective families and substantial delays in permanency for children." *Id.* (quoting DSS Manual § 710). The DSS Manual further states that DSS and its programs are committed to providing "'equal opportunities for all families and children without regard to their . . . religion'" and that, therefore, "[n]o individual shall be denied the opportunity to become a foster or adoptive parent on the basis of . . . religion . . . ." *Id.* (quoting DSS Manual § 710).

In addition to the State policies and regulations, DSS and any CPAs with which it contracts must also comply with federal statutory and regulatory requirements in order to receive federal funding under Title IV-E of the Social Security Act. *See id.* Although faith-based organizations like Miracle Hill are entitled to participate in HHS-funded foster care programs, HHS explicitly requires as part of its contracts with state foster care systems that "'no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as . . . religion." *Id.* at 9–10 (quoting 45 C.F.R. § 75.300(c)). Additionally, HHS regulations "prohibit religiously affiliated agencies from 'support[ing] or engag[ing] in any explicitly religious activities (including activities that involve overt religious content such as . . . proselytization) as part of the programs

or services funded with direct financial assistance from the HHS awarding agency.'" *Id.* at 10 (quoting 45 C.F.R. § 87.3).

Miracle Hill is one of the CPAs in Greenville, South Carolina, and it serves the counties of Abbeville, Anderson, Cherokee, Greenville, Greenwood, Laurens, Newberry, Oconee, Pickens, and Spartanburg (known as "Region 1"). *Id.* at 10–11. Miracle Hill is a faith-based ministry, and it is the largest CPA in both the state and the upstate South Carolina region. *Id.* at 11–12. As a CPA, Miracle Hill provides home studies and assessments, which DSS relies on when making placement decisions; assists potential foster parents with the licensing process; makes determinations on where foster children should be placed; and helps foster parents determine if the child is a fit with their home when a potential placement arises. *Id.* at 11. Furthermore, Miracle Hill "permits children as well as adults to volunteer with children and teenagers awaiting placement" and allows families to volunteer together. *Id.* However, Miracle Hill requires prospective foster parents and volunteer mentors to agree with Miracle Hill's doctrinal statement, which reads:

> We Believe . . .
>
> > -The Bible to be the only inspired, infallible, inerrant and authoritative Word of God. *2 Tim. 3:16; 2 Pet 1:20-21*
> >
> > - That there is one God, creator of heaven and earth, eternally existent in three distinctive persons: the Father, Son, and Holy Spirit. *1 Tim 2:5; Gen 1:1; Mt. 3:16-17; 2 Cor. 13:14; John 10:30*
> >
> > - In the deity and humanity of Jesus Christ; that He was born of a virgin; that we are redeemed by His atoning death through His shed blood; that He bodily resurrected and ascended into Heaven and that He will come again in power and great glory to judge the living and the dead. *Eph. 1:7-10; Acts 1:9-11; Mt. 1:23-25; 1 Cor. 15:1-8; 2 Tim. 4:1*
> >
> > - In the value and dignity of all people created in God's image, but alienated from God and each other because of our sin and guilt and justly subject to

God's wrath. *Gen 1:26-27; Psalm 139:13; Mt. 22:37-39; Rom. 12:20-21; Gal. 6:10; Eph. 2:1-3; Rom. 5:12*

- The regeneration by the Holy Spirit by grace through faith is essential for the salvation of lost and sinful people. *Tit. 3:4-7; Eph. 2:8-9; 2 Cor. 6:2*

-In the forgiveness of sins, the resurrection of the body, and life everlasting solely through repentance and faith in Jesus Christ. *Col. 1:13-14; 1 Thess. 4:16-17; John 3:16*

- That the Holy Spirit unites all believers in the Lord Jesus Christ and that together they form one body – the church. *1 Cor. 12:12-13; 1 Cor. 12:27*

-God ordained the family as the foundational institution of human society. It is composed of persons related to one another by marriage, blood or adoption, and that God's design for marriage is the legal joining of one man and one woman in a life-long covenant relationship. *Gen. 1:26-28; Eph. 5:21- 6:4; Mt. 19-4-6*

- God creates each person as either male or female, and these two distinct, complimentary sexes, together reflect the image and nature of God. *Gen. 1:27; Gen. 2:18*

*Id.* at 12–13 (quoting *What We Believe: Our Doctrinal Statement*, Miracle Hill Ministries, https://bit.ly/34m0OVM). Until July 2019, Miracle Hill required potential foster parents and volunteers to be active members of and in good standing with a Protestant church approved by Miracle Hill, "have a genuine concern for the spiritual welfare of children entrusted in their care," and "have a lifestyle that is free of sexual sin." *Id.* at 13. However, in July 2019, Miracle Hill changed its religious requirement, "lifting its formal prohibition against Catholics and Orthodox Christians" while still requiring all prospective foster parents and mentors to "be followers of Jesus Christ" who are "active in and accountable to a Christian church" and agree with Miracle Hill's doctrinal statement. *Id.* at 14.

In reviewing Miracle Hill's 2018 application to renew its license as a CPA, DSS discovered that Miracle Hill "was using religious information that it gathered about prospective foster parents and families to refuse to provide services as a licensed child-placement agency to families who did

not adhere to its evangelical Christian beliefs and those that did not attend Miracle Hill-approved Christian churches." *Id.*at 14. Accordingly, DSS determined that Miracle Hill's practices constituted discrimination on the basis of religion, in violation of several state and federal policies and regulations, including DSS's own policy statement prohibiting such discrimination. *Id*. at 14–15. Therefore, on January 26, 2018, DSS issued Miracle Hill only a temporary six-month CPA license under S.C. Code Reg. § 114-4930(F). *Id.* at 15. DSS notified Miracle Hill that it had thirty days to address DSS's concerns and issue a written plan of compliance. *Id.* To Plaintiff's knowledge, Miracle Hill has not issued a written plan of compliance to date. *Id.*

On March 13, 2018, McMaster issued Executive Order No. 2018-12, directing DSS to permit faith-based foster-care child-placement subgrantees to associate only with "foster parents and homes who share the same faith . . . in recruiting, training, and retaining foster parents," and ordering DSS not to deny licensure to faith-based programs based on these actions. *Id.* at 15. The Executive Order further dictated that DSS "not directly or indirectly penalize religious identity or activity" when applying the state's requirements for licensure for foster care. *Id.*

Additionally, McMaster solicited a waiver from HHS's Administration for Children and Families, which exempted South Carolina from HHS's requirement that federal funds for state foster-care programs be withheld or returned in case of noncompliance with federal antidiscrimination requirements by subgrantee agencies. *Id.* at 16. On January 23, 2019, HHS conditionally granted the South Carolina Foster Care Program an exemption from the antidiscrimination requirement of 45 C.F.R. § 75.300(c) (the "HHS Waiver"). *Id*. In granting the exemption, the Administration of Children and Families stated that the South Carolina Foster Care Program subgrantees, like Miracle Hill, could use "religious criteria in selecting among

prospective foster care parents." *Id.* Subsequently, relying on the HHS Waiver, DSS reissued a standard CPA license to Miracle Hill. *Id.*

On November 19, 2019, HHS issued a notice of proposed rulemaking that would replace the relevant language of 45 C.F.R. § 75.300(c) as follows: "It is a public policy requirement of HHS that no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services, to the extent doing so is prohibited by federal statute." *Id.* at 16 – 17 (citing 84 Fed. Reg. 63,832, 63,835 (proposed Nov. 19, 2019)). According to Plaintiff's Complaint, because the "pertinent legal prohibition against federal funding of religiously discriminatory foster-care programs is constitutional rather than statutory, the effect of the proposed amendment to the regulation would be to remove from the regulation the prohibition against religious discrimination," meaning that Miracle Hill would no longer be prohibited by federal regulations from discriminating on the basis of religion. *Id.* at 17. In addition to the notice of proposed rulemaking, HHS also issued a notice of nonenforcement of 45 C.F.R. § 75.300(c), stating that HHS had "determined to exercise its enforcement discretion not to enforce the regulations until they have been repromulgated." *Id.* (citing Notification of Nonenforcement of Health and Human Services Grants Regulation, 84 Fed. Reg. 63,809, 63,809 (Nov. 19, 2019)).

Plaintiff desired to volunteer with her family to work with foster children through Miracle Hill. *Id.* at 18. Plaintiff hoped that through this process her family could "get to know and develop relationships with children who might be good matches for foster placement in her home." *Id.* Plaintiff initially contacted Miracle Hill to inquire about opportunities to volunteer in September or October of 2014. *Id.* Miracle Hill asked Plaintiff to provide the name of her church, and she responded by giving the name of her Catholic parish. *Id.* According to the Complaint, a

representative from Miracle Hill "informed Ms. Maddonna that she and her family were no longer welcome to volunteer because Miracle Hill would not accept Catholics as volunteer mentors for children in foster care." *Id.* The representative expressed to Plaintiff that the Maddonnas would have been a good match "but for the Maddonnas' Catholic faith[.]" *Id.* at 18–19. A separate representative confirmed that only Christians who attended Protestant churches were permitted to volunteer with Miracle Hill's foster program. *Id.* at 19.

