IN THE UNITED STATES DISTRICT COURT
for the DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

AIMEE MADDONNA,

                                    *Plaintiff*,

v.                                                      Case No. 6:19-cv-03551-JD

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, ET AL.,

                                    *Defendants*.

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT HENRY McMASTER'S AND DEFENDANT MICHAEL LEACH'S
## MOTION FOR JUDGMENT ON THE PLEADINGS

Richard B. Katskee*
Kenneth D. Upton, Jr.*
Sarah R. Goetz*
AMERICANS UNITED FOR SEPARATION OF
  CHURCH AND STATE
  1310 L Street NW, Suite 200
  Washington, DC 20005
  Tel: (202) 466-3234
  Fax: (202) 466-3353
  *katskee@au.org*
  *upton@au.org*
  *goetz@au.org*

Aaron J. Kozloski (D.S.C. Bar No. 9510)
CAPITOL COUNSEL, LLC
  P.O. Box 1996
  Lexington, SC 29071-1996
  Tel: (803) 465-1400
  Fax: (888) 513-6021
  *aaron@capitolcounsel.us*

                        *Counsel for Plaintiff*

* Admitted *pro hac vice*

                                    Date: August 20, 2021
                                    Location: Greenville, SC

# TABLE OF CONTENTS

Page(s)

Table of Authorities ............................................................................................................... ii

Nature of the Case .................................................................................................................... 1

Concise Statement of Facts ...................................................................................................... 3

Legal Standard .......................................................................................................................... 9

Argument .................................................................................................................................. 9

    A.    *Fulton* is not, and cannot be, dispositive of Mrs. Maddonna's Establishment Clause claims. ............................................................................................................. 9

        1.    *Fulton*'s narrow free-exercise holding does not authorize the sweeping exemption that the state issued here. ......................................................... 9

        2.    *Fulton* also does not undermine Mrs. Maddonna's other allegations of Establishment Clause violations. ....................................................... 15

    B.    *Fulton* does not stand for the proposition that enforcing the state antidiscrimination provisions here would violate the Free Exercise Clause. .............. 17

        1.    This case is the wrong vehicle to resolve any free-exercise question in the first instance. ............................................................................... 17

        2.    The state's antidiscrimination laws do not run afoul of the Free Exercise Clause. ............................................................................... 18

    C.    This Court may grant relief on Mrs. Maddonna's claims. ........................................... 24

Conclusion .............................................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*303 Creative LLC v. Elenis*,
   No. 19-1413, 2021 WL 3157635 (10th Cir. July 26, 2021)...................................21

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967)....................................................................................17, 18

*Adams v. Bain*,
   697 F.2d 1213 (4th Cir. 1982) ............................................................................24

*Africa v. Pennsylvania*,
   662 F.2d 1025 (3d Cir. 1981)...............................................................................10

*Alexander v. City of Greensboro*,
   No. 1:09-CV-293, 2011 WL 3360644 (M.D.N.C. Aug. 3, 2011) .........................16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................9

*Bd. of Educ. v. Grumet*,
   512 U.S. 687 (1994).......................................................................................10, 12

*Butler v. United States*,
   702 F.3d 749 (4th Cir. 2012) .................................................................................9

*Clark v. Martinez*,
   543 U.S. 371 (2005).............................................................................................11

*Corp. of Presiding Bishop v. Amos*,
   483 U.S. 327 (1987).............................................................................................11

*County of Allegheny v. ACLU Greater Pittsburgh Chapter*,
   492 U.S. 573 (1989).............................................................................................11

*Crawford v. Senex L., P.C.*,
   No. 3:16-CV-00073, 2017 WL 5162821 (W.D. Va. Nov. 7, 2017) ......................16

*Cutter v. Wilkinson*,
   544 U.S. 709 (2005).............................................................................................11

*DeStefano v. Emergency Hous. Grp., Inc.*,
   247 F.3d 397 (2d Cir. 2001).................................................................................16

*Drager v. PLIVA USA, Inc.*,
   741 F.3d 470 (4th Cir. 2014) .................................................................................9

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir. 1999) .................................................................................9

*Emp. Div. v. Smith*,
   494 U.S. 872 (1990)....................................................................................1, 8, 19

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Estate of Thornton v. Caldor, Inc.*,
  472 U.S. 703 (1985)..................................................................................................11, 12

*Flast v. Cohen*,
  392 U.S. 83 (1968)..........................................................................................................17

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
  313 F.3d 852 (4th Cir. 2002) .........................................................................................18

*Fulton v. City of Philadelphia*,
  141 S. Ct. 1868 (2021)............................................................................................ *passim*

*Hernandez v. C.I.R.*,
  490 U.S. 680 (1989)........................................................................................................10

*Larson v. Valente*,
  456 U.S. 228 (1982)........................................................................................................23

*Lee v. Weisman*,
  505 U.S. 577 (1992)...........................................................................................10, 16, 23

*Lefkoe v. Jos. A. Bank Clothiers*,
  No. WMN-06-1892, 2008 WL 7275126 (D. Md. May 13, 2008) ..........................16

*Lemon v. Kurtzman*,
  403 U.S. 602 (1971)........................................................................................................15

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)..........................................................................................................9

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*,
  138 S. Ct. 1719 (2018)...................................................................................................10

*Miller v. Brown*,
  462 F.3d 312 (4th Cir. 2006) .........................................................................................17

*New Amsterdam Cas. Co. v. Waller*,
  323 F.2d 20 (4th Cir. 1963) ...........................................................................................24

*Norwood v. Harrison*,
  413 U.S. 455 (1973)........................................................................................................16

*Otten v. Baltimore & Ohio R.R. Co.*,
  205 F.2d 58 (2d Cir. 1953).............................................................................................11

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
  490 U.S. 477 (1989)........................................................................................................13

*Santa Fe Indep. Sch. Dist. v. Doe*,
  530 U.S. 290 (2000)..........................................................................................10, 11, 12, 23

**TABLE OF AUTHORITIES—continued**

**Page(s)**

*Texas Monthly, Inc. v. Bullock*,
  489 U.S. 1 (1989) ........................................................................... 11

*United States v. Danielczyk*,
  683 F.3d 611 (4th Cir. 2012) ......................................................... 13

*Welsh v. United States*,
  398 U.S. 333 (1970) ....................................................................... 10

**Constitution, Statutes, and Regulatory Materials**

U.S. Const. amend. I ................................................................... *passim*

42 U.S.C. § 2000bb-1 ......................................................................... 11

45 C.F.R. § 75.101(b)(1) ...................................................................... 4

45 C.F.R. § 75.300(c) ........................................................................... 4

45 C.F.R. § 87.3 ................................................................................... 4

Fed. R. Civ. P. 12(b) ........................................................................... 9