On February 12, 2019, Plaintiff reached out to Miracle Hill again to revisit the possibility of volunteering with foster children "with the ultimate hope of fostering a child." *Id.* On February 20, 2019, a representative informed Plaintiff that, because "mentors play an important role in providing spiritual as well as emotional support, guidance, and counsel," Miracle Hill requires those mentor volunteers to "agree with [Miracle Hill's] Protestant statement of faith" and "share distinctly Protestant beliefs and convictions." *Id.* The representative further instructed Plaintiff that she could reach out to a different agency to become a mentor or that she and her family could do other charitable work with Miracle Hill but could not mentor or foster any children assigned to Miracle Hill by DSS. *Id.*

Plaintiff acknowledges that when she reached out to DSS requesting to volunteer, it was before Miracle Hill had lifted its formal bar on Catholics participating in its foster care services. *Id.* at 20. However, the requirement for prospective foster parents to agree to and conform with Miracle Hill's Protestant statement of faith remains a prerequisite for volunteering with Miracle Hill's foster children. *Id.* Plaintiff attests that she has reviewed Miracle Hill's doctrinal statement and finds it inconsistent with her religious beliefs and understanding of her faith. *Id.* She states that if she were to agree to practice in accordance with the doctrinal statement, "she would be forced either to misrepresent her faith and falsely affirm commitments to religious beliefs that are not her

own, or else abandon her own beliefs to adopt the religious beliefs and practices that Miracle Hill favors." *Id.* She considers affirming the doctrinal statement to be "tantamount to forsaking her faith and leaving the Catholic Church." *Id.* Accordingly, Plaintiff states that she has been prevented from becoming a volunteer mentor through Miracle Hill, and, thereby has been deprived of the opportunity to eventually foster with Miracle Hill. *Id.*

Plaintiff alleges that her inability to volunteer through and eventually foster with Miracle Hill was directly caused by the actions of the State Defendants and Federal Defendants because they have affirmatively enabled the discrimination against her by authorizing Miracle Hill and other religiously-affiliated CPAs to use religious criteria to reject prospective foster parents. *Id.* at 20–23. Plaintiff further asserts that "[w]hen prospective volunteers and foster parents are turned away . . . because of their religious beliefs, they may be deterred from fostering a child through other channels" because they "fear that they will again be subjected to the sting of discrimination" or because other agencies might not have comparable services and resources. *Id.* at 21–22. Additionally, Plaintiff contends that Defendants have failed to consider the best interests of the children and have "den[ied] [them] access to caring volunteer mentors" and made "it less likely that they will receive suitable home-placements," ultimately depriving "vulnerable children of safe, affirming, and loving homes" and "worsening South Carolina's foster-care crisis." *Id.* at 21–23. Plaintiff further argues that Defendants' actions have "deprive[d] children of the opportunity to be placed with foster families who share their faith and deprives those children's biological parents of their statutory right to direct their children's religious upbringing." *Id.* at 22. Finally, Plaintiff contends that Defendants have not considered how their actions could affect LGBTQ youth "whose very identities are at odds with the religious doctrinal statement to which Miracle Hill . . . requires prospective foster families and volunteers to attest and follow." *Id.* at 23.

In her Complaint, Plaintiff asserts causes of action for violation of the Establishment Clause of the First Amendment against all Defendants, and violation of the Equal Protection clauses of the Fifth and Fourteenth Amendments by the Federal and State Defendants, respectively. *Id*. at 29–38. Plaintiff further argues that the Federal Defendants' disbursements of funds to the South Carolina Foster Care Program, granting the HHS Waiver, and notice of nonenforcement of 45 C.F.R. § 75.300(c) are contrary to constitutional rights, and, therefore, violate the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(B). *Id.* at 30. Finally, Plaintiff contends that the Federal Defendants' disbursement of funds to the South Carolina Foster Care Program and the HHS waiver are "arbitrary, capricious, an abuse of discretion, and contrary to law under 5 U.S.C. § 706(2)(A)," in violation of the APA. *Id.* at 30–31.

As to these claims, Plaintiff seeks for this court to (1) declare that the State Defendants have violated and continue to violate the First and Fourteenth Amendments to the Constitution by funding foster-care CPAs that use religious criteria to perform contracted-for government services; (2) declare that the Federal Defendants have violated and continue to violate the First and Fifth Amendments of the Constitution and the APA by "providing federal funds to foster-care child-placement agencies that use discriminatory religious criteria to perform contracted-for government services"; (3) declare that the HHS Waiver, exempting the South Carolina Foster Care Program from the religious anti-discrimination requirement of 45 C.F.R. § 75.300(c), was issued in violation of and continues to violate the APA and the First and Fifth Amendments of the U.S. Constitution; (4) declare that South Carolina Executive Order No. 2018-12 was issued in violation of and continues to violate the First and Fourteenth Amendments of the U.S. Constitution; (5) enter a permanent injunction prohibiting all Defendants from "expending or providing public funds to foster care child placement agencies that use discriminatory religious criteria to perform

contracted-for services"; (6) enjoin all Defendants from "implementing, enforcing, or relying on the [HHS Waiver]" or on the notice of nonenforcement of 45 C.F.R. § 75.300(c) "to the extent that it seeks to circumvent the injunction entered herein and authorize conduct declared here unlawful"; (7) enjoin the State Defendants from "implementing, enforcing, or relying on" South Carolina Executive Order No. 2018-12; and (8) award any further relief the court deems just and proper. *Id.* at 31–33.

The State Defendants have filed motions to dismiss, arguing that Plaintiff lacks standing to assert her claims and that she has failed to allege sufficient facts to constitute cognizable causes of action.[5] (ECF Nos. 19, 21). Specifically, as to standing, the State Defendants assert that Plaintiff has not alleged a cognizable injury; that any injury she suffered is a result of the conduct of Miracle Hill and/or Plaintiff and is, therefore, not fairly traceable to State Defendants; and that Plaintiff's alleged injuries would not be redressed by the relief she seeks. (ECF No. 19 at 12–14, 26–31). Additionally, the State Defendants argue that Plaintiff further lacks standing because any injury she alleges "has not yet occurred and may never occur," because she has not actually applied to foster and "it is pure conjecture to speculate what might have happened had Plaintiff applied to Miracle Hill and raised her concerns regarding the doctrinal statement" being inconsistent with her understanding of her Catholic faith. *Id.* at 23; *see also id.* at 12. Furthermore, the State Defendants claim that Plaintiff lacks stigmatic injury standing because she fails to satisfy the basic requirements of general standing, which are similarly required to show stigmatic standing. *Id.* at 28–31. As to the merits of Plaintiff's claims, the State Defendants argue that such claims should be dismissed because Plaintiff has failed to plausibly allege interference with a fundamental right in the face of "numerous legitimate government purposes" for State Defendants' actions, *id.* at 34–

---

[5] As noted above, Defendant Leach's motion specifically "refers to, relies on, and incorporates" Defendant McMaster's motion to dismiss. (ECF No. 21).

36; that State Defendants' actions did not discriminate among religions, *id.* at 32; that these sorts of actions have been "historically permissible," *id.* at 26–31; and that the government's "accommodation of faith-based child welfare providers is not only permitted by the First Amendment, it is required by decades of Supreme Court precedent, state and federal law, and the First Amendment itself," *id.* at 44–45 (emphasis omitted). Plaintiff responded to these motions to dismiss (ECF No. 24), and State Defendants filed replies (ECF Nos. 30, 31).

The Federal Defendants filed a separate motion to dismiss, also asserting that Plaintiff lacks standing to bring her claims against them because Plaintiff cannot show that her alleged injuries are traceable to them or that the relief Plaintiff seeks will redress her alleged injuries. (ECF No. 34 at 11–16). Furthermore, the Federal Defendants assert that Plaintiff lacks standing to challenge HHS's nonenforcement provision or the notice of proposed rulemaking because such actions post-dated her alleged injury. *Id.* at 17. Additionally, the Federal Defendants contend that the court lacks jurisdiction over Plaintiff's APA claims regarding agency enforcement decisions because the APA "precludes review of agency actions that are 'committed to agency discretion by law.'" *Id.* (quoting 5 U.S.C. § 701(a)(2)). Finally, Federal Defendants assert that Plaintiff has failed to raise cognizable constitutional claims because she has failed to identify a state action for which Federal Defendants can be held responsible; the HHS waiver and enforcement decisions were driven by a secular purpose with the primary effect of neither advancing nor inhibiting religion and did not excessively entangle church and state; the exemption was not fatally arbitrary; and the exemption is rationally related to legitimate government interests. *Id.* at 22–31. Plaintiff responded to the motion (ECF No. 38), and Federal Defendants replied (ECF No. 42). The motions to dismiss are now ripe for review.