Fed. R. Civ. P. 12(c) ...................................................................... 9, 16

S.C. Code § 1-32-40 ........................................................................... 11

S.C. Code § 63-9-30(5) ........................................................................ 3

S.C. Code Regs. § 114-550(H)(11) ..................................................... 20

S.C. Code Regs. § 114-4910 ................................................................. 3

DSS Human Services Policy and Procedure Manual ................. 4, 20, 21

**Other Authorities**

Brief of Prospective Foster Parents as *Amici Curiae* in Support of Respondents,
  *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) (No. 19-123),
  https://bit.ly/3ybtnDO ................................................................... 19

## NATURE OF THE CASE

Aimee Maddonna initiated this suit after she was turned away, solely on the basis of her religious identity and beliefs, by Miracle Hill Ministries, the largest and most prominent child placing agency licensed and funded by South Carolina to administer foster-care services on the state's behalf. Because she is Catholic, she was subjected to the sting of discrimination and deprived of the opportunity to participate in the state's foster-care program on the same terms as any other prospective foster parent. And the state, in the persons of Governor Henry McMaster and South Carolina Department of Social Services Director Michael Leach, licenses, underwrites, and authorizes this discrimination—including by issuing to faith-based child placing agencies a blanket exemption from state antidiscrimination laws.

On these allegations, this Court found that Mrs. Maddonna has sufficiently alleged that the state impermissibly favors religion and advances and prefers certain religious beliefs in violation of the Establishment Clause. The state now asks the Court to throw those findings out the window based on the Supreme Court's recent decision in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021). It should not.

*Fulton* was a free-exercise suit by a religious entity against Philadelphia when the city declined to exempt that entity from the nondiscrimination requirements that apply to those the city hires to perform foster-care services. In other words, it is about what the government owed to the agency with which it contracts. *Fulton* resolved that question in a narrow, fact-bound opinion that reaffirmed the long-standing *Employment Division v. Smith* test and turned in part on the fact that the agency there had never turned away a prospective foster parent from the program.

This case, by contrast, is a suit by an individual who *was* turned away from the state program because of her religious beliefs. It began with the state's voluntary grant—not denial— of a religious accommodation to a faith-based child placing agency. And it asks not what the

1

government might have owed under the Free Exercise Clause to that agency, but instead what the government owes under the Establishment Clause to the prospective foster parents who are turned away. In other words, this case starts where *Fulton* ended, asking what responsibility the state, having granted a religious accommodation to its foster-care contractors, has to those who suffer invidious religious discrimination because of it. Yet the state urges this Court to conclude that *Fulton* forecloses Mrs. Maddonna's Establishment Clause claims.

By the state's logic, the holding in *Fulton* that one child placing agency was entitled to an exemption from Philadelphia's antidiscrimination provisions under the Free Exercise Clause also necessarily means both that the blanket exemption *here* is a lawful, permissible religious accommodation, and that the state owes nothing at all to Mrs. Maddonna and the other South Carolinians who are subjected to discriminatory treatment as a result. Both propositions are incorrect: Religious exemptions are constitutionally permissible only if they do not detrimentally affect nonbeneficiaries—a requirement that, as Mrs. Maddonna alleges, the state's sweeping exemption does not satisfy. And *Fulton*—which says absolutely nothing about the Establishment Clause—also has no bearing on the merits of Mrs. Maddonna's other allegations, which relate to the state's impermissible funding of religious discrimination, coercion, and proselytization, and speak to what the State owes to *her*.

*Fulton* on its face does not, and as a matter of law cannot, mean that a religious exemption is constitutionally required under the Free Exercise Clause in every circumstance in which one is sought (much less that when one is granted—here, voluntarily—the state owes nothing to anyone harmed by it as a result).

This Court should not entertain the question the state seeks to pose—namely, whether enforcing South Carolina's antidiscrimination laws with respect to faith-based child placing agencies would violate those entities' free-exercise rights in light of *Fulton*. For that inquiry is

purely hypothetical: The state has *already* granted its faith-based contractors a religious accommodation, so they are not subject to, and hence not burdened by, any antidiscrimination law to which they object. No child placing agency is a party to this lawsuit; and no party to this lawsuit asserts any free-exercise claim. Regardless, the state antidiscrimination laws do *not* violate the Free Exercise Clause, under any level of judicial scrutiny.

This Court should resist the state's wishful expansion of *Fulton*, deny the motion for judgment on the pleadings, and permit discovery to proceed.

## CONCISE STATEMENT OF FACTS

### A.    Foster Care in South Carolina.

South Carolina is responsible for the children removed from their families and placed in foster care in the state; the children are in the state's legal custody. South Carolina therefore administers a statewide foster-care system to provide services to these children. The number of children in that system has risen steadily over the last several years, today numbering more than 4,000. Compl. ¶¶ 26, 28. Greenville County is home to the highest concentration of these children. *Id.* ¶ 27. But while the number of children in foster care has grown, the number of placements in foster homes has stagnated, resulting in a shortfall of nearly 2,000 homes—a crisis for the children whom the foster-care system is supposed to serve. *Id.* ¶ 29 & n.3.

To fulfill its legal duty to care for these children and find them appropriate foster families, the state's Department of Social Services contracts with private child placing agencies, which receive licenses from the state to facilitate foster-care placements on its behalf and are paid with state and federal funds for the services that they perform. *Id.* ¶ 30; S.C. Code § 63-9-30(5); S.C. Code Regs. § 114-4910. The agencies conduct investigations of foster homes and make recommendations to DSS as to whether foster-family licenses should be issued; monitor foster homes for compliance; and investigate complaints of wrongdoing. Compl. ¶ 34. The agencies also

exercise control over foster children's time in the system, by developing written case plans for the children assigned to them and determining appropriate home placements based on the agency's assessment of foster families and of the children's needs. *Id.* ¶ 35.

Federal and state law govern the agencies' provision of these services. DSS policy explicitly forbids agencies to discriminate against prospective foster parents in the provision of foster-care services, including on the basis of religion. Compl. ¶¶ 36–38. The DSS Human Services Policy and Procedure Manual commits DSS and its programs to providing "equal opportunities to all families and children, without regard to their . . . religion." *Id.* ¶ 37; DSS Manual § 710. It further provides that "[n]o individual shall be denied the opportunity to become a foster or adoptive parent on the basis of . . . religion." Compl. ¶ 38; DSS Manual § 710. The agencies, as subrecipients of federal funds provided to the state, are also bound by federal regulations prohibiting religious discrimination and proselytization in the administration of federally funded foster-care services. Compl. ¶¶ 40–45; 45 C.F.R. §§ 75.101(b)(1), 75.300(c), 87.3. And whatever other federal and state laws govern the funding and administration of foster-care services, the state, and therefore also all subgrantees performing state foster-care services, are bound by the U.S. Constitution, which forbids government to fund religious discrimination.