## II.    LEGAL STANDARD

Article III of the Constitution restricts federal courts' jurisdiction to the adjudication of cases and controversies. *Raines v. Byrd*, 521 U.S. 811, 818 (1997). One element of the case-or-controversy requirement is that a plaintiff must have standing to sue, or, in other words, that the plaintiff is the proper party to bring suit. *See id.* The standing doctrine upholds this restriction by "ensur[ing] that a plaintiff has a personal stake in the outcome of a dispute, and that judicial resolution of the dispute is appropriate." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 287, 396 (4th Cir. 2011). Thus, "[t]o meet the constitutional requirement for standing, a plaintiff must prove that: 1) he or she suffered an 'injury in fact' that is concrete and particularized, and is actual or imminent; 2) the injury is fairly traceable to the challenged action of the defendant; and 3) the injury likely will be redressed by a favorable decision." *Id.* Such alleged injury must be particularized to that plaintiff, and courts have consistently held that "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not have an Article III case or controversy." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 573–74 (1992). Additionally, to be "fairly traceable" to the defendant, there must be a "causal connection between the injury and the conduct complained of" and the injury must not be the result of "the independent action of some third party not before the court." *Id.* at 561. Furthermore, the Plaintiff must show more than mere conjecture or speculation as to the redressability of her alleged injuries should she prevail on the merits of her case.

The party invoking federal jurisdiction bears the burden of establishing the three elements of standing. *Id.* Because standing is not a pleading requirement but rather an "indispensable part of the plaintiff's case" that speaks directly to whether the claims establish a "case or controversy"

within the parameters of federal court jurisdiction, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof" at that stage in the litigation. *Id.* Accordingly, here, the court considers Plaintiff's burden regarding standing with the same scrutiny that it would within the context of a motion to dismiss at the pleading stage.

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint or pleading. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "[T]he legal sufficiency of a complaint is measured by whether it meets the standard stated in Rule 8 [of the Federal Rules of Civil Procedure] . . . and Rule 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted)." *Id.* Rule 8(a)(2) requires that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This pleading standard requires that a complaint contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007).

In *Ashcroft v. Iqbal*, the United States Supreme Court stated that to survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when [a party] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Id.* The plausibility standard "asks for more than a sheer possibility that a [party] has acted unlawfully." *Id.* Rather, "[i]t requires [a party] to articulate facts, when accepted as true, that 'show' that [the party] has stated a claim entitling [them] to relief[.]" *Francis*, 588 F.3d at 193 (*quoting Twombly*, 550 U.S. at 557). Such "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Determining whether a complaint

states [on its face] a plausible claim for relief [which can survive a motion to dismiss] will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—"'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

## III.    ANALYSIS

### A. Plaintiff Has Adequately Alleged General Article III Standing for Her Establishment Clause and Equal Protection Claims except as to the notice of nonenforcement.

Before the court can address the merits of Plaintiff's Complaint to determine if she has set forth cognizable claims for relief, the court must first consider whether Plaintiff has standing to bring this action. *See Raines*, 521 U.S. at 818 (recognizing that standing is jurisdictional because without standing, there is no "case-or-controversy"); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."). As noted above, Plaintiff bears the burden of proving the following elements with sufficient factual allegations as would survive a motion to dismiss: (1) a particularized injury in fact; (2) traceability of that injury to the defendants; and (3) the likelihood that the injury will be redressed by a favorable decision of this court. *See Lujan,* 504 U.S. at 560–61.

*1. Injury in Fact*

In the Complaint, Plaintiff alleges the following injuries: (1) that Defendants have "erected a barrier to [her] and her family's participation in publicly funded governmental foster-care services on the same terms as other prospective foster families[,]" because they fund and license CPAs like Miracle Hill which "exclude prospective foster parents and volunteer mentors who do not affirm the agencies' religious beliefs[;]" (2) that Defendants' actions have subjected her to the

"stigma of religious discrimination[;]" and (3) that Defendants' actions, in effect, "impermissibly condition participation in a governmental service on the profession of and adherence to certain religious beliefs, thereby unconstitutionally coercing Plaintiff and her family to profess and adhere to those beliefs." (ECF No. 1 at 5). In her responses to the motions to dismiss, Plaintiff clarifies her injuries as "(1) the erection and maintenance of a religious barrier to her ability to participate in publicly funded governmental foster-care services, and (2) the stigma of discrimination flowing from that religious barrier and different treatment."[6] (ECF No. 24 at 17). For purposes of their motion to dismiss, the Federal Defendants do not contest that Plaintiff has satisfied the first element of standing by sufficiently alleging an injury in fact. *See* (ECF Nos. 34-1 at 11–17 (addressing traceability and redressability, but assuming injury in fact has been satisfied)). The State Defendants, on the other hand, attempt to recharacterize Plaintiff's stated injury as denial of "her ability to volunteer with and foster through a specific, private CPA of her choice[,]" and argue that "there is no constitutionally protected right to become a foster parent or mentor by means of volunteering with a CPA of one's own choosing." (ECF No. 19 at 22). Furthermore, State Defendants argue that Plaintiff "has simply failed to allege that the putative injury actually occurred." *Id.* at 23.

The court first notes that, at this stage in the litigation, it must accept the well-pled allegations in the Complaint as true. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). In her Complaint, Plaintiff alleges that when she reached out to Miracle Hill in February 2019, she was told she could not volunteer with *or foster with* Miracle Hill because of her religious beliefs. (ECF No. 1 at 19). Thus, while Plaintiff did not officially apply to foster children through Miracle Hill,

---

[6] While it appears in the Complaint that Plaintiff attempts to raise claims for alleged injuries of others, including foster children, their biological parents, and LGBTQ youth, *see* (ECF No. 1 at 20–23), Plaintiff recognizes that she does not have standing to sue for such alleged harms and clarifies that she does not premise her standing on those alleged harms to others (ECF No. 24 at 17 n.1).

the court considers that, taking the facts of the Complaint as true, such application would likely have been futile, as Miracle Hill explicitly notified Plaintiff of her inability to foster notwithstanding her not filing a formal application. Accordingly, State Defendants' reliance on the fact that Plaintiff never actually applied to participate in the foster program as the basis of their argument that Plaintiff lacks any injury in fact to support standing must fail at this stage. Furthermore, the court must accept Plaintiff's characterization of her injuries—namely, the stigma resulting from the discrimination Plaintiff suffered and the practical barriers to her participation in the South Carolina Foster Care Program—and disregard the State Defendants' recharacterization of such injuries as the ability to foster specifically through Miracle Hill. Thus, to the extent the State Defendants contend that Plaintiff's stated injuries fail to satisfy the injury in fact element of standing, this argument must also fail.

As the United States Supreme Court has explained, stigmatic injury "accords a basis for standing . . . to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct[.]" *Allen v. Wright*, 468 U.S. 737, 755 (1984) (quoting *Heckler v. Mathews*, 465 U.S. 728, 740 (1984)). Indeed, the Supreme Court has recognized that "discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler*, 465 U.S. at 739–40. Similarly, the Fourth Circuit has held that "[f]eelings of marginalization and exclusion are cognizable forms of injury" in the context of Establishment Clause claims, "because one of the core objections of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a particular religion 'that they are outsiders, not full

members of the political community.'" *Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir. 2012) (quoting *McCreary Cty. v. ACLU*, 545 U.S. 844, 860 (2005)). In this case, Plaintiff alleges stigmatic injury because she was personally turned away by Miracle Hill, a government-funded, faith-based CPA, on the grounds that she did not conform to Miracle Hill's religious standards.