### B.    Miracle Hill Ministries and State Authorization of Religious Discrimination.

Miracle Hill Ministries is the largest child placing agency that the state licenses and funds. Compl. ¶¶ 47–48. For prospective foster families in Greenville County who want to provide nontherapeutic foster care (as opposed to therapeutic foster care for children who have more complex medical needs that require specialized care), there are few alternatives. *Id.* ¶ 50 & nn.4, 6. Given its substantial government funding, Miracle Hill has the resources to provide comprehensive support to foster families.

Miracle Hill is a religiously affiliated organization that administers its foster-care services "in a Christ-centered environment." *Id.* ¶ 53. Because it believes that "foster parents are in a position of spiritual influence over the children in their homes," it requires prospective foster parents and volunteer mentors to affirm Miracle Hill's evangelical-Christian doctrinal statement, to identify the church that they attend, and to provide a "personal testimony of [their] faith/salvation in Jesus Christ." *Id.* ¶¶ 54–57. Miracle Hill refuses its services to prospective foster parents whom it deems not to be followers of Christ, those who are not active members of certain Christian churches of which Miracle Hill approves, and those who do not or cannot agree "in belief and practice" with Miracle Hill's evangelical-Christian doctrinal statement. *Id.* ¶ 59.

In 2018, DSS learned that Miracle Hill discriminates against prospective foster parents on the basis of their religion. *Id.* ¶ 60. Having determined that Miracle Hill was thus violating federal and state antidiscrimination laws and regulations, DSS issued Miracle Hill a temporary license and directed it, in accordance with DSS policy, to provide a written plan for coming into compliance with the law. *Id.* ¶¶ 61–62. But rather than following through by requiring Miracle Hill to obey the law, the state instead orchestrated a series of actions to allow Miracle Hill to continue to discriminate. First, Governor McMaster issued Executive Order 2018-12, which directs DSS to continue funding and licensing child placing agencies that discriminate on the basis of religion while providing state services, South Carolina law notwithstanding. *Id.* ¶¶ 64–66. Governor McMaster next successfully lobbied the U.S. Department of Health and Human Services for a statewide exemption from federal antidiscrimination requirements for all faith-based foster-care agencies in South Carolina. *Id.* ¶¶ 68–71. Finally, DSS replaced Miracle Hill's temporary license with a regular license, allowing it to continue discriminating on the basis of religion in the provision of publicly funded state services. *Id.* ¶ 72.

In other words, the state isn't just aware of Miracle Hill's discrimination; it has expressly and intentionally authorized, facilitated, and funded that discrimination.

### C.    Plaintiff Aimee Maddonna.

Having grown up in a family that was committed to providing foster homes to needy children, Aimee Maddonna was determined that her own family should do the same. So she contacted Miracle Hill to see whether she and her husband and children could volunteer with children assigned to the agency by the state. *Id.* ¶¶ 78–80. She hoped that through volunteering the family would develop relationships with children who might be good matches for the family, so that the Maddonnas could ultimately provide a loving home for a child in need. *Id.* ¶ 81.

She first contacted Miracle Hill in 2014, corresponding extensively with a Miracle Hill representative to answer questions about her experience with the foster-care system and her family's ability to volunteer with foster children. *Id.* ¶ 82–83. All seemed well until Miracle Hill asked one last question: Where do the Maddonnas attend church? *Id.* ¶ 83. Mrs. Maddonna gave the name of her Catholic parish. *Id*. It was only then that Mrs. Maddonna learned that she and her family were not welcome, because Miracle Hill would not allow Catholics to have contact with children in foster care. *Id.* The representative expressed disappointment that the Maddonnas had failed this religious test, because otherwise they were a great fit for the program. *See id.*

In February 2019, Mrs. Maddonna again contacted Miracle Hill to revisit the possibility that her family would be accepted as volunteer mentors, with the hope of ultimately fostering a child. *Id.* ¶ 85. Miracle Hill again rejected Mrs. Maddonna. *Id.* ¶ 86–87. To take part in the state's foster-care programs administered by Miracle Hill, parents must be followers of Jesus Christ, be active in and accountable to a Christian church deemed acceptable to Miracle Hill, and agree in belief and practice with Miracle Hill's doctrinal statement of faith. *Id.* ¶ 59. Mrs. Maddonna does

not and cannot fulfill Miracle Hill's requirements, for Miracle Hill's doctrinal statement is inconsistent with her religious beliefs. *Id.* ¶¶ 91–94.

When Mrs. Maddonna and her family were rejected initially, and when they were rejected the second time in 2019, and at all times between and since, Miracle Hill has been licensed by the state and has been receiving federal and state funds to carry out state foster-care services. *Id.* ¶ 90.

### D.    Effects of the State's Authorization of Religious Discrimination.

As a direct result of the state's actions, prospective volunteers and foster parents like the Maddonnas are turned away from a governmental program, to their detriment, solely because they hold disfavored religious beliefs or practice a disfavored faith. The state thus artificially reduces the already grossly inadequate number of homes and families available to needy foster children (*id.* ¶¶ 28–29, 97) and thereby gravely harms the very children whom it is duty-bound to protect. The State has, in other words, expressly licensed government-funded religious discrimination in the performance of a state program, while also deepening South Carolina's foster-care crisis and depriving vulnerable children of safe, loving homes, like the Maddonnas'.

### E.    Procedural Posture.

Mrs. Maddonna filed her complaint in December 2019. The state defendants filed Rule 12(b) motions to dismiss, arguing, among other things, that the state was required to accommodate faith-based child placing agencies' religious objections to federal and state antidiscrimination laws. ECF Nos. 19, 21. On August 10, 2020, the Court denied their motions in large part. ECF No. 43.[1] The case proceeded to discovery.

---

[1] The Court granted the motions to dismiss Mrs. Maddonna's equal-protection claim (*see* ECF No. 43, at 37–41) while permitting her other claims to proceed.

F.    The *Fulton* Decision.

On June 17, 2021, the Supreme Court issued its decision in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), a free-exercise challenge by Catholic Social Services, a faith-based child placing agency, to Philadelphia's antidiscrimination provisions that prohibit child placing agencies from discriminating against prospective foster parents on the basis of sexual orientation.

The Court decided just one question: whether Philadelphia violated CSS's rights under the Free Exercise Clause of the First Amendment when, after learning that CSS refused foster-care services to same-sex couples, the city enforced its antidiscrimination provisions by ceasing to refer children to CSS for family placements and not renewing its contract to work with prospective foster parents. *See id.* at 1874, 1876–82.