Plaintiff also alleges that the Defendants' actions have created practical barriers to her participation in the state foster care system as not all foster care agencies are equivalent or offer the same services. *See* (ECF No. 1 at 11). Specifically, Plaintiff alleges that, by authorizing discrimination by CPAs providing public foster care services, Defendants have denied Plaintiff access to the largest and most well-resourced CPA in the state, which, because of the substantial government funding it receives, can provide comprehensive support to foster families. *See id.* at 11); *see also* (ECF No. 24 at 12). Furthermore, unlike DSS, Miracle Hill allows entire families to volunteer with children in their care, "enabl[ing] families to develop the types of relationships with children in foster care that lead to long-term foster placements." (ECF No. 24 at 12). Plaintiff alleges that because her own children have special needs, the ability to volunteer as a family was a vital prerequisite to ensure a good fit for a child within their family. *Id.* Plaintiff need not allege that she has been excluded entirely from participation in the state foster care program or even that she has been rejected by a majority of CPAs. On the contrary, it is well-established that "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *N.E. Fla. Ch. of the Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). In the context of equal protection cases, the injury in fact is nothing

more than "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id*. Here, Plaintiff purports that "over the last five years, more than 90% of all children in foster care statewide that have been assigned to private child-placement agencies by DSS have been entrusted to Miracle Hill." (ECF No. 1 at 11). Accordingly, it is reasonable to infer that the ability of faith-based agencies like Miracle Hill to use religious criteria to select its foster families creates a substantial barrier to Plaintiff's ability to foster a child in South Carolina. *See, e.g. Dumont v. Lyon*, 341 F. Supp. 3d 706, 722 (E.D. Mich. 2018). Therefore, Plaintiff has adequately alleged an injury in fact for both her Establishment Clause and Equal Protection claims.[7]

### 2. Traceability

With respect to the second element of standing—traceability—both the State and Federal Defendants argue Plaintiff's injuries are not fairly traceable to the Defendants because a third party, Miracle Hill, "declined to assist Plaintiffs in become foster parents because of its own religious beliefs." (ECF No. 34-1 at 14); *see also* (ECF No. 19 at 24–27). Federal Defendants also assert that Plaintiff cannot show her injuries were traceable to the notice of nonenforcement because her interactions with Miracle Hill ended in February 2019, and, therefore, her purported injuries occurred prior to the issuance of the notice of nonenforcement and proposed rule re-promulgation. (ECF No. 34-1 at 17). In response, Plaintiff asserts that her injuries are directly traceable to the alleged conduct of the Defendants, because Defendants took affirmative steps to

---

[7] As noted herein, Plaintiff asserts that the allegations regarding her tax dollars being used to support Miracle Hill were included in the Complaint to show a direct injury, not to support a notion of taxpayer standing. However, the court must note that, to the extent Plaintiff has attempted to assert any taxpayer standing, the court finds that she has failed to do so. *See infra*, 39.

permit Miracle Hill to discriminate against and refuse to work with Plaintiff because of her religious beliefs. (ECF Nos. 24 at 16, 20–24; 38 at 14–16).

For Plaintiff to establish that her injuries are traceable to the Defendants, she must show that there is a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. The injury must be fairly traceable to the "challenged action of the defendant[,] . . . not the result of independent action of some third party not before the court." *Id.* Nevertheless, the Fourth Circuit has explained that "[i]mposition of the stringent proximate cause standard, derived from principles of tort law, has been held to 'wrongly equate injury fairly traceable to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 315–16 (4th Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)) (internal alterations omitted). Accordingly, the relevant inquiry to determine traceability is simply whether the Defendants' alleged actions are "at least in part responsible for" Plaintiffs' injuries. *Id*.

According to the Complaint, Plaintiff has not contacted Miracle Hill since February 2019, when she was told that she could not foster or volunteer with the children due to her Catholic faith. (ECF No. 1 at 20). As Federal Defendants have asserted, HHS did not issue its notice of nonenforcement or announce its proposed rule-making until November 2019—many months after Plaintiff asserts Defendants caused her purported harms. Because the notice of nonenforcement was not in effect at the time Plaintiff was allegedly turned away by Miracle Hill, there is no way Plaintiff can fairly trace that injury to the notice of nonenforcement or proposed rule-making. As such, to the extent Plaintiff challenges those acts by Federal Defendants within the context of her

Equal Protection or Establishment Clause claims, Plaintiff has failed to establish that her alleged injuries are traceable to such acts and, therefore, does not have standing to challenge them.[8]

However, as to the remainder of Plaintiff's allegations, this court notes—as have courts from other circuits—the potential implications of the Defendants' position. *See Marouf v. Azar*, 391 F. Supp. 3d 23, 34 (D.D.C. 2019). Essentially, according to Defendants, neither a state nor a federal agency can be held accountable for a grantee's known, and *explicitly permitted*, exclusion of persons from a government-funded program based on religious criteria. *See id.*; *see also* (ECF Nos. 50, 57). As the District Court for the District of Columbia explained, "[s]urely, the government would not take this position if, say, Plaintiff here was excluded from fostering a child based on [her] . . . *religious faith*." *Marouf*, 391 F. Supp. 3d at 34 (emphasis added). Nevertheless, in this case, that is the exact argument Defendants make to defend their actions which allowed Plaintiff to have been rejected from South Carolina's public foster care program because of her religion.

Despite Defendants' attempt to pass-the-buck on to Miracle Hill, courts in this circuit have held that "a 'challenged agency action *authorizing* the conduct that allegedly caused' [Plaintiff's] injuries" is sufficient to establish causation and traceability for purposes of standing. *Mathis v. Geo Group, Inc.*, No. 2:08-CT-21-D, 2010 WL 3835141, at *6 (E.D.N.C. Sept. 29, 2010) (quoting *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) (*en banc*)) (internal alterations omitted) (emphasis added). Plaintiff has met that standard. As discussed above, Plaintiff

---

[8] Plaintiff fully acknowledges that such actions by Federal Defendants post-dated her contact with Miracle Hill, but argues that her harm is ongoing and did not end with her rejection in February 2019, because she is still precluded from fostering due to her religious beliefs. (ECF No. 38 at 16–17 n.2). Nonetheless, Plaintiff appears to recognize that the 2019 notice of nonenforcement is, in essence, just a reimplementation of the 2018 exemption. *See id.* (stating that whether Defendants "rely on the 2018 exemption or the 2019 notice of nonenforcement or both is of no moment" because the result is the same); *see also* (ECF No. 1 at 32) (asking for the court to enjoin Defendants from relying on the notice of nonenforcement "to the extent it seeks to circumvent" any injunction the court imposed as to the other actions of the Defendants). Thus, any ongoing harm Plaintiff claims to have suffered is arguably ultimately traceable back to the 2018 HHS Waiver, which the court has already determined she has standing to challenge.

alleges she suffered the stigma resulting from being discriminated against on the basis of her religion, as well as the practical barriers to their participation in the State foster care program. (ECF Nos. 1 at 5; 24 at 17; 38 at 42–43). To show that the stigma and practical barriers to fostering were the result of the Defendants' conduct, Plaintiff's Complaint details the progression of events within both the federal and state governments that ultimately lead to McMaster's 2018 Executive Order and the HHS Waiver which she challenges. *See* (ECF No. 1 at 7–17).

To begin, the Complaint sets forth the processes by which CPAs are licensed through DSS, including the requirement that they comply with all State and federal policies and regulations, and reimbursed by DSS with funds from HHS. (ECF No. 1 at 7–10). Both DSS and HHS prohibit government-funded CPAs from discriminating against foster children or prospective foster parents on the bases of religion. *Id*. at 9–10 (citing DSS Manual; 45 C.F.R. §§ 75.300(c), 87.3). When DSS became aware that Miracle Hill was rejecting prospective foster families who did not meet Miracle Hill's religious criteria, in contravention of both state and federal regulations, DSS declined to renew Miracle Hill's standard CPA license. *Id*. at 14–15. Instead, DSS issued Miracle Hill a temporary six-month license and required that Miracle Hill issue a "written plan for resolving the legal violations that DSS had identified and for complying with applicable laws, regulations, and policies" within thirty days. *Id*. at 15. However, to date, "Miracle Hill has never issued a written plan of compliance." *Id.*

Plaintiff claims that, rather than requiring Miracle Hill to comply with the applicable state and federal non-discrimination requirements as DSS had, Governor McMaster sought to create and obtain exemptions from such requirements to enable Miracle Hill to continue excluding prospective foster parents based on its religious criteria. *See id*. Accordingly, McMaster requested that HHS grant South Carolina a waiver from the non-discrimination provisions of 45 C.F.R. §

75.300(c), which would allow South Carolina CPAs "to discriminate in the operation and provision of governmental services funded under Title IV-E of the Social Security Act[,]" effectively allowing South Carolina agencies to "use 'religious criteria in selecting among prospective foster care parents,' including criteria based on the religious identity and practices of prospective foster parents." *Id*. at 16. While waiting for the decision on the waiver request, McMaster entered the Executive Order requiring DSS to "'review and revise its policies and manuals . . . [to] ensure that DSS does not directly or indirectly penalize religious identity or activity[,]'" and prohibiting DSS from "'deny[ing] licensure to faith-based CPAs solely on account of their religious identity or sincerely held religious beliefs.'" *Id*. at 15. On January 23, 2019, HHS granted South Carolina the exemption that McMaster had requested. *Id.* at 16. Only after the HHS Waiver was granted did DSS reissue a standard CPA license to Miracle Hill. *Id*.