Declining CSS's demands to rewrite free-exercise jurisprudence, the Court analyzed Philadelphia's antidiscrimination provisions under *Employment Division v. Smith*, which provides that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton*, 141 S. Ct. at 1876 (citing *Smith*, 494 U.S. 872, 878–82 (1990)). The Court concluded under *Smith* and its progeny, however, that because Philadelphia's antidiscrimination requirements authorized exemptions on a discretionary, case-by-case basis, this "system of individual exemptions" undermined the general applicability of those requirements, triggering strict scrutiny. *See id.* at 1877–78 (quoting *Smith*, 494 U.S. at 884). Only because of that did the Court undertake a fact-intensive inquiry into whether the requirements were narrowly tailored to serve a compelling governmental interest. *Id.* at 1881–82. And on that analysis, the Court concluded that the record was inadequate to support Philadelphia's position that granting an exemption to CSS would thwart its asserted interests in enforcing its antidiscrimination provisions. *Id.*

**LEGAL STANDARD**

On this Rule 12(c) motion for judgment on the pleadings, just as on a Rule 12(b)(6) motion to dismiss, the Court must accept as true all well-pleaded facts in the Complaint and must view those facts in the light most favorable to Mrs. Maddonna, drawing all reasonable factual inferences in her favor. *See Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014). The Complaint need only contain sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At the pleading stage, general factual allegations of injury resulting from defendants' conduct suffice, for the Court presumes that general allegations embrace the specific facts necessary to support the claim. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). A Rule 12(c) motion "test[s] the sufficiency of a complaint; importantly, [it] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Butler v. United States*, 702 F.3d 749, 751 (4th Cir. 2012) (internal quotation marks omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).

**ARGUMENT**

A.     ***Fulton* is not, and cannot be, dispositive of Mrs. Maddonna's Establishment Clause claims.**

1.     *Fulton's narrow free-exercise holding does not authorize the sweeping exemption that the state issued here.*

The Court in this case has already held that Mrs. Maddonna adequately alleged that the state's blanket exemption for faith-based child placing agencies impermissibly favors religion and advances and prefers certain religious beliefs, in violation of the Establishment Clause. *See* ECF No. 43, at 36. The state now asks this Court to do an about-face, contending that the Supreme Court, in determining that CSS was entitled to an exemption from Philadelphia's antidiscrimination requirements under the Free Exercise Clause, also necessarily recognized that the blanket exemption *here*, and the resulting rejection of and harm to Mrs. Maddonna because

she is Catholic, is both a lawful, permissible religious accommodation under the Establishment

Clause and required under the Free Exercise Clause.[2] In other words, the state urges this Court to

conclude that because one child placing agency was entitled to a religious exemption from an

entirely different set of nondiscrimination requirements in one context, every child placing agency

everywhere is entitled to a religious exemption from all other states' laws, in every other context,

and, further, that the state here has no responsibility to the people, like Mrs. Maddonna, who suffer

as a result. Not so.

Though government may, and in some circumstances must, grant religious exemptions

from general legal requirements, "accommodation is not a principle without limits." *Bd. of Educ.

v. Grumet*, 512 U.S. 687, 706 (1994). "[T]he principle that government may accommodate the free

exercise of religion does not supersede the fundamental limitations imposed by the Establishment

Clause." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000) (quoting *Lee v. Weisman*,

505 U.S. 577, 587 (1992)).

The Supreme Court has made clear that religious exemptions are permissible only if they

are limited to alleviating substantial government-imposed burdens on religious exercise (*see*

---

[2] Mrs. Maddonna alleges that she was twice rejected by Miracle Hill and that she remains barred
from participating in the state foster-care services it offers because Miracle Hill's doctrinal
statement is inconsistent with her religious beliefs. ECF No. 1, ¶¶ 82–95. The state attacks both
the theological validity of Mrs. Maddonna's beliefs and her sincerity in holding them. *See* ECF
No. 79, at 11–12 & n.8. Not only do those attacks have no place in a motion for judgment on the
pleadings, but the state never has any business judging (or disparaging and asking the Court to
judge) the reasonableness or quality of Mrs. Maddonna's beliefs. *See Masterpiece Cakeshop, Ltd.
v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1731 (2018). What the state (or anyone else) thinks
that a Catholic should believe is beside the point as a matter of law. *See, e.g.*, *Hernandez v. C.I.R.*,
490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular
beliefs or practices to a faith, or the validity of particular litigants' interpretations of those
creeds."); *Africa v. Pennsylvania*, 662 F.2d 1025, 1030 (3d Cir. 1981) ("Judges are not oracles of
theological verity, and the Founders did not intend for them to be declarants of religious
orthodoxy."). What matters is what Mrs. Maddonna believes (*see, e.g.*, *Welsh v. United States*, 398
U.S. 333, 339 (1970)), and whether, because of those beliefs, she suffers discrimination in the state
program.

*County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 613 n.59 (1989); *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 334 (1987)), and only if they do not detrimentally affect nonbeneficiaries (*see Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709–10 (1985)). Where properly presented, these Establishment Clause mandates are also preconditions to any free-exercise claim for a religious accommodation, whether constitutional or statutory, regardless of the level of judicial scrutiny that would apply if the preconditions are met and the claim is deemed colorable.[3] For if religious exemptions from general laws detrimentally affect nonbeneficiaries, they cross the line from permissible accommodations to unconstitutional preferences for the benefited religious beliefs and their adherents. *See, e.g.*, *Cutter*, 544 U.S. at 722; *Caldor*, 472 U.S. at 709–10; *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 15 (1989) (plurality opinion). The Religion Clauses "give[] no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities." *Caldor*, 472 U.S. at 710 (quoting *Otten v. Baltimore & Ohio R.R. Co.*, 205 F.2d 58, 61 (2d Cir. 1953) (Hand, J.)).

Relatedly, because no accommodation may lawfully be authorized unless a claimant's religious exercise is substantially burdened and the accommodation would not detrimentally affect third parties, any exemption requires an individualized assessment of these constitutionally mandated prerequisites, not a blanket religious waiver for whoever wants one—yet that is just what the state afforded here.

---

[3] Because no federal or state statute can forbid what the Constitution requires or require what it forbids (*see, e.g.*, *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005); *Santa Fe*, 530 U.S. at 302), the federal Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, and the South Carolina Religious Freedom Act, S.C. Code § 1-32-40, must be interpreted to incorporate these constitutional mandates (*see, e.g.*, *Cutter*, 544 U.S. at 720). Thus, the statutes cannot require, or even permit, exemptions from antidiscrimination laws if the exemptions would inflict harms on nonbeneficiaries in violation of the Establishment Clause.