Thus, Plaintiff has alleged that, "[b]ut for the State's ongoing funding and licensing of Miracle Hill while allowing it to discriminate, [Plaintiff] would not suffer discrimination on the basis of her religious beliefs in obtaining publicly funded governmental foster-care services."[9] (ECF No. 24 at 20); *see also* (ECF No. 1 at 5 (explaining how Defendants' actions caused Plaintiff's alleged harms)). Additionally, Plaintiff argues that Miracle Hill would not have had its license renewed but for McMaster's intervention and the HHS Waiver. (ECF No. 24 at 21). Accordingly, the well-pled allegations in the Complaint clearly establish that Defendants are "at least in part responsible for" Plaintiff's alleged injuries, *Judd*, 718 F.3d at 316, and the traceability requirement of standing has been met as to Plaintiff's Equal Protection and Establishment Clause

---

[9] Plaintiff acknowledges that in July 2019, Miracle Hill lifted its formal bar on Catholics participating in its foster care program. (ECF No. 1 at 14). Defendants argue that this breaks the causal chain such that any harm alleged to have arisen after July 2019 is merely speculative, because Plaintiff has not applied to foster since that time. However, as Plaintiff explains in her Complaint, although Miracle Hill lifted the formal bar against Catholic participation in its programs, prospective volunteers and foster parents are still required to affirm Miracle Hill's doctrinal statement of faith, which Plaintiff believes to be inconsistent with her religious views. *Id.* at 20. Accordingly, taking all facts in the Complaint as true, Plaintiff is still precluded from working with Miracle Hill based on her religious beliefs.

claims, except to the extent such claims challenge the notice of nonenforcement or proposed rule re-promulgation.

### 3. Redressability

Finally, the Defendants argue that (1) because Miracle Hill was the cause of Plaintiff's injuries, the relief requested against Defendants "would do nothing more than raise a speculative chance of remedying Plaintiff's alleged injur[ies];" and (2) since Miracle Hill is not a party to this action, the court cannot issue relief compelling Miracle Hill to refrain from taking actions causing Plaintiff's injuries or to redress them. (ECF No. 34-1 at 15); *see also* (ECF No. 19 at 28). In reply, Plaintiff argues that, "[i]f the injunction is granted, HHS must either require South Carolina and its subgrantees to provide the federally funded services in a religiously non-discriminatory fashion, or curtail the funding." (ECF No. 38 at 17); *see also* (ECF No. 24 at 24). Plaintiff contends that whether Miracle Hill decides to comply or forgo funding is "beside the point" because, either way, Plaintiff "will no longer be turned away from a federally funded program solely because of her religious beliefs." (ECF No. 38 at 17–18).

Again, at this stage of the proceedings, the court must accept the well-pled factual allegations in the Complaint. The Supreme Court has recognized that, "[w]hen the 'right invoked is that of equal treatment,' the appropriate remedy is a mandate of *equal* treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Heckler*, 465 U.S. at 740 (quoting *Iowa-Des Moines Nat'l Bank v. Bennett*, 284 U.S. 239, 247 (1931)) (emphasis in original). In this case, Plaintiff asks the court, *inter alia*, to enjoin Defendants from "expending or providing public funds to foster-care child-placement agencies that use discriminatory religious criteria to perform contracted-for governmental services" and seeks for Defendants to be enjoined from "implementing, enforcing,

or relying on the exemption from the religious-antidiscrimination requirement" or the Executive Order No. 2018-12. (ECF No. 1 at 32). In other words, Plaintiff seeks a mandate of equal treatment with respect to participation in South Carolina's public child welfare and foster program. Plaintiff alleges injury by reason of the stigma of discrimination and practical barriers to fostering enabled by the Defendants' actions. Thus, accepting the factual allegations in the complaint as true, the court finds that, for purposes of this order, the remedies Plaintiff seeks would redress the harms alleged.

Therefore, the court concludes, as to Plaintiff's claims for violations of the Establishment Clause and Equal Protection Clause, Plaintiff has sufficiently established standing to bring her claims except as specifically noted above.

### B. Plaintiff Has Set Forth General Article III Standing and Prudential Standing for Her APA Claims.[10]

When challenging agency action under the APA, a plaintiff must demonstrate both constitutional and prudential standing.[11] *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,* 522 U.S. 479, 488 (1988). In the context of constitutional standing, the plaintiff must demonstrate that she has suffered a sufficient injury in fact or that she will suffer a sufficient injury in fact as a result of the agency action. *Id.* As for prudential standing, the plaintiff must show that the interest she seeks to have protected "is arguably within the zone of interests to be protected by the statute . . . in question." *Id.* It is not necessary that a plaintiff show congressional intent to protect her and her interests. *Id.* Rather, the plaintiff must demonstrate that her interests are

---

[10] Although the APA does not itself establish subject matter jurisdiction in this court over claims challenging agency decisions, *see Califano v. Sanders,* 430 U.S. 99, 107 (1997), in this case, Plaintiff challenges the constitutionality of Federal Defendants' agency decisions, and, as such, the court has subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1331.

[11] The court notes that Federal Defendants do not challenge Plaintiff's standing to sue under the APA. Nevertheless, because standing is jurisdictional in nature and is at issue as to Plaintiff's other claims, which fundamentally underly her APA claims, the court will briefly address Plaintiff's standing as to the APA claims.

"arguably within the zone of interests to be protected or regulated by the statute . . . ." *Id.* However, the plaintiff must do more than show that her interests are so "marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Secs. Industry Ass'n*, 479 U.S. 388, 399 (1987).

*1. Constitutional Standing*

Plaintiff asserts that her APA claims are proper merely because the actions which she challenges constitute final agency action that are reviewable under the APA. *Id.* at 30–31. However, reviewability of agency action under the APA is separate and distinct from Plaintiff's standing to bring such a claim for judicial review. As an initial matter, the court notes that Plaintiff's APA claim under 5 U.S.C. § 706(2)(B), whereby she challenges the HHS Waiver and the notice of nonenforcement of the nondiscrimination provision, explicitly and necessarily relies on her claims that Federal Defendants violated the Equal Protection and Establishment Clauses of the Constitution. *See* (ECF No. 1 at 30). Similarly, in support of her claim under 5 U.S.C. § 706(2)(A), Plaintiff challenges the process by which Federal Defendants granted the HHS Waiver, the same action underlying her constitutional claims, and alleges the same harms arising therefrom. *See id.* at 30–31. Thus, these claims are inextricably intertwined with Plaintiff's constitutional claims challenging the HHS Waiver, for which the court has already determined Plaintiff has established an injury-in-fact and has standing to pursue. Accordingly, the court finds that, at this stage of the proceedings, Plaintiff has constitutional standing as to her APA claims challenging the HHS Waiver for the same reasons discussed above.

Additionally, as noted above, the notice of nonenforcement post-dated Plaintiff's alleged injuries. Accordingly, Plaintiff's alleged injuries are not fairly traceable to the notice of nonenforcement. The court recognizes, however, that a valid APA claim requesting injunctive

relief may be based on a substantial likelihood of *future* injury as a result of the challenged agency action, so long as that threatened injury is "real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *see also Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979) (stating that a plaintiff may challenge the prospective operation of a statute that prevents a realistic and impending threat of direct injury). Here, in regards to her APA claim under 5 U.S.C. § 706(2)(B), Plaintiff alleges that the nonenforcement effectively allows for continued discrimination in violation of her constitutional rights. *See* (ECF No. 1 at 30). As the court noted above, the notice of nonenforcement appears, in essence, to be a blanket waiver for all states, much like the HHS Waiver for South Carolina. Accordingly, the court finds that at this stage, Plaintiff has sufficiently demonstrated a realistic and impending threat of personal injury as to the notice of nonenforcement for purposes of her APA claim. This impending threat is fairly traceable to the notice of nonenforcement, as it effectively reimplements and extends the HHS Waiver's previous provisions, which Plaintiff alleges caused her present injuries. Furthermore, because Plaintiff seeks for Defendants to be enjoined from implementing the notice of nonenforcement, the relief she seeks would redress the injuries alleged. Accordingly, the court finds Plaintiff has, at this stage, demonstrated standing to challenge the notice of nonenforcement as to her APA claim.

Additionally, within her APA claims, Plaintiff also seeks to challenge the "disbursement of funds to the South Carolina Foster Care Program" under both 5 U.S.C. 706(2)(A) and (2)(B). (ECF No. 1 at 30). Plaintiff purports not to rely on taxpayer standing to bring her claims, and instead asserts a direct injury resulting from the appropriation of the funds. The court must caution, however, that, to the extent Plaintiff's challenge to the disbursement of funds within her APA claims relies on taxpayer standing, the court finds such reliance is improper. Courts have consistently held that a "plaintiff raising only a generally available grievance about government—

claiming only harm to [her] and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more tangibly benefits [her] than it does the public at large— does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573–74. In *Flast v. Cohen*, the Supreme Court created a narrow exception to the general prohibition against taxpayer standing, allowing taxpayers to establish standing to bring an Establishment Clause challenge, stating that the "taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Article I, § 8 of the Constitution." 392 U.S. 83, 102–03 (1968). However, this narrow exception applies only "when the taxpayer has established a 'logical link between his taxpayer status and the type of legislative enactment attacked' as well as a 'nexus between that status and the precise nature of the constitutional infringement alleged.'" *Hinrichs v. Speaker of the House of Reps. of the In. Gen. Assembly*, 506 F.3d 584, 598 (7th Cir. 2007) (quoting *Flast*, 392 U.S. at 102–103). Therefore, Plaintiff could only conceivably attempt to assert taxpayer standing as to her claims under the Establishment Clause. Although Plaintiff's APA claims explicitly rely on her Establishment Clause claim, the portions of the APA on which Plaintiff relies "ha[ve] not been held applicable to persons who have no other basis for standing to seek judicial review than their status as a federal taxpayer." *Tax Analysts & Advocates v. Simon*, 390 F. Supp. 927, 932 (D.D.C. 1975); *see also Haring v. Blumenthal*, 471 F. Supp. 1172, 1176 (D.D.C. 1979).