Mrs. Maddonna has alleged that the state's blanket exemption from its antidiscrimination laws for any faith-based child placing agencies with objections to providing services to prospective foster parents on the basis of the parents' religion violates the Establishment Clause. *See* ECF No. 1, ¶¶ 64–67, 116, 118. Among other things, she alleges that the state's accommodation of child placing agencies' religious discrimination inflicts severe harms on prospective foster parents of disfavored faiths, who are prevented from participating in a government program and being considered for foster-care licenses on the same footing as people whose religious beliefs are afforded preferred status—as well as grave harms on the children in the foster-care system, who lose out on the chance to be placed in loving homes.[4] *See id.* ¶¶ 95–108.

And this Court has already held, in denying the state defendants' earlier motions to dismiss (ECF Nos. 19, 21), that Mrs. Maddonna has adequately alleged that the discrimination and exclusion from equal participation in a government program based on her religion constituted official favoritism toward, advancement of, and preference for others' religious beliefs, in violation of the Establishment Clause. *See* ECF No. 43, at 31–36. What is more, the Court unambiguously rejected the state's argument that because it was accommodating child placing agencies' religious beliefs it is shielded from Establishment Clause liability. *Id.* at 35–36. On the contrary, the Court recognized, not all religious accommodations are permissible (*see id.* at 35 (citing *Grumet*, 512 U.S. at 706; *Santa Fe*, 530 U.S. at 302)); and Mrs. Maddonna adequately alleged that the accommodation here runs afoul of the Establishment Clause (*id.* at 35–36).

*Fulton* changes none of that. As described above, the Supreme Court's sole inquiry in *Fulton* was whether Philadelphia's antidiscrimination requirements, including the city's system of

---

[4] Though Mrs. Maddonna does not premise her standing on the harms to children in the system, those harms count in adjudicating the merits under the Establishment Clause. *See, e.g.*, *Caldor*, 472 U.S. at 709–10 (in evaluating constitutionality of required accommodation for employee's religious practice, weighing not just the harms that would befall the employer (who was a party in the case), but the harms to other employees (who were not)).

discretionary exemptions and refusal to consider religious exemptions, amounted to an unconstitutional burden on the religious exercise of one particular child placing agency. The Supreme Court did not address any Establishment Clause issue—much less did it undermine the long-standing Establishment Clause principles on which this Court relied when it denied the state's Rule 12(b) motions here. In fact, the term "Establishment Clause" does not appear even once in any opinion in *Fulton*. And because the Supreme Court does not overturn its own precedent by implication (*see, e.g.*, *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989)), this Court should not and cannot accept the state's invitation to read it as having done so (*see United States v. Danielczyk*, 683 F.3d 611, 615 (4th Cir. 2012) ("[L]ower courts should not conclude that the Supreme Court's more recent cases have, by implication, overruled [its] earlier precedent." (alteration in original) (citation omitted))).

But even if the *Fulton* Court *had* considered what the government owes to prospective foster parents and children when it accommodates a child placing agency's religious discrimination—a matter that it had no cause to consider and did not actually consider—*Fulton* still would not be controlling here.

Notably, the facts in *Fulton* are a far cry from Mrs. Maddonna's detailed factual allegations regarding the scope of the exemption here and the harms that it inflicts on her and other nonbeneficiaries—facts that are crucial to determining whether governmental action is a permissible accommodation that complies with the Establishment Clause or an impermissible advancement of religion that doesn't. Most notably, the *Fulton* Court emphasized that "[n]o same-sex couple has ever sought certification from CSS" in its 50 years of contracting with Philadelphia to provide foster-care services—and hence, no one was ever turned away as a prospective foster parent on the basis of sexual orientation. *Fulton*, 141 S. Ct. at 1875. By contrast, Mrs. Maddonna

alleges that Miracle Hill actually *did* turn her away—twice—based on her religious identity and beliefs. *See* ECF No. 1, ¶¶ 82–95.

Moreover, whereas in *Fulton* the Supreme Court underscored that there are "more than 20 other agencies in the City, all of which currently certify same-sex couples" (*Fulton*, 141 S. Ct. at 1875), Mrs. Maddonna has alleged that there are few, if any, comparable opportunities elsewhere: Miracle Hill is the largest, best-resourced private agency offering nontherapeutic foster-care services in the state, having been assigned the vast majority of all private placements over the last several years. *See* ECF No. 1, ¶¶ 47–50. Of the three other agencies purportedly operating in the Greenville area, two are based more than 40 miles outside Greenville, and the third has apparently been assigned just one child from DSS in the last five years. *Id.* ¶ 50 & nn.4–6.

And the exemptions themselves are vastly different in scope: The *Fulton* Court required that an exemption be granted to one particular agency on the facts of that case (141 S. Ct. at 1882), whereas here the state granted a blanket exemption from nondiscrimination requirements for all faith-based child placing agencies (ECF No. 1, ¶¶ 64–67), without regard to whether prospective foster parents and children are harmed—or even whether the agencies other than Miracle Hill wanted, requested, or made any showing of need for the exemption.

The state here doggedly insists that because an exemption for CSS was granted in *Fulton*, where no one was harmed by it, the state's conduct here is absolutely immune from constitutional challenge and this Court cannot even consider whether the exemption burdens nonbeneficiaries. *See* ECF No. 79, at 18–19. Pointing to some superficial similarities in the cases does not excuse ignoring the Supreme Court's actual reasoning in *Fulton* based on the facts and legal claims there, however; nor does it justify throwing aside this Court's earlier rulings (and three-quarters of a century of Establishment Clause precedent) grounded in the quite different facts and wholly different legal claims here. This Court's earlier rulings on the pleadings remain correct.

14

2.    *Fulton also does not undermine Mrs. Maddonna's other allegations of Establishment Clause violations.*

Nor are the state's Establishment Clause violations limited to making Mrs. Maddonna pay, by suffering invidious religious discrimination in a government program, the heavy costs of accommodating state contractors' religious views. She further alleges that the State has acted with an impermissible religious purpose, that its actions lack a predominantly secular effect, that it endorses and indeed coerces religion, and that it entangles itself with religion by, among other things, (i) privileging the religious beliefs of Miracle Hill over those of Mrs. Maddonna and other prospective foster parents—and over the best interests of the children in foster care; (ii) funding Miracle Hill's discriminatory practices; (iii) delegating to Miracle Hill the state's authority and discretion regarding the care of children in the state's custody while allowing Miracle Hill to exercise that authority and discretion in accordance with and in service of its own religious beliefs and objectives; and (iv) funding Miracle Hill's religious coercion and proselytization of prospective foster parents and children in foster care. *See* ECF No. 1, ¶¶ 110–18.