Further, even if Plaintiff could rely on taxpayer standing in regards to an APA claim, she does not challenge any *legislative* action for which taxpayer standing would apply, but rather, has challenged discretionary executive actions and appropriations.[12] Moreover, Plaintiff has alleged

---

[12] The court takes judicial notice of the fact that HHS is a cabinet-level agency within the Executive Branch of the federal government.

no nexus between any *legislative* action and Plaintiff's status as a taxpayer. Additionally, Plaintiff's alleged injury involving tax dollars being used to support faith-based CPAs is separate and distinct from her alleged injuries of stigmatization and practical barriers to her participation in the foster-parent program, and is not particularized to Plaintiff but could apply to every other taxpaying citizen in the public at large. Accordingly, to the extent Plaintiff relies on taxpayer standing to challenge Federal Defendants' disbursement of funds to the South Carolina Foster Care Program, such claim must fail. Nonetheless, Plaintiff has provided a sufficient basis at this stage of the litigation to support constitutional standing as to her APA claims as a whole, separate and apart from any reliance on taxpayer standing.

### 2. Prudential Standing

Because Plaintiff has set forth a basis for constitutional standing underlying both APA claims, the court next addresses whether Plaintiff has sufficiently asserted prudential standing to pursue these claims. Under the prudential standing requirement, "the plaintiff's grievance must fall within the 'zone of interests' to be protected or regulated by the statute or constitutional guarantee in question." *Taubman Realty Grp. Ltd. Partnership v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003). Here, Plaintiff does not attempt to bring forth some generalized grievance from which she has suffered no personal effect. On the contrary, Plaintiff alleges that Federal Defendants' actions have directly caused her to be discriminated against on the basis of her religion, precluding her from participating in federally-funded programs on that basis. To hold that Plaintiff falls outside the "zone of interests" to be protected here would essentially be to rule that private citizens have no basis to challenge agency action that directly affects their constitutional right to equal treatment under the law regardless of religious affiliation. The court declines to set such precedent

and holds that Plaintiff has sufficiently demonstrated that she is "arguably within the zone of interests" for prudential standing purposes.

Accordingly, the court finds that Plaintiff has set forth both constitutional and prudential standing as to her APA claims, except to the extent Plaintiff relies on taxpayer standing to set forth a general grievance for funding of a federal program.

### C. Plaintiff's Complaint sets forth a claim for violation of the Establishment Clause.

The Establishment Clause requires that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. 1, cl. 1. When evaluating a claim for violation of the Establishment Clause, the Fourth Circuit has repeatedly indicated that the applicable test is that set forth by the United States Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *See, e.g.*, *Wood v. Arnold*, 915 F.3d 308, 313 (4th Cir. 2019). To pass scrutiny under the *Lemon* test, the government's conduct "'(1) must be driven in part by a secular purpose; (2) must have a primary effect that neither advances nor inhibits religion; and (3) must not excessively entangle church and State.'" *Id.* at 314 (quoting *Moss v. Spartanburg Cty. Sch. Dist. 7*, 683 F.3d 599, 608 (4th Cir. 2012)) (emphasis omitted). Government action violates the Establishment Clause if it fails any of the *Lemon* factors. *Id.* In this case, although the parties dispute whether the Defendants can identify a secular purpose for their actions under the first prong,[13] the well-pled allegations in the Complaint set forth a cause of action based on Defendants' alleged violation of the second and third prongs of the *Lemon* test.

---

[13] Defendants claim the secular purpose for their actions was to maximize the number and diversity of available foster and adoption agencies in the state. (ECF Nos. 19 at 36; 34-1 at 27–28). In response, Plaintiff argues this is merely a "sham" purpose and that the allegations in the Complaint demonstrate that allowing CPAs to exclude qualified foster families based on religious criteria unrelated to the ability to care for a child does not maximize the number of families for children but rather, the opposite. (ECF No. 24 at 27). The court need not address this prong however, because it finds that the Complaint sufficiently alleges violations of the two remaining prongs of the *Lemon* test, as discussed below, to avoid dismissal at this stage of the case.

To satisfy the second *Lemon* factor, the primary effect of the challenged action must neither be to advance nor to inhibit religion. *Wood*, 915 F.3d at 316. "This requirement sets an objective standard, which 'measures whether the principal effect of government action is to suggest government preference for a particular religious view or for religion in general.'" *Id.* (quoting *Mellen*, 327 F.3d at 374) (internal alterations omitted). When deciding what the primary purpose or effect of the government's conduct is, courts in this circuit "consistently have examined the entire context surrounding the challenged practice, rather than only reviewing the contested portion." *Id.* at 314. Additionally, the Fourth Circuit has included within this objective analysis the United States Supreme Court's "endorsement test," which considers whether a reasonable, informed observer would conclude that the government's action amounts to the endorsement of a particular religion or religion generally. *Id.* at 316. "Thus, in this Circuit, the primary effect prong asks whether, irrespective of government's actual purpose, a reasonable, informed observer would understand that the practice under review in fact conveys a message of endorsement or disapproval of a religion." *Id.* (quoting *Mellen*, 327 F.3d at 374) (internal quotation marks omitted). In this context, a reasonable, informed observer is presumed to be "'aware of the history and context of the forum in which the [challenged conduct] takes place.'" *Id.* (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001)).

With this standard in mind, at this stage of the proceedings the court must consider only whether, accepting as true the allegations in the Complaint and all reasonable inferences arising therefrom, Plaintiff has plausibly alleged that Defendants conveyed a message endorsing religion by allowing state-licensed, government-funded CPAs to reject prospective foster parents based on religious criteria. The court finds that she has.

Specifically, as to the State Defendants, Plaintiff alleges that, "[r]ather than require Miracle Hill to comply with federal and state law—and thereby ensure that the State's continued funding and licensing of Miracle Hill [did] not violate the Constitution . . . McMaster issued Executive Order No. 2018-12" which directed that "'to the fullest extent permitted by state and federal law . . . DSS shall not deny licensure to faith-based CPAs solely on account of their religious identity or sincerely held beliefs." (ECF No. 1 at 15). Furthermore, McMaster's Executive Order expressly permitted faith-based CPAs to "associate only with 'foster parents and homes who share the same faith' as the subgrantee 'in recruiting, training, and retaining foster parents.'" *Id.* Relying on this Executive Order, when DSS reinstated Miracle Hill's license, it allowed "Miracle Hill to continue offering publicly funded foster-care services on behalf of the State in a discriminatory manner." *Id*. at 16. Similarly, Plaintiffs allege the Federal Defendants "sanctioned, enabled, and facilitated faith-based [CPAs]' use of public funds for their own religious purposes, abdicating altogether the Federal Defendants' constitutional duty to ensure nondiscrimination in the provision of federally-funded foster-care services." *Id.* at 25. As a result, Plaintiff claims the effect of Defendants' actions is to harm Plaintiff, her family, and "other prospective foster parents and volunteers like them by underwriting and enabling child-placement agencies' religious discrimination, thereby denying these families the chance to participate in a governmental program on the same footing as those who satisfy the agencies' religious tests, subjecting these families to the stigma of discrimination, and coercing them to affirm and adhere to religious beliefs that they do not share." *Id*. at 27.

Although the Defendants dispute these facts, the court must assume their veracity based on the present procedural posture. Accepting the truth of the factual allegations above, as well as those set forth in the rest of the Complaint, the court finds that a reasonable, informed observer could conclude that the Defendants' actions were taken in an effort to protect a specific CPA, Miracle

Hill, and permit discrimination within South Carolina's foster care program on the basis of Miracle Hill's religious criteria. Other courts have similarly held that a state's authorization for faith-based CPAs to use religious criteria to exclude prospective foster parents "objectively endorses the religious views of those agencies[,] . . . sending a message . . . that [those prospective foster parents who are rejected] are outsiders, not full members of the community." *Dumont*, 341 F. Supp. 3d at 734 (internal quotation marks omitted). Accordingly, taking all facts set forth in the Complaint as true, Plaintiff has set forth sufficient allegations that Defendants' actions had the primary effect of advancing and endorsing religion and, thereby, violate the *Lemon* test and the requirements of the Establishment Clause.