The state defendants previously sought dismissal with respect to these Establishment Clause violations also, and the Court likewise rejected those attempts.[5] *See* ECF No. 43, at 33–34. The state's attempt to relitigate the sufficiency of these additional allegations and legal theories under the Establishment Clause should likewise be rejected, because, again, *Fulton* says not a word about the Establishment Clause. Thus, it is no surprise that the state's arguments on these issues barely mention *Fulton*—because there is nothing for the state to point to. *See* ECF No. 79, at 24–

---

[5] The Court did not address Mrs. Maddonna's argument that the state acted with an impermissible religious purpose, because it found that she had adequately alleged that the state's actions lacked a predominantly secular effect and entangled government with religion, in violation of the Establishment Clause. *See* ECF No. 43, at 31 & n.13 (citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971)).

25. Instead, the state simply rehashes the arguments it already made and this Court already rejected (down to re-challenging Mrs. Maddonna's standing to bring her claims—a matter that *Fulton* surely did not and could not address). Reprising all of that here, nominally under *Fulton*, is not just a waste of this Court's time, but an improper use of Rule 12(c). *See, e.g.*, C*rawford v. Senex L., P.C.*, No. 3:16-CV-00073, 2017 WL 5162821, at *3 (W.D. Va. Nov. 7, 2017) ("[A] motion for judgment on the pleadings is not an opportunity to *re-litigate* issues raised and decided in a motion to dismiss." (citation omitted)); *Alexander v. City of Greensboro*, No. 1:09-CV-293, 2011 WL 3360644, at *4 (M.D.N.C. Aug. 3, 2011) ("[T]he court will not reconsider [on a Rule 12(c) motion] issues that it addressed fully at the Rule 12(b)(6) stage."); *Lefkoe v. Jos. A. Bank Clothiers*, No. WMN-06-1892, 2008 WL 7275126, at *6 (D. Md. May 13, 2008) (refusing to reevaluate earlier rulings where defendants "simply assert the same arguments" in their Rule 12(c) motion "as were raised on the motion to dismiss").[6]

---

[6] The state vaguely asserts, for example, that *Fulton* "disposed of" (ECF No. 79, at 24) Mrs. Maddonna's claim that it impermissibly coerces religion, because the Supreme Court determined that, in that case, CSS "does not seek to impose [its] beliefs on anyone else." 141 S. Ct. at 1882. But that statement was a factual predicate to the Court's legal conclusion, based on what CSS actually did and did not do; it was not a general pronouncement of a legal principle. *Fulton* simply has no bearing on Mrs. Maddonna's claim that South Carolina has impermissibly funded and authorized and is responsible for religious coercion, and that she herself suffered that coercion when she was put to the unconstitutional choice either to forgo participation on equal terms in the state program if she wished to remain true to her faith, or else to compromise her own beliefs by affirming and pledging to practice contrary religious beliefs in order to participate. *Fulton* says nothing to dislodge the settled legal precedent that being pressured to change one's religious beliefs and practices on pain of denial of a government service is the type of "subtle [or not-so-subtle] coercive pressure" (*Lee*, 505 U.S. at 592) that the Establishment Clause forbids. *See also DeStefano v. Emergency Hous. Grp., Inc.*, 247 F.3d 397, 412 (2d Cir. 2001). Nor does the Supreme Court's determination about the conduct and objectives of CSS in *Fulton* have any bearing on whether there is impermissible religious coercion when Miracle Hill requires, and South Carolina authorizes it to require, prospective foster parents to affirm and pledge to live in accordance with its statement of faith as a prerequisite to receiving state-funded services (*cf. Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish" (citation omitted)).

**B.** ***Fulton*** **does not stand for the proposition that enforcing the state antidiscrimination provisions here would violate the Free Exercise Clause.**

1. *This case is the wrong vehicle to resolve any free-exercise question in the first instance.*

As an initial matter, this Court should decline to reach the question whether enforcing South Carolina's antidiscrimination laws against child placing agencies would violate the Free Exercise Clause—an issue that is not even presented by the pleadings that limit the Court's consideration and thus is outside the proper scope of a Rule 12(c) motion. For faith-based child placing agencies in South Carolina are simply *not* subject to antidiscrimination regulations to which they have religious objections. Governor McMaster made it so when he issued Executive Order 2018-12, which created a blanket waiver from the state requirements and directed DSS to continue funding and licensing religious agencies that do not comply. *See* ECF No. 1, ¶¶ 64–66. And he sought, and received, the same license from the federal government. *Id.* ¶¶ 68–71. So neither Miracle Hill nor any other child placing agency in the state is subject to any antidiscrimination requirements to which it has a religious objection; and no child placing agency has suffered any consequence for failing to follow the requirements.

The question that the state insists on posing is thus purely hypothetical, and answering it would be akin to an impermissible advisory opinion. *Cf., e.g.*, *Flast v. Cohen*, 392 U.S. 83 (1968) ("[I]t is quite clear that the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions."); *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) (ripeness doctrine prevents courts "from entangling themselves in abstract disagreements"); *Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006) ("The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in clean-cut and concrete form." (citation omitted)).

Moreover, because no South Carolina child placing agency is actually burdened in any material way by any antidiscrimination provision (and none are suing or being sued here), there is no party before this Court asserting any free-exercise violation; this is not, in other words, a case about what the state owes to Miracle Hill or any other agency. Rather, it is brought against the state by an individual turned away from a state program because she is Catholic, over what constitutional duty the state (not any child placing agency under contract with the state) owes to *her*. There is thus no record before the Court on which to evaluate whether the specific antidiscrimination regulations at issue impermissibly burden any agency's religious exercise. And there is no opportunity for the Court to make those determinations on an individualized basis, as it must in order to distinguish between a permissible religious accommodation and an impermissible establishment, for the reasons explained above. *See* Section I.A, *supra*.

In its order denying the state defendants' motions to dismiss, this Court recognized the impropriety of addressing the argument that the state reasserts here, because it "is based solely on speculation regarding what Miracle Hill, a non-party to this action, would have done if its license had been revoked." ECF No. 43, at 36. Nothing material has changed. Whatever the state may wish that *Fulton* had said, this Court should refrain from weighing in on constitutional issues that are novel and at present merely hypothetical and completely outside the scope of the actual pleadings. *Cf. Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 857 (4th Cir. 2002) (Courts should not be in "the habit of . . . decid[ing] questions of a constitutional nature unless absolutely necessary to a decision of the case" (citation omitted)).