Moreover, Plaintiff has also stated a plausible claim for violation of the Establishment clause based on the third prong of the *Lemon* test, which requires courts to determine whether the challenged government action created "'an excessive entanglement between government and religion,' which 'is a question of kind and degree.'" *Wood*, 915 F.3d at 318. One way in which plaintiffs commonly establish excessive entanglement is to show that the government's action "has 'the effect of advancing or inhibiting religion.'" *Id*. (citing *Agostini v. Felton*, 521 U.S. 203, 232–33 (1997)). As discussed above, the court has already found that the Defendants' action as alleged in the Complaint had the primary effect of advancing religion. Consequently, Plaintiff has sufficiently pled that the challenged actions excessively entangled the government and religion. *See id*. Thus, the well-pled allegations in the Complaint sufficiently assert, for purposes of this order, that Defendants have violated both the second and third prongs of the *Lemon* test and, thereby, set forth a claim for violation of the Establishment Clause.

*1. Accommodation vs. Establishment Clause*

Both State and Federal Defendants argue that they cannot be liable for violation of the Establishment Clause because their actions merely accommodated Miracle Hill's and other faith-based CPAs' religious beliefs by allowing them to participate in the State child welfare system as CPAs without compromising their sincerely-held beliefs. *See* (ECF Nos. 19 at 42–44; 34-1 at 29–32). However, the United States Supreme Court has made it clear that "accommodation is not a principle without limits[.]" *Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 706 (1994). In this case, "[t]he fact that [the Executive Order and the HHS Waiver] facilitate[] the practice of religion is not what renders it an unconstitutional establishment." *Id*. Supreme Court precedent "allow[s] religious communities and institutions to pursue *their own interests* free from governmental interference, but [the Supreme Court] ha[s] never hinted that an otherwise unconstitutional delegation of political power to a religious group could be saved as a religious accommodation." *Id*. (emphasis added); *see also Larkin v. Grendel's Den, Inc*., 459 U.S. 116, 123 (1982) ("Some limited and incidental entanglement between church and state authority is inevitable in a complex modern society, but the concept of a 'wall' of separation is a useful signpost. Here that 'wall' is substantially breached by vesting discretionary governmental powers in religious bodies." (internal citations omitted)). As the Supreme Court has explained,

> The principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause. It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion or religious faith, or tends to do so.

*Santa Fe Independent Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000) (quoting *Lee v. Weisman*, 505 U.S. 577, 587 (1992)) (internal alterations and quotation marks omitted). This is what Plaintiff alleges in this case: that by knowingly funding an agency that uses religious eligibility criteria to screen prospective foster parents, Defendants have "sponsored and funded" religious

discrimination. (ECF No. 24 at 10; *see also* (ECF No. 1 at 26–27 (alleging Defendants' actions coerce prospective foster parents to adopt Miracle Hill's religious beliefs in order to be able to foster through that agency)).

"[T]he core rationale underlying the Establishment Clause is preventing 'a fusion of governmental and religious functions[.]'" *Larkin*, 459 U.S. at 126 (quoting *Sch. Dist. of Abington Township v. Schempp*, 374 U.S. 203, 222 (1963)). According to the Complaint, the system which Defendants' "accommodations" have created "does not by its terms require that [religiously affiliated CPAs'] power be used in a religiously *neutral* way." *Id.* at 125 (emphasis added). Rather, under the Executive Order and the HHS Waiver, religiously-affiliated CPAs' power to accept or reject prospective foster parents is completely "standardless, calling for no reasons, findings, or reasoned conclusions." *Id.* Defendants appear to argue that it is not their responsibility to ensure "that the delegated power '[is] used exclusively for secular, neutral, and nonideological purposes.'" *Id.* (quoting *Levitt v. Comm. for Pub. Ed.*, 413 U.S. 472, 480 (1973); *Comm. for Pub. Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756, 780 (1973)) (internal alterations omitted). Contrary to Defendants' argument, the Supreme Court has long recognized that the Constitution does not permit "a system of government in which important, discretionary governmental powers would be delegated to or shared with religious institutions." *Id.* at 127. Therefore, to the extent Defendants' assert that their actions are immune from challenge under the Establishment Clause as "religious accommodation," such argument is directly contrary to the well-pled allegations in the Complaint and long-established federal jurisprudence and must be rejected at this stage of the proceedings.[14]

---

[14] Defendants also raise a related argument that, had they done nothing and permitted DSS to revoke Miracle Hill's CPA license for failure to comply with state and federal non-discrimination requirements, Miracle Hill's free exercise rights would have been violated. This argument is based solely on speculation regarding what Miracle Hill, a non-party to this action, would have done if its license had been revoked. More importantly, however, such an argument

### D. Plaintiff's claim for Equal Protection is subject to dismissal.

The Equal Protection Clause of the Fourteenth Amendment provides, in relevant part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. In other words, the Equal Protection clause "'keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.'" *Moss v. Spartanburg Cty. School Dist. No. 7*, 676 F. Supp. 2d 452, 459 (D.S.C. 2009) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). In order to survive dismissal on an equal protection claim, a plaintiff must allege facts sufficient to show that he was "treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* Unless the challenged classification violates a fundamental right or is drawn upon a suspect class such as race, religion, or gender, it is presumed valid and need only be rationally related to a legitimate state interest to pass under the Equal Protection clause. *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (citing *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)); *Johnson v. Hall*, Civ. A. Nos. 4:08-cv-2726-TLW-TER, 4:09-cv-0102-TLW-TER, 2010 WL 3724746, at *10 (D.S.C. Aug. 23, 2010) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985)).

In this case, for purposes of the motions to dismiss, Plaintiff has met the first hurdle, alleging that Defendants' actions resulted in Plaintiff being treated differently from otherwise

---

is unsupported by the law. "The Free Exercise Clause does not . . . relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Fulton v. City of Philadelphia*, 922 F.3d 140, 152 (3d Cir. 2019) (quoting *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990)) (internal quotation marks omitted). In other words, Miracle Hill's "religious or conscientious objections do not supersede the basic obligation to comply with generally applicable civil rights laws provided those laws are applied neutrally." *Id.* at 153 (citing *Masterpiece Cakeshop, Ltd. V. Colo. Civil Rights Comm'n*, --- U.S. ---, 138 S. Ct. 1719, 1727 (2018)).

similarly-situated prospective foster parents on the basis of her religion. *See, e.g.*, (ECF No. 1 at 22 (alleging that DSS has committed itself "to the exercise of non-discriminatory practice . . . but for Governor McMaster's order to the contrary."))). Now the court must consider whether Plaintiff has alleged a lack of justification for Defendants' actions and this disparate treatment under the requisite level of scrutiny. *See Morrison*, 239 F.3d at 654.

As noted above, under the Equal Protection Clause, challenged government action that "caus[es] disparate treatment based on a 'suspect classification' such as race or religion . . . receives very strict scrutiny by the courts." *Prudential Prop. & Cas. Co. v. Ins. Comm'n of S.C. Dep't of Ins.*, 534 F. Supp. 571, 575–76 (D.S.C. 1982). Plaintiff argues that the State Defendants' actions afforded a "denominational preference" to evangelical Christianity, and, consequently, must be evaluated under strict scrutiny. (ECF No. 38 at 39). The State Defendants,[15] on the other hand, argue that their actions in requesting the HHS Waiver and issuing the Executive Order were "facially neutral with respect to religion and designed to limit South Carolina's interference with religious exercise" and are, therefore, only subject to rational basis review. (ECF No. 19 at 33). In particular, State Defendants argue that their actions treat all religions equally by allowing any religiously-affiliated CPA to apply its own religious criteria to select prospective foster parents. *See id*. at 33– 43. The court agrees with State Defendants.

When government action is "neutral on its face" and "afford[s] a uniform benefit to *all* religions," the proper inquiry is whether the action is rationally related to a legitimate government purpose. *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*,

---

[15] Although Federal Defendants purport to argue that Plaintiff failed to state a claim for equal protection violations, Federal Defendants' arguments amount to no more than a recitation of their injury in fact and traceability arguments with respect to standing. The court has already addressed and rejected these arguments. Nevertheless, although only State Defendants actually challenge whether Plaintiff has plausibly stated a claim for equal protection, the court analyzes the sufficiency of the claim as against both the State and Federal Defendants.

483 U.S. 327, 339 (1987) (emphasis in original). The facts set forth in the Complaint, and undisputed by Defendants, establish that the Executive Order and the HHS Waiver do not distinguish between religions, but apply equally to all faith-based CPAs "so that no 'religious organization' would have 'to choose between the tenets of its faith or applying for a CPA license . . . .'" (ECF No. 19 at 32); *see also* (ECF No. 1 at 15). Accordingly, to the extent State Defendants' actions permit religious discrimination in the administration of the State foster care program, their actions need only withstand rational basis review to pass muster under the Equal Protection Clause. *See Amos*, 483 U.S. at 339.