> 2.     *The state's antidiscrimination laws do not run afoul of the Free Exercise Clause.*

Even if this Court were to reach the question whether the Free Exercise Clause requires South Carolina to grant a religious exemption from its antidiscrimination requirements—which it should not, for the reasons explained above—*Fulton* does not resolve that question, much less does

it dispose of Mrs. Maddona's claims about the state's treatment of *her* when she suffers invidious discrimination in a state program because of that exemption. Again, *Fulton* falls squarely within the Supreme Court's existing free-exercise jurisprudence: It does not hold that religious child placing agencies are automatically and absolutely entitled to an exemption from a general law any time they ask for one (much less that the state must grant a blanket exemption even to those who do not ask and do not show a need or religious basis for wanting one). It does not hold that the state must, or even can, make third parties pay the costs and bear the burdens of that exemption by inflicting invidious religious discrimination on them.[7] It does not say what the state owes to those who are injured by a religious exemption that the state voluntarily grants. It does not direct application of strict scrutiny to an entirely different antidiscrimination law. And, of course, it does not dictate the result—under whatever level of judicial scrutiny—on the wildly different facts here.

Rather, the Supreme Court determined in *Fulton* that Philadelphia's contractual antidiscrimination provisions were not generally applicable, and thus they were subject to strict scrutiny, because they allowed for discretionary, individualized exemptions. *Fulton*, 141 S. Ct. at 1877–78 (citing *Smith*, 494 U.S. at 884). Otherwise, rational-basis review would have applied under *Smith*. *See id.* Then, applying strict scrutiny to the particular facts there accordingly, the

---

[7] The state contends (ECF No. 79, at 3–4, 19 n.16) that Mrs. Maddona admitted in an *amicus* brief with other prospective foster parents in *Fulton* (*see* Brief of Prospective Foster Parents Subjected to Religiously Motivated Discrimination by Child-Placement Agencies as *Amici Curiae* in Support of Respondents, *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) (No. 19-123), https://bit.ly/3ybtnDO) that the Supreme Court's decision there would be dispositive of her claims. That is simply not true. Nowhere do the *amici* even hint that their own cases rise or fall with *Fulton*. Rather, they describe the serious harms that they as would-be foster parents (and the children they might have fostered) suffered at the hands of government contractors who turned them away for religious reasons (*see Amicus* Brief, *supra*, at 5–20); and they explain the importance of the Establishment Clause mandates that protect them against those harms (*id.* at 26–31). Again, the Supreme Court did not consider any Establishment Clause claim or any harm to third parties, much less did (or could) it overrule long-standing Establishment Clause jurisprudence *sub silentio*. And because no one was ever turned away on grounds that Philadelphia forbade, on the record before the Court there were no third-party harms at issue.

Court held that Philadelphia had failed to meet its burden under the compelling-interest test. *Id.* at 1881–82. Because, as explained in the previous subsection, there is no antidiscrimination provision being enforced here, and no dispute between any religious child placing agency and the state, this Court has no basis on which to determine whether strict scrutiny would apply or, if it did, whether the State would satisfy that burden. But even if the Court were to address those hypothetical questions, *Fulton* is not dispositive of either one. And the state antidiscrimination laws do not violate the Free Exercise Clause under any form of judicial review.

*a.* Free Exercise analysis begins from the premise that "laws incidentally burdening religion" are subject to rational-basis review as long as they are neutral and generally applicable. *See id.* at 1876–77 (citing *Smith*, 494 U.S. at 878–82). The state commits DSS and its programs to providing "equal opportunities to all families and their children, without regard to their . . . religion." ECF No. 1, ¶ 37; DSS Human Services Policy and Procedure Manual § 710. Therefore, "[n]o individual shall be denied the opportunity to become a foster or adoptive parent on the basis of . . . religion." ECF No. 1, ¶ 38; DSS Manual § 710. The antidiscrimination requirement here, unlike the requirement in *Fulton*, is neutral and generally applicable and subject to rational-basis review only—a low bar that the law surely meets.[8] The state was not, therefore,

---

[8] What the state describes (ECF No. 79, at 21–22) as a scheme of discretionary exemptions in § 710 is anything but, and it does not defeat that provision's general applicability. Though the policy says that "[l]icensing decisions will not be made on the above basis [e.g., religion] except in rare cases in which such consideration is in the best interest of the child" (*see* DSS Manual § 710), that exception on its face relates to child-placement determinations, not general licensure. In an individual placement determination, the best interests of the child are always paramount, and the religion of the foster parents may be pertinent to address the child's or birth parents' religious needs or preferences (*see* S.C. Code Regs. § 114-550(H)(11)). When licensing determinations are made with an eye to the match between a particular child and a particular parent (*see, e.g.*, DSS Manual §§ 741.2, 750.2 (discussing child-specific licensure in the context of license renewals and fostering by DSS staff)), therefore, the prospective parent's religion might make that person a poor fit for the child. But outside those special circumstances, licensing of prospective foster parents occurs prior to, and independent of, any individual placement determination for any particular

required under *Fulton* to grant any religious accommodation from § 710—and for the reasons already explained, the Establishment Clause bars the exemption that it did grant.

*b.* Even if this Court were to conclude that the state's antidiscrimination requirements must be reviewed under strict scrutiny, *Fulton* still is not controlling, because the facts that Mrs. Maddonna alleges in her Complaint are the opposite of those on which the *Fulton* Court relied to conclude that Philadelphia had not met its burden under the compelling-interest test.

Philadelphia asserted that it had compelling interests in "maximizing the number of foster parents" and "ensuring equal treatment of prospective foster parents and foster children." *Fulton*, 141 S. Ct. at 1881. The Supreme Court concluded that while Philadelphia's interest in maximizing the number of foster parents is important, the city had not adequately established that granting CSS an exemption would thwart that goal; and the Court speculated that the opposite might be true. *Id.* at 1881–82. The Court also agreed that advancing the equal treatment of foster parents and children is a weighty governmental interest, but it determined that "[o]n the facts of this case . . . this interest cannot justify denying CSS an exception for its religious exercise." *Id.* at 1882.

Here, the state contends that, *as a matter of law*, its interests in maximizing the number of foster parents and ensuring the equal treatment of foster parents and children "can be achieved

---

child. And the bar against denial of a foster-parent license based on religion is absolute—no exceptions.