"To be irrational in the Constitutional sense, 'the relationship of the classification to its goal' must be 'so attenuated as to render the distinction arbitrary.'" *Johnson*, 2010 WL 3724746, at *10 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992)). Thus, "[i]f the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Giarratano*, 521 F.3d at 303 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)). Further, the burden is on Plaintiff "'to negate every conceivable basis which might support'" Defendants' actions. *Johnson*, 2010 WL 3724746, at *10 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). In other words, "the State has no obligation to produce evidence to support the rationality of [its challenged action], which 'may be based on rational speculation unsupported by any evidence or empirical data.'" *Giarratano*, 521 F.3d at 303 (quoting *FCC v. Beach Comms., Inc.*, 508 U.S. 307, 315 (1993)).

The dilemma of how this rational basis standard interacts with the dismissal standard under Fed. R. Civ. P. 12(b)(6) was resolved by the Fourth Circuit in *Giarratano*:

> The rational basis standard requires the government to win if any set
> of facts reasonably may be conceived to justify its classification; the

Rule 12(b)(6) standard requires the plaintiff to prevail if relief could be granted under any set of facts that could be proved consistent with the allegations. The rational basis standard, of course, cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard. The latter standard is procedural, and simply allows the plaintiff to progress beyond the pleadings and obtain discovery, while the rational basis standard is the substantive burden that the plaintiff will ultimately have to meet to prevail on an equal protection claim. . . .

While we therefore must take as true all of the complaint's allegations and reasonable inferences that follow, we apply the resulting "facts" in the light of the deferential rational basis standard. To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications.

521 F.3d at 303–04 (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 459–60 (7th Cir. 1992)) (internal citations and quotation marks omitted). In that case, the Fourth Circuit held that dismissal was proper because the complaint's "conclusory assertion" that the challenged action "'is not rationally related to any legitimate government interest'" was "insufficient to overcome the presumption of rationality . . . ." *Id*. at 304. Applying this analysis to the matter at hand, the court finds that dismissal of the equal protection claims regarding religion is also proper in this case.

In support of her equal protection claims against Defendants, Plaintiff simply alleges that the "[t]here is no constitutionally adequate justification for Federal Defendants' actions" and that "Federal Defendants fail to advance any legitimate government interest, much less an important one . . . ." (ECF No. 1 at 28). Plaintiff alleges the same as to the State Defendants. *Id.* at 29. This is a legal conclusion, not a factual allegation, and the court need not accept it when ruling on a motion to dismiss. *ACA Fin. Guaranty Corp. v. City of Buena Vista, Va*., 917 F.3d 206, 212 (4th Cir. 2019). Additionally, in response to Plaintiffs' allegations, Defendants' proffered numerous legitimate government interests rationally related to their actions permitting the use of religious criteria by faith-based CPAs including, *inter alia*, "increasing community support and options for

foster child placement by maximizing the number and diversity of CPAs[.]" (ECF No. 19 at 34).

Thus, Plaintiff's "conclusory assertion[s]" are "insufficient to overcome the presumption of rationality" afforded to Defendants' actions which are facially neutral with respect to religion. *See Giarratano*, 521 F.3d at 304. "As long as the [challenged action] chosen by [Defendants] rationally advances a reasonable and identifiable governmental objective, [courts] must disregard the existence of other methods of allocation that [judges], as individuals, perhaps would have preferred." *Schweiker v. Wilson*, 450 U.S. 221, 235 (1981). Accordingly, Plaintiff's equal protection claim for religious discrimination fails as a matter of law and Defendants are entitled to dismissal of that claim.

### E. Plaintiff's APA claims challenge reviewable agency action.

Before reaching the merits of Plaintiff's specific APA claims, the court must determine if Plaintiff has challenged agency actions that are in fact subject to judicial review under the APA. The APA provisions "allow any person 'adversely affected or aggrieved' by agency action to obtain judicial review thereof, so long as the decision challenged represents a 'final agency action' for which there is no other adequate remedy in a court." *Webster v. Doe*, 486 U.S. 592, 599 (1988).[16] There is a presumption of reviewability with limited exceptions. *Dept. of Homeland Security Reagents of the Univ. of Cal. Wolf v. Vidal*, ___ S. Ct. ___, 2020 WL 3271746, at *7 (June 18, 2020). Those exceptions are enumerated in § 701(a), which states that the chapter on judicial

---

[16] Federal Defendants do not appear to assert that the challenged agency actions were not "final" within the meaning of the APA. To the extent any such challenge has been made, the court disagrees. Final agency action must "mark the consummation of an agency's decision making process," *i.e.*, it must not be "merely tentative," and must be a decision whereby rights or obligations are determined or "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Here, while the posture of the challenged action is somewhat convoluted in the sense that the notice of nonenforcement effectively extended the HHS Waiver to all states rather than just to South Carolina and appears to be merely a placeholder pending rule re-promulgation, there is no set time frame for *when* or *if* such nonenforcement will cease. Furthermore, such actions have, according to the Compliant, provided an avenue through which states may license private CPAs notwithstanding discrimination on constitutionally prohibited bases which could result in legal consequences. Thus, the court finds that all the federal agency actions Plaintiff challenges constitute final agency action subject to judicial review under the APA.

review applies "except to the extent (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985) (citing 5 U.S.C. § 701(a)). Generally, courts have determined that an agency's decision not to take enforcement action "should be presumed immune from judicial review" because "such decision has traditionally been 'commited to agency discretion.'" *Id.* at 832. Here, Federal Defendants rely on this exception—arguing that the agency decisions challenged were nonenforcement decisions left solely to the discretion of HHS and are unreviewable by law. (ECF No. 34-1 at 17–22). However, the Supreme Court has emphasized that such decisions are "only presumptively unreviewable." *Heckler*, 470 U.S. at 832. Indeed, Plaintiff argues that Federal Defendants' reliance on *Heckler* is misplaced because here, instead of "merely exercising agency discretion under the rules," the Federal Defendants have "wholly abdicated [their] responsibility to enforce the law." (ECF No. 38 at 25). The court agrees.

Recently, in *Department of Homeland Security Regents of University of California Wolf v. Vidal*, the Supreme Court determined that the rescission of the Deferred Action of Childhood Arrivals ("DACA") was subject to review under the APA because DACA is "more than just a non-enforcement policy," as it allowed deferred status individuals to request authorization to work, making them eligible for various benefits such as Social Security and Medicare. 2020 WL 3271746, at *8. The court held that, "[u]nlike an agency's refusal to take requested enforcement action, access to these types of benefits is an interest 'courts often are called upon to protect.'" *Id.*

In this case, by granting the HHS Waiver and issuing the notice of nonenforcement, Federal Defendants essentially created a mechanism through which individual states could circumvent constitutional protections for individuals like Plaintiff. The court finds that this is beyond the scope of what is excepted from judicial reviewability based on agency discretion, as such actions

necessarily implicate individual's constitutional rights, which, like the benefits linked to DACA, the courts are called upon to protect. Courts have often undertaken review of actions having constitutional implications in order to protect the fundamental rights of a challenger within the context of the APA. *See Webster*, 486 U.S. at 603 (noting that there would be a "'serious constitutional question' . . . if a federal statute were construed to deny any judicial forum for a colorable constitutional claim."). Additionally, in *Heckler*, the Supreme Court explicitly noted that in presuming un-reviewability of the nonenforcement provision in question, "[n]o colorable claim [had been] made that the agency's refusal to institute proceedings violated any constitutional rights of respondents," and, therefore, the court did not address whether that would rebut the presumption. *Heckler*, 470 U.S. at 838. Accordingly, for all these reasons, Federal Defendants' reliance on *Heckler* is misplaced, and Plaintiff has established that her APA claims are judicially reviewable.

Notably, Federal Defendants do not raise a claim in their motion to dismiss that Plaintiff has failed to set forth a cognizable claim for relief regarding her APA claims outside of their argument that the agency actions in question were nonreviewable. Accordingly, the court will not address the sufficiency of the factual basis as to those claims, as such has not been challenged.

## F. CONCLUSION

Accordingly, for the reasons set forth herein, the Defendants' motions to dismiss (ECF Nos. 19, 21, 34) are **GRANTED in part and DENIED in part**. Defendants' motions are granted with respect to Plaintiff's claim for equal protection, which is hereby **DISMISSED**. However, Defendants' motions are denied as to all other claims pursuant to the APA and Plaintiff's claim for violation of the Establishment Clause. [17]

---

[17] As noted above, although Plaintiff's claim for violation of Equal Protection remains pending before this court, Plaintiff may not rely on the notice of nonenforcement or proposed rulemaking in asserting her Equal Protection

**IT IS SO ORDERED.**

s/ Timothy M. Cain_____
United States District Judge

August 10, 2020
Anderson, South Carolina

---

challenge moving forward. Additionally, to the extent Plaintiff relies on taxpayer standing for any of her claims, she has failed to provide a sufficient basis for taxpayer standing. However, because she has alleged a direct injury resulting from the funding of the private CPAs, Plaintiff's lack of taxpayer standing does not preclude her ability to move forward with this litigation.