But even if the exception in § 710 were not limited to child-specific licensure, it *still* would not be akin to the exemption in *Fulton*, under which "the Commissioner . . . in his/her *sole discretion*" could grant exemptions from Philadelphia's contractual antidiscrimination requirements (141 S. Ct. at 1878 (emphasis added) (citation omitted)). Indeed, the Tenth Circuit recently recognized the difference between the genuinely discretionary, individualized exemption in *Fulton* and an exemption that contains some kind of objective standard, which does not trigger strict scrutiny under *Fulton*. *See 303 Creative LLC v. Elenis*, No. 19-1413, 2021 WL 3157635, at *17 (10th Cir. July 26, 2021) (exemption from public-accommodations law based on showing a "bona fide relationship" between the discriminatory practice and the goods or services was "facially unlike the 'entirely discretionary' exemption addressed in *Fulton*"). The "best interest of the child" exemption is like the "bona fide relationship" in *303 Creative*, not the entirely discretionary exemption scheme in *Fulton*.

while simultaneously accommodating faith-based CPAs." *See* ECF No. 79, at 23. But that is a fact question. That Philadelphia failed to meet its burden on the record there does not mean that no other conclusion is possible on different facts. And the facts here *are* different. Profoundly so.

As already explained, whereas no same-same couple had ever sought certification from the child placing agency in *Fulton* (141 S. Ct. at 1875), Mrs. Maddonna alleges that Miracle Hill has twice turned her away based on her religious identity and beliefs (ECF No. 1, ¶¶ 82–95). And in contrast to the "more than 20" alternate child placing agencies in Philadelphia, none of which discriminated in the manner that CSS did (*Fulton*, 141 S. Ct. at 1875), Mrs. Maddonna alleges that the very few other agencies that operate in her area do not offer comparable services and are not as well-regarded or well-resourced as the one that turned her away (ECF No. 1, ¶ 50 & nn.4–6). Those factual allegations must be accepted as true on a Rule 12(c) motion.

Likewise, whereas the record in *Fulton* suggested that accommodating CSS might facilitate rather than undermine Philadelphia's interest in maximizing the number of available foster parents, Mrs. Maddonna has alleged and intends to prove the opposite in South Carolina: She alleges that prospective foster parents who are turned away by a child placing agency because of their religious beliefs may be discouraged from fostering a child through other channels for fear that they will again be subjected to discriminatory treatment, or else because there are no other agencies that have comparable resources or provide comparable services and support to foster parents (*id*. ¶ 100). Thus, she alleges, the state's accommodating child placing agencies' religious discrimination results in the exclusion of many otherwise-eligible prospective foster parents, including the Maddonnas themselves, at a time when the number of children in need of good homes in South Carolina far outpaces the number of available foster families. *See id.* ¶¶ 26–29, 97. The State's protestations to the contrary (*see* ECF No. 79, at 18 n.14) do not displace Mrs. Maddonna's well-pleaded allegations.

*c.* The state leans heavily for its free-exercise assertions (ECF No. 79, at 3) on the Supreme Court's statement in *Fulton* that, "so long as the government can achieve its interests in a manner that does not burden religion, it must do so" (141 S. Ct. at 1881), without acknowledging that religion *is* burdened by the state's actions here—*Mrs. Maddonna's* religion. Officially preferring Miracle Hill's religion to the Maddonnas' is not, and cannot be, required by the Free Exercise Clause because it is forbidden by the Establishment Clause. *See Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."). *See generally Santa Fe*, 530 U.S. at 302; *Lee*, 505 U.S. at 587.

Indeed, under *Larson* it is the official denominational preference for Miracle Hill's religion over Mrs. Maddonna's, and not the desire of Miracle Hill to avoid the state's general antidiscrimination requirements, that "demand[s] that [the Court] treat the law as suspect and . . . apply strict scrutiny in adjudging its constitutionality." 456 U.S. at 246. So even if the state's grant of an accommodation were otherwise permissible, which it isn't, the particular exemption here, and the denominational preference that it wrought, would be subject to strict scrutiny; the nondiscrimination law itself is not. The state must therefore prove, with the same specificity as was required in *Fulton*, that the favoritism toward Miracle Hill's evangelical Protestantism over Mrs. Maddonna's Catholicism serves a compelling governmental interest and is narrowly tailored to that end—a showing that it cannot make on the pleadings, and one that we do not believe it can make here under any circumstance. For among other defects, the blanket exemption it granted is available, for example, to religious entities that have no theological justification for otherwise-unlawful discrimination but simply want to escape liability for non-religiously based misdeeds. That is not narrowly tailored to anything.

**C.    This Court may grant relief on Mrs. Maddonna's claims.**

Finally, the state suggests that the relief Mrs. Maddonna seeks would be unconstitutional because of the holding in *Fulton*. But that position rests solely on the false premise that *Fulton* is dispositive of the claims presented here. As demonstrated above, that simply is not the case. And the same analysis that requires a different outcome for her claims necessarily dictates different available relief as well. Just as the law governing a free-exercise claim warrants specific relief based on unique facts, an Establishment Clause claim based on different facts will warrant relief specific to the conduct and harm proven. In short, the state's Rule 12(c) challenge fails because Mrs. Maddonna "colorably states facts which, if proven, would entitle [her] to relief" (*Adams v. Bain*, 697 F.2d 1213, 1216 (4th Cir. 1982)), and she "need not set forth any theory *or demand any particular relief*[,] for the court will award appropriate relief if the plaintiff is entitled to it upon any theory" (*New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24–25 (4th Cir. 1963) (emphasis added)). In short, a full range of equitable and declaratory relief is at the Court's disposal in fashioning its judgment.

## CONCLUSION

The legal contrast between *Fulton* and *Maddonna* couldn't be starker. *Fulton* was a free-exercise case that asked, when might government be obliged to grant a specific exemption from a nondiscrimination law that an entity claims substantially burdens its religious exercise and that is shot through with other exemptions? But that issue isn't even present in this case, because the state *already* granted the exemption—and not just an individualized one to Miracle Hill, but a blanket one, prospectively, to all faith-based entities that might want to avoid the law for any reason. The issues here are thus quite different: When does the state, in granting an exemption, go too far, by improperly shifting the burden of an exemption onto other persons? And what does the state then owe to those who are harmed by its actions? The answers to these questions—for which *Fulton*

provides no guidance—lie in the Establishment Clause. Hence, the motion for judgment on the pleadings fails.

Respectfully submitted this 20th day of August, 2021.

/s/ *Aaron J. Kozloski*

Richard B. Katskee*               Aaron J. Kozloski (D.S.C. Bar No. 9510)
Kenneth D. Upton, Jr.*            CAPITOL COUNSEL, LLC
Sarah R. Goetz*                   P.O. Box 1996
AMERICANS UNITED FOR SEPARATION OF    Lexington, SC 29071-1996
   CHURCH AND STATE       Tel: (803) 465-1400
   1310 L Street NW, Suite 200    Fax: (888) 513-6021
   Washington, DC 20005    *aaron@capitolcounsel.us*
   Tel: (202) 466-3234
   Fax: (202) 466-3353
   *katskee@au.org*
   *upton@au.org*
   *goetz@au.org*

*Counsel for Plaintiff*

  * Admitted *pro hac vice*