IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| AIMEE MADDONNA, | ) | Case No.: 6:19-cv-3551-JD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES; | ) | |
| | ) | |
| ALEX AZAR, in his official capacity as | ) | |
| Secretary of the UNITED STATES | ) | |
| DEPARTMENT OF HEALTH AND | ) | |
| HUMAN SERVICES; | ) | |
| | ) | |
| ADMINISTRATION FOR CHILDREN | ) | |
| AND FAMILIES, UNITED STATES | ) | |
| DEPARTMENT OF HEALTH AND | ) | |
| HUMAN SERVICES; | ) | |
| | ) | |
| LYNN JOHNSON, in her official capacity | ) | |
| as Assistant Secretary of the | ) | |
| ADMINISTRATION FOR CHILDREN | ) | |
| AND FAMILIES; | ) | |
| | ) | |
| HENRY MCMASTER, in his official | ) | |
| capacity as Governor of the STATE OF | ) | |
| SOUTH CAROLINA; and | ) | |
| | ) | |
| MICHAEL LEACH, in his official capacity | ) | |
| as State Director for the SOUTH | ) | |
| CAROLINA DEPARTMENT OF SOCIAL | ) | |
| SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This is essentially a First Amendment Establishment Clause case arising from a third-party

foster care child-placing agency's ("CPA") policy of only working with Christian foster parents

who affirm its doctrinal statement of faith. (DE 1.) In South Carolina, the foster care system is

overseen by the South Carolina Department of Social Services ("SCDSS" or "DSS"), which has

legal custody of all foster children in South Carolina, licenses all foster families, and oversees the training and supervision of foster homes and residential foster facilities in the State.  (DE 111-2, p. 6:2-14.)  SCDSS has final authority over and responsibility for all children in foster care in South Carolina.  (Id.)  Before the court are cross-motions for summary judgment by the parties. Plaintiff Aimee Maddonna ("Plaintiff" or "Maddonna"), an aspiring foster parent, has moved for summary judgment seeking to declare, among other things, that Governor McMaster's Executive Order No. 2018-12[1] violates the Establishment Clause of the First Amendment to the U.S. Constitution and that the federal defendants' Notice of Nonenforcement, published in 84 Fed. Reg. 63809 (Nov. 19, 2019) violates the Administrative Procedure Act ("APA").  (DE 110.)

On the other hand, the United States Department of Health and Human Services ("HHS"); Alex Azar, in his official capacity as Secretary of the United States Department of Health and Human Services; Administration for Children and Families, United States Department of Health And Human Services; and Lynn Johnson, in her official capacity as Assistant Secretary of the Administration for Children and Families (collectively "Federal Defendants") seek summary judgment against Maddonna.  (DE 108.)  Federal Defendants contend, among other things, that Maddonna's claims against them are moot.  (Id.)  In addition, Henry McMaster, in his official capacity as Governor of the State of South Carolina ("McMaster" or "Governor"), and Michael Leach ("Leach"), in his official capacity as State Director for DSS (collectively "State Defendants") argue they are entitled to summary judgment because the United States Supreme Court's decisions in Fulton (applying the Free Exercise Clause) and Kennedy (applying the

---

[1]    Executive Order No. 2018-12 provides "that DSS shall not deny licensure to faith-based CPA's solely on account of their religious identity or sincerely held religious beliefs."  (DE 111-15, p. 4.)  The order is based on a finding, among others, that "the licensing and participation of faith-based organizations in South Carolina's foster-care system is a long-standing and constitutionally permissible  practice[.]"  (Id. at 3.)

Establishment Clause) control the outcome, among other reasons. (DE 111); Fulton v. City of Philadelphia, 141 S. Ct. 1868 (2021), Kennedy v. Bremerton Sch. Dist., 142 S. Ct. 2407 (2022). State Defendants also contend that Maddonna's claims are moot. (DE 111.)

The parties have briefed the motions, and the motions are ripe for review and decision. After reviewing the motions and memoranda submitted, the Court denies Maddonna's motion for summary judgment (DE 110) and grants the Federal and State Defendants' motions for summary judgment (DE 108, 111) for the reasons below.

## BACKGROUND

Plaintiff lives in Simpsonville, South Carolina, in the northwest part of the state ("Upstate") near Greenville, South Carolina, and she would like to be a foster parent. (DE 1, ¶¶ 16, 77, 79, 80.) In this case, the dispute arose on February 20, 2019, when Miracle Hill Ministries Inc. ("Miracle Hill"), a foster care service provider in South Carolina, informed Maddonna that she could not serve as a volunteer mentor to foster children in Miracle Hill's care.[2] (Id. ¶ 86.) Miracle Hill, based in Greenville, South Carolina, serves as a foster-care child placement agency for the State and provides government-funded services under contract with the State to those seeking to be licensed by DSS as foster parents. When this lawsuit was filed, Miracle Hill was the largest placement agency in the Upstate. (DE 110-2, ¶¶ 18-20, 28-29.) Still, Maddonna was "turned away by Miracle Hill because [she] d[id] not share Miracle Hill's evangelical-Christian beliefs and [could not] affirm its statement of faith."[3] (Id. ¶ 89.)

---

[2]    Miracle Hill is a religiously affiliated organization that administered its foster-care services in a Christ-centered environment. (DE 110-2, ¶¶ 21-26.) Miracle Hill believes that foster parents are in a position of spiritual influence over the children in their homes, and thus it required prospective foster parents and volunteer mentors to attest that they read and agreed with Miracle Hill's doctrinal statement. (Id. ¶¶ 27, 74.)

[3]    On July 16, 2021, however, Miracle Hill announced that it would no longer accept government funding. The organization's president stated, "[i]t is with a humble heart that we have taken a step of faith and are officially choosing dependence on the Lord by declining government funding effective July 1, 2021,

To fulfill its duty to care for children in the State's legal custody, DSS contracts with private CPAs that hold licenses from the State to facilitate placement of foster children with foster parents and receive reimbursements from state and federal funds for performing those services. See S.C. Code Ann. § 63-9-30(5); S.C. Code Regs. 114-4910; (DE 110-2, ¶ 5). DSS issues a standard, one-year license to qualifying foster-care CPAs that satisfy its regulatory requirements. Then, it monitors these licensed agencies to ensure their continuing compliance with federal and state laws and regulations. See S.C. Code Regs. 114-4920(E), 114-4930(E). If a CPA is temporarily unable to comply with a state foster care licensing requirement, DSS may grant the agency a temporary license if the agency provides it with a written plan detailing how, during a probationary period, the agency will correct the areas of non-compliance. See S.C. Code Regs. 114-4930(F). DSS may deny or revoke a CPA's license if it determines that the agency cannot comply with State regulations or if the agency provides false information during the application or relicensing process. See id. at 114-4930(G)(1)(d)–(e). Licensed CPAs perform various services on behalf of the State. For instance, they conduct initial and relicensing foster-home investigations consistent with regulations established by DSS and make recommendations that DSS uses to determine whether a foster-family license should be issued, denied, reissued, or revoked. See S.C. Code Regs. 114-550(C)–(E), 114-4980(A). They also monitor the homes for compliance with DSS's foster-home regulations, investigate complaints about possible violations of those regulations, and provide DSS with written reports of their findings, conclusions, and any recommended actions affecting the investigated homes' licenses. (Id.)

---

for our Foster Care Program." (DE 108-2.) Equally, South Carolina has confirmed that "Miracle Hill has not received any funding from [SCDSS] for any reason for any services provided after June 30, 2021." (DE 108-3; see also DE 108-4; DE 108-5.)

For the services they provide under the contract, CPAs are paid an "administrative payment" of $20 to $30 per child per day (depending on the child's age) while living with a foster family affiliated with that CPA.[4]  (DE 111-5; see also DE 111-9, p. 3:4-11.)  If foster families change CPAs, the administrative fee follows them to their new CPA.  (DE 111-2, p. 11:5-25.)  If a child is moved to a new foster family's home, the administrative fee follows the child.  (Id.)  When SCDSS removes a child from a foster home—e.g., to be returned to her family of origin or to be adopted—the administrative fee to the CPA stops.  (DE 111-3, p. 20:6-15.)

DSS's contract does not require CPAs to recruit prospective foster parents or to help prospective foster parents seek licensure.  (DE 111-5; DE 111-4, pp. 5:24–6:20.)  The contract provides funding that partially reimburses CPAs for providing the administrative services governed by the agreement.  (DE 111-5.)  The contract does not require, fund, or reimburse CPAs' efforts to recruit, screen, or assist prospective foster parents seeking licensure from SCDSS.  (DE 111-3, p. 17:15–19:16; DE 111-6, p. 6:1-18.)

DSS licenses and works directly with foster and prospective foster parents of any faith or no faith.  (DE 111-3, p. 7:5-19; DE 111-6, p. 8:2-25.)  DSS likewise intentionally and affirmatively recruits from a full cross-section of South Carolinians to ensure the foster care system includes an array of foster placements as diverse as the children it serves.  (DE 111-2, p. 4:18–5:20; DE 111-3, p. 7:5-11.)  Recently, DSS has focused mainly on kinship foster care and directs prospective non-kin foster parents to CPAs to assist them with seeking licensure and to provide support once they are licensed.  (DE 111-3, p. 8:13–9:10.)  Even so, a foster parent or prospective foster parent

---

[4]     In 2019, the administrative rate was $10 per child per day.  (DE 111-9, p. 7:6-9.)  The amounts were adjusted to their present rates in 2021 pursuant to a Change Order.  (Id. at p. 3:4-11.)  A separate amount, known as a "board payment" or a "maintenance payment" is paid by SCDSS to the foster family itself to help defray costs associated with housing and caring for the child.  (Id. at 4:11–6:13.)  The board payment amount also varies based on the age of the child.  (Id.)

who cannot or prefers not to work with a CPA can still work directly with SCDSS.  (DE 111-2, p. 10:9-15.)

For the minority of families who choose not to work with SCDSS directly, twenty-seven CPAs partner with foster families across the State.  (DE 111-8.)  Eighteen CPAs serve in the Upstate of South Carolina.  (Id.)  Most have been licensed for over a decade.  (Id.)  All eighteen are licensed to help provide "non-therapeutic" foster care (also known as "regular" foster care), and nine are also licensed to help provide therapeutic foster care for children with heightened needs.  (Id.)  Of the twenty-seven CPAs in the State, only one is known to limit its partnerships based on the prospective family's faith.[5]  (DE 111-3, p. 28:3-12; DE 111-6, p. 3:7-11, 4:12–5:8.) That was Miracle Hill.[6]  Miracle Hill also serves any child in need regardless of race, color, national origin, ethnicity, sex, or religion.  (DE 111-3, p. 21:5-15; DE 111-10, p. 2.)  In addition, Miracle Hill also works with most volunteers without regard to such factors.  Nevertheless, because Miracle Hill believes its foster care ministry is an exercise of its religious beliefs, it partners only with prospective foster parents and foster care volunteers who share its religious

---

[5]    There is some evidence that one other CPA limits its recruitment efforts to individuals from within its religious denomination and that another CPA does not affirmatively recruit same-sex couples.  But that evidence supports, at most, only a conclusion that these two CPAs target their recruiting efforts.  (DE 111-3, p. 22:8–27:22.)  It does not indicate what those two CPAs do (or would do) if approached by a prospective foster parent of another faith or in a same-sex marriage.  (Id.)  No evidence rebuts the testimony of the SCDSS employees responsible for licensing, monitoring, and reviewing CPAs that all CPAs other than Miracle Hill work with prospective foster parents of any faith (or no faith) and sexual orientation.  (DE 111-3, p. 28:3-12; DE 111-6, p. 3:7-11, 4:12–5:8.)

[6]    Miracle Hill works with a fraction of the prospective foster parents and foster child placements handled by SCDSS each year.  In 2019, for example—the year Plaintiff inquired with Miracle Hill about working with children in foster care—SCDSS licensed 797 new foster parents.  Of that number, only 337 of them (42% of the total) were assisted by a CPA, including 54 (6.7% of the total) who were assisted by Miracle Hill. (DE 111-12, pp. 1-2.)  Similarly, in 2018—the year the State Defendants took the actions that Plaintiff challenges in this lawsuit—8,435 unique children were served in foster care, of whom only 2,120 (25% of the total) were placed with help from a CPA, including 261 (3% of the total) who were placed with help from Miracle Hill.  (Id. at 3.)  Thus, more than 93% of newly licensed foster families and 97% of foster children statewide are served by someone other than Miracle Hill, as are more than 90% of foster placements in the Upstate Region.  (Id. at 1-3.)

mission and affirm its Christian doctrinal statement in belief and practice. (DE 11-7, p. 3:22–4:11; see also DE 111-11.)

Like every other State, South Carolina receives foster care reimbursements from HHS as authorized by statute. That statute prohibits States from using funds in a discriminatory fashion "on the basis of the race, color, or national origin." 42 U.S.C. § 671(a)(18). In late 2017, HHS amended its regulations to add "religion" and "sexual orientation." 45 C.F.R. § 75.300(c) (2017). This new regulation purported to apply to SCDSS and CPAs as sub-recipients of the funds. See id. §§ 75.101(b)(1), 1355.30(i).

In 2018, SCDSS determined it would issue Miracle Hill only a temporary license renewal in light of its recruiting and partnering only with foster parents who share its religious beliefs. (DE 111-13.) Governor McMaster then wrote to HHS seeking a "deviation" or waiver from the new regulation. (DE 111-14.) His letter contended that the new rules "effectively require CPAs to abandon their religious beliefs or forgo the available public licensure and funding," contending the new rules violate the CPAs' constitutional rights, as well as the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb-4. See id. at 2. Governor McMaster also directed HHS's attention to Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S. Ct. 2012 (2017), issued after HHS amended its regulations, claiming "[t]he Supreme Court has made clear that faith-based entities may contract with the government without having to abandon their sincere[] religious beliefs." (DE 111-14.) A waiver, Governor McMaster contended, would protect the rights of faith-based CPAs and, more importantly, maximize the number of available foster homes. Id.

Shortly after that, Governor McMaster issued Executive Order No. 2018-12 ("Order"), which directed SCDSS to "not deny licensure to faith-based CPAs solely on account of their

religious identity or sincerely held religious beliefs" and to "ensure that SCDSS does not directly or indirectly penalize religious identity or activity." (DE 111-15, p. 4.)  In support of this directive, the Order asserted, among other things, that "the licensing and participation of faith-based organizations in South Carolina's foster-care system is a long-standing and constitutionally permissible practice."  (Id. at 3.)  The Order further stated "faith-based organizations may retain their religious character and participate in government programs," a right "guaranteed by, *inter alia,* the First Amendment to the United States Constitution[,] article I, section 2 of the South Carolina Constitution," and "by the South Carolina Religious Freedom Act of 1999,"  codified at S.C. Code Ann. §§ 1-32-10 to 60.  Id. at 2.

On January 23, 2019, HHS responded to Governor McMaster's request for a waiver.  (DE 111-16.)  The response noted Governor McMaster's concerns about the decrease in available foster homes if HHS enforced the new regulation against faith-based CPAs and his concerns that enforcement would unlawfully force faith-based CPAs to abandon their religious beliefs or forgo licensure.  (Id. at 1-2.)  HHS determined that requiring subrecipients who use religious criteria in partnering with prospective foster care parents "to comply with the religious non-discrimination provision of 45 C.F.R. § 75.300(c) would cause a burden to religious beliefs that is unacceptable under RFRA."  (Id. at 3.)  Accordingly, HHS granted the waiver. [7]  (See id. at 4.)  SCDSS then issued Miracle Hill a regular annual CPA license.

Maddonna filed her Complaint on December 20, 2019, challenging the Conditional Exception Letter, the Notification of Nonenforcement, and HHS's partial funding of the South Carolina Foster Care Program.  (DE 1.)  Maddonna asserted that these actions violate the

---

[7]    HHS's waiver relied on the valid permitted exemption mechanism found in 45 C.F.R. § 75.102. (See DE-111-16, Letter from Wagner to Governor McMaster.) Other federal regulations pertaining to foster care funds also allow for discretionary exemptions.  See 45 C.F.R. § 87.3(a).

Administrative Procedure Act, the Establishment Clause, and the Fifth Amendment's equal protection component. (DE 1, ¶¶ 109-30, 148.) Equally, Maddonna asserted two claims against the State Defendants: violation of the Establishment Clause and violation of the Equal Protection Clause. (DE 1, ¶¶ 109-21, 131-39.)

The Federal and State Defendants moved to dismiss the complaint because Plaintiff lacked standing and failed to state a claim. (See DE 19, DE 21, DE 34.) On August 10, 2020, the Court issued an order granting in part and denying in part the motion. (DE 43.) In particular, the Court dismissed Plaintiff's equal protection claims, (id. at 37-41), dismissed Plaintiff's constitutional challenges to the Notification of Nonenforcement, (id. at 21-22), and dismissed Plaintiff's claims challenging the Federal Defendants' funding of the South Carolina Foster Care Program to the extent that Plaintiff relied on taxpayer standing, (id. at 20 n.7, 28-30). Thus, Maddonna's only remaining claims are that (1) the Conditional Exception Letter violates the Establishment Clause (Count I) against the Federal and State Defendants, (2) the Conditional Exception Letter violates the APA because it is arbitrary and capricious, an abuse of discretion, contrary to law, and contrary to constitutional right (specifically, the Establishment Clause) (Counts IV and V) against the Federal Defendants; and (3) the Notification of Nonenforcement violates the APA because it violates constitutional right (specifically, the Establishment Clause) (Count IV) against the Federal Defendants.

## **LEGAL STANDARD**

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986). "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp., 477 U.S. at 322. "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." Wai Man Tom v. Hosp. Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020) (citation omitted). If the burden of persuasion at trial would be on the nonmoving party "a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Celotex Corp., 477 U.S. at 324. "[T]he burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Id. at 325. "If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied . . . ." Id. at 332 (Brennan, J., dissenting).

Accordingly, once the movant has made this threshold demonstration, to survive the motion for summary judgment, under Rule 56(e), the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324 (citation omitted). Under this standard, "the mere existence of a scintilla of evidence" in favor of the non-movant's position is not enough to withstand the summary judgment motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

"Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." Wai Man Tom, 980 F.3d at 1037.

"Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." Jacobs v. N.C. Admin. Off. of the Courts, 780 F.3d 562, 568 (4th Cir. 2015) (quoting 10A Charles A. Wright et al., Federal Practice & Procedure § 2728 (3d ed. 1998)). "The court may grant summary judgment only if it concludes that the evidence could not permit a reasonable jury to return a favorable verdict. Therefore, courts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted and alterations adopted). A court improperly weighs the evidence if it fails to credit evidence that contradicts its factual conclusions or fails to draw reasonable inferences in the light most favorable to the nonmoving party. See id. at 659-60.

## DISCUSSION

### A. Maddonna's Claims against the Federal Defendants

To begin with, Federal Defendants contend Maddonna's claims against them are moot because "Miracle Hill determined that, effective July 1, 2021, it would no longer accept government funding, state or federal." (DE 108-1, p. 13.) This Court agrees. The three remaining Establishment Clause claims against the Federal Defendants—Counts I, IV, and V—involve the Conditional Exception letter (Counts I, IV, and V) and the Notification of Nonenforcement (Count IV). The Court had determined that Maddonna had standing to sue the Federal Defendants at the pleading stage because HHS issued a conditional exception to South Carolina that permitted

federal funds to flow to Miracle Hill.[8] (DE 43, pp. 24–25.) In support of it, Maddonna's Complaint alleges that she was injured "because, by funding and licensing child-placement agencies, including Miracle Hill, that exclude prospective foster parents and volunteer mentors who do not affirm the agencies' religious beliefs, . . . Defendants have erected a barrier to Mrs. Maddonna and her family's participation in publicly funded governmental foster-care services on the same terms as other prospective foster families." (DE 1, ¶ 17.) Although SCDSS provided funding to Miracle Hill at the time the Complaint was filed, SCDSS has confirmed that "Miracle Hill has not received any funding from SCDSS for any reason for any services provided after June 30, 2021[]" (DE 108-3). To that end, Miracle Hill's actions are now independent of the Federal Defendants.

> Article III limits a federal court's jurisdiction to actual 'cases' and 'controversies,' and the parties' dispute must 'be extant at all stages of review, not merely at the time the complaint is filed.' Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 160, 136 S. Ct. 663, 193 L. Ed. 2d 571 (2016) (citations omitted). To account for this requirement, the mootness doctrine recognizes that some 'intervening circumstance[s] deprive[] the plaintiff of a personal stake in the outcome of the lawsuit, [such that] the action can no longer proceed.' Id. at 160-61 (cleaned up). 'A case becomes moot, however, only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.' Id. at 161 (cleaned up). 'As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.' Id. (citation omitted).

Synopsys, Inc. v. Risk Based Sec., Inc., 70 F.4th 759, 764 (4th Cir. 2023). Further, "[m]ootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Arizonans for Off. Eng. v. Arizona, 520 U.S. 43, 68 n.22 (1997) (internal quotation marks and citation omitted). Maddonna opposes this argument and the application of the mootness doctrine here because she asserts that,

---

[8]    Similarly, the Court determined that Maddonna had standing to challenge the Notification of Nonenforcement under the APA because, although it was issued after her most recent interactions with Miracle Hill, it too permitted federal funds to continue to flow to Miracle Hill, which created a substantial likelihood that she would be injured again. (DE 43, pp. 27–28.)

> [t]he challenge here is to the South Carolina foster-care program as it currently operates under the 2018 Executive Order and HHS Notice of Nonenforcement. The program still receives federal funds, and it still permits any CPA, now and in the future, to discriminate based on the CPA's religious beliefs when providing foster-care services on the State's behalf and on the federal government's dime.

(DE 131, p. 12.)  That said, this theory differs from that alleged in the Complaint, and the Court has already rejected this "taxpayer-standing theory".  (DE 43, p. 30) ("Plaintiff's alleged injury involving tax dollars being used to support faith-based CPAs is separate and distinct from her alleged injuries of stigmatization and practical barriers to her participation in the foster-parent program, and is not particularized to Plaintiff but could apply to every other taxpaying citizen in the public at large.").[9]  Accordingly, the Court grants the Federal Defendants' Motion for Summary Judgment (DE 108) because Maddonna's claims are moot.[10]

### B.  Maddonna's Claims against the State Defendants

Despite this Court's ruling regarding the Federal Defendants, that ruling does not resolve Maddonna's claims against the State Defendants.  Thus, Maddonna contends she is entitled to summary judgment because South Carolina's approach to religious CPAs violates the

---

[9]    Maddonna also believes the mootness doctrine should not apply here because the Fourth Circuit in Wall v. Wade suggests that "Miracle Hill's voluntary cessation could not moot Plaintiff's claims unless 'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur'—by South Carolina, by Miracle Hill, or by any other person or entity performing program functions or receiving program funds." (DE 131, p. 13 (quoting Wall v. Wade, 741 F.3d 492, 497 (4th Cir. 2014)).)  At any rate, the voluntary cessation doctrine "traces to the principle that a party should not be able to evade judicial review . . . by temporarily altering questionable behavior."  Eden, LLC v. Justice, 36 F.4th 166, 170 (4th Cir. 2022) (quoting Porter v. Clarke, 852 F.3d 358, 364 (4th Cir. 2017)).  Miracle Hill is not a party to this litigation, so there is no judicial review for it to evade.

[10]    As to Maddonna's invalid notice claim of the Notice of Nonenforcement, this Court declines to consider this argument because it is not properly before the Court.  Maddonna's Complaint does not allege that HHS issued the Notification of Nonenforcement in violation of § 706(2)(D) for failure to follow the notice-and-comment procedures set forth in 5 U.S.C. § 553.  Rather, the only APA claim that Maddonna asserts in her Complaint related to the Notification of Nonenforcement is that it violates her constitutional rights in violation of § 706(2)(B).  (DE 1, ¶ 143.)  Maddonna has not asserted a notice-and-comment claim here.  "A plaintiff may not raise new claims after discovery has begun without amending his complaint."  Cloaninger ex rel. Est. of Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009) (collecting cases).  A claim raised for the first time at summary judgment may not be considered.  Id.

Establishment Clause in three ways.  First, it coerces religious belief and exercise by prospective foster parents and foster youth.  (DE 110-1, pp. 17-18.)  Second, it delegates governmental power to religious entities without safeguards against the use of the power for religious purposes, thereby fusing governmental and religious functions.  (Id. at 18.)  Third, because the blanket waiver is not tailored to any substantial burden on religious exercise and burdens third parties, it cannot be understood as a permissible religious accommodation but is impermissible governmental favoritism towards a CPA's religion.  (Id.)  This Court disagrees.[11]  The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.  In Kennedy v. Bremerton Sch. District, the Supreme Court has instructed that the Establishment Clause must be interpreted by "reference to historical practices and understandings."  142 S. Ct. 2407, 2428 ("In place of Lemon and the endorsement test, this Court has instructed that the Establishment Clause must be interpreted by 'reference to

---

[11]    State Defendants oppose Maddonna's motion for summary judgment on procedural and substantive grounds (DE 134) as well as raising arguments in support of their motion for summary judgment (DE 111). While the Court agrees in part with State Defendants on their substantive application of the Establishment Clause among other things, the Court disagrees with the State Defendants' claim that Maddonna lacks standing or that her claims are now moot against them (DE 111, pp. 34-35).  As to the State Defendants' standing argument, the record before the Court shows, as it did with the Court's previous order (DE 43), that Maddonna has met her burden of proof to establish an injury-in-fact.  "Article III standing is 'part and parcel of the constitutional mandate that the judicial power of the United States extend only to 'cases' and 'controversies.'" Baehr v. Creig Northrop Team, P.C., 953 F.3d 244, 252 (4th Cir. 2020) (citation omitted). State Defendants contend that "while Plaintiff's suit in Maddonna I was pending, Plaintiff—self-described as an 'observant Catholic[],' []—learned from media reports that in July 2019, Miracle Hill had altered its policy."  (DE 111, p. 34.)  Further, State Defendants claim that the "agency now welcomes Catholic foster parents who affirm Miracle Hill's doctrinal statement—a statement approved by the Roman Catholic Church."  (Id. (citing DE 111-19, 26:4–8).)  At the same time, the record also shows, among other things, that Maddonna reviewed Miracle Hill's Doctrinal Statement and found that it conflicted with her religious beliefs and her understanding of her faith.  (DE 132-9, ¶ 20.)  Therefore, the impediments to standing raised by the State Defendants previously (DE 43) and raised now do not defeat subject matter jurisdiction.

Equally, the Court finds that the claims against the State Defendants are not moot just because Miracle Hill no longer receives federal funding.  Rather, Maddonna's claim also challenges the State Defendants alleged delegation of governmental functions to religious entities without adequate safeguards to prevent endorsement of religious beliefs.

historical practices and understandings.'"). "[T]he line" that courts and governments "must draw between the permissible and the impermissible" has to "'accor[d] with history and faithfully reflec[t] the understanding of the Founding Fathers.'" Id. (citations omitted). "An analysis focused on original meaning and history, this Court has stressed, has long represented the rule rather than some 'exception' within the 'Court's Establishment Clause jurisprudence.'" Id. (citation omitted). "From now on, historical practice and understanding 'must' play a central role in teasing out what counts as an establishment of religion." Firewalker-Fields v. Lee, 58 F.4th 104, 122 (4th Cir. 2023). As a result,

> in Establishment Clause cases, the *plaintiff has the burden of proving a set of facts that would have historically been understood as an establishment of religion*. That requires proving both a set of facts, like in all litigation, and proving that those facts align with a historically disfavored establishmentarian practice. This is in contrast to those constitutional provisions where the Supreme Court has directed that historical tradition defines an exception, rather than the rule. There, the burden falls on the defendant to establish the exception.

Id. at 122 n.7 (emphasis added) (internal quotation marks and citations omitted). Maddonna has not met her burden here because she has not set forth facts related to the application or delivery of foster care programs nationally or in South Carolina that would have been historically understood as an establishment of religion.[12]  Summary judgment is, therefore, warranted in favor of the Federal and State Defendants based on the arguments raised by Maddonna here.

---

[12]    Maddonna objects to the State Defendants' arguments and evidence to support their claim to "a long history of religious agencies . . . cooperat[ing] with the State, without giving up their status as private, religious entities[,]" (DE 132, p. 34), on the grounds that it is inadmissible hearsay. Maddonna also argues that the Government-run foster care, as we know it today, simply did not exist during the time Defendants describe. (Id. at 35.) The Court need not venture into this debate because both arguments overlook the standard of review at summary judgment, which places the burden here on Plaintiff, not State Defendants, to prove a set of facts that historically disfavors establishmentarian practice. See Fed. R. Civ. P. 56 ("The court shall grant summary judgment *if the movant shows* that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (emphasis added)).

### 1. Coercion

Maddonna contends that "[b]y authorizing religious CPAs to turn away prospective foster parents based on religious criteria, South Carolina's blanket waiver ties participation in a state program to religion, pressuring prospective foster parents to adhere to agencies' religious beliefs to participate fully in South Carolina's foster-care program." (DE 110-1, p. 19.) In short, Maddonna argues she was "subjected to that coercion when, solely because of her Catholic faith, Miracle Hill twice rejected her as a mentor or foster parent, even though Miracle Hill otherwise determined that she was a perfect candidate." (Id.) In any event, "[o]ffense . . . does not equate to coercion." Kennedy, 142 S. Ct. at 2430.

Still, Maddonna posits, "[t]his rejection put her to an impossible choice: To work with the CPA best suited to her family's needs, she would have to forsake her faith." (DE 110-1, p. 19.) To the contrary, Plaintiff's understanding of "coercion" does not satisfy the current Establishment Clause doctrine based on the specific facts here. Maddonna contends "'subtle coercive pressure' is sufficient," to meet the "exceedingly low" jurisprudential threshold. (Id. (quoting Lee v. Weisman, 505 U.S. 577, 587 (1992); Herndon ex rel. Herndon v. Chapel Hill-Carrboro City Bd. of Educ., 89 F.3d 174, 180 (4th Cir. 1996)).) Yet many cases Maddonna cites to are misapplied in this context.[13] Also, in light of Kennedy, Maddonna cannot rely on these authorities that apply the now "abandoned Lemon [test][14] and its endorsement test offshoot" in a vacuum without

---

[13]    For example, the Supreme Court in Lee was concerned with "protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools," in the context of invocations at formal graduation ceremonies. 505 U.S. 577, 592.

[14]    According to the "Lemon Test," "t[]o pass muster under the Establishment Clause, a challenged government action must satisfy each of the Lemon test's three criteria" – "[f]irst, whether there was a secular purpose behind the statute; second, whether the statute's principal or primary effect was one that neither advanced nor inhibited religion; and third, whether the statute fostered an "excessive government entanglement with religion." Lambeth v. Bd. Of Commissioners Of Davidson Cnty., NC, 407 F.3d 266, 269 (4th Cir. 2005) (citing Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971)).

referencing historical practices and understandings.  Kennedy, 142 S. Ct. at 2427.  To do otherwise would "invite[] chaos."  Id. ("The Court has explained that these tests 'invited chaos' in lower courts, led to 'differing results' in materially identical cases, and created a 'minefield' for legislators.").

A "fundamental limitation imposed by the Establishment Clause, [] guarantees at a minimum that a government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so."  Lee, 505 U.S. at 577–78 (citation omitted).  "Members of [the Supreme Court] have sometimes disagreed on what exactly qualifies as impermissible coercion in light of the original meaning of the Establishment Clause."  Kennedy, 142 S. Ct. at 2429.  However, in Lee, a case Maddonna relies on, the Supreme Court stated, "[t]he potential for divisiveness is of particular relevance here though, because it centers around an . . . environment where, as we discuss below, . . . subtle coercive pressures exist and where the student *had no real alternative* which would have allowed her to avoid the fact or appearance of participation."  505 U.S. at 588.  Furthermore, "founding-era religious establishments often bore [] certain telling traits," "reflecting 'forms of coerc[ion]' regarding 'religion or its exercise.'"  Shurtleff v. City of Bos., Massachusetts, 142 S. Ct. 1583, 1609 (2022) (Gorsuch J., joined by Thomas, J., concurring) (citations omitted).  One such trait relevant to Maddonna's claim is that "the government used the established church to carry out certain civil functions, often by giving the established church *a monopoly* over a specific function."  Id. (citing Michael W. McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105, 2131-2181 (2003)).

The record does not support Maddonna's claim that she was coerced to adhere to Miracle Hill's religious beliefs to participate fully in South Carolina's foster care program.  State

Defendants did not compel Maddonna to sign Miracle Hill's statement or leave her without an adequate alternative to signing it.  To the contrary, Maddonna could foster the same children at any of twenty-six other private agencies in the State, including eighteen in the Upstate or with the State itself (which has the ultimate licensing authority).  (DE 111 at 5.)  Only Miracle Hill partners with those who share its faith.  (Id.)  Furthermore, the State Defendants did not give Miracle Hill a "monopoly" on the functions of a CPA.  Accordingly, Maddonna has not shown "a historically disfavored establishmentarian practice" based on a claim of "subtle and indirect pressure." Firewalker-Fields, 58 F.4th at 122 n.7; Herndon, 89 F.3d at 180.[15]

## 2.  Delegation of governmental power to religious entities

Next, Maddonna argues that South Carolina "'enmesh[es] churches in the exercise of substantial governmental powers' in its foster-care program[,]" in violation of the Establishment Clause. (DE 110-1, p. 22 (citing Larkin v. Grendel's Den, Inc., 459 U.S. 116, 126 (1982).)  But Maddonna's legal premise is again based on the now abandoned framework of the "Lemon Test," particularly the third factor regarding an "excessive government entanglement with religion." Lemon, 403 U.S. at 612-13; see also Larkin, 459 U.S. at 126 (relying on Lemon in assessing whether a statute "enmeshes churches in the exercise of substantial governmental powers."). Instead, based on historical practices and understandings which Kennedy requires, Establishment Clause protections are more likely triggered "when the government use[s] the established church to carry out certain civil functions, often by giving 'the established church *a monopoly* over a

---

[15]    Maddonna also contends that "South Carolina's blanket waiver enables religious coercion of foster children."  (DE 110-1, p. 13.)  Even so, because "a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties,'" Maddonna lacks standing to pursue this argument.  Kowalski v. Tesmer, 543 U.S. 125, 129 (2004) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)).

specific function.'" Shurtleff, 142 S. Ct. at 1609 (Gorsuch, J., joined by Thomas, J., concurring) (citations omitted).[16]

Maddonna claims, among other things, that South Carolina authorizes and invests private CPAs with the governmental authority "to provide foster care services for the state." (DE 110-2 ¶ 4.) She also claims that the agencies "recruit, train, and license families or make recommendations for licensure to [DSS]." (Id. ¶ 6.) And she claims that "they handle initial inquiries and applications from prospective foster parents," (id. ¶ 7), "guide prospective parents through the application process[,]" "perform home studies for the state, 'conduct[ing] a walk-through of the home, assess[ing] the family, interview[ing] . . . applicable household members,'" and submit a "'written home study assessment' to DSS along with a recommendation whether the family is suitable to be licensed as foster parents," (id. ¶ 8). But Maddonna does not contend that Miracle Hill was given the exclusive authority over foster care services for the State or that Miracle Hill had any authority to issue licenses. Also, Miracle Hill was only one of twenty-seven other CPAs in the State, and Maddonna was not required to go through a CPA to be a foster parent and could foster directly through the State. (DE 111 at 5.) Accordingly, Maddonna has not shown "a historically disfavored establishmentarian practice" based on a claim that the State Defendants delegated governmental power to a religious entity. Firewalker-Fields, 58 F.4th at 122 n.7.

### 3. Impermissible Religious accommodation

Lastly, Maddonna claims "[t]he Executive Order's prospective licensing of contracted CPAs to administer the foster-care program in a discriminatory manner is not a permissible

---

[16]    Although the cases Maddonna cites apply a "Lemon Test" analysis, they still involve complete delegation of civic function to a religious entity. See Larkin, 459 U.S. at 117 (whether a statute that gave churches a "veto" power over issuing a liquor license to any entity within five hundred feet of their church violated the establishment clause); Bd. Of Educ. Of Kiryas Joel Vill. Sch. Dist. V. Grumet, 512 U.S. 687, 690 (1994) (whether creating a separate public school district for a specific religious enclave, thus allocating political power on religious criterion, violates the establishment clause).

religious accommodation." [17] (DE 110-1, p. 24.) Further, Madonna claims, "South Carolina's blanket waiver blatantly—and unconstitutionally—disregards the harms to third parties." (Id. at 26.) In particular, Maddonna contends that the waiver subjects prospective foster parents to discrimination based on their religion, stigmatizing them and discouraging them from fostering children. (DE 110-1, p. 27.) She also contends that the waiver subjects prospective foster parents to practical hurdles, as different agencies have different locations and provide different services and support. (Id.)

At the start, Maddonna's "impermissible religious accommodation" argument naturally invokes the State Defendants' protections under the Free Exercise Clause of the First Amendment. See e.g., Fulton v. City of Philadelphia, 141 S. Ct. 1868. Nevertheless, "[t]his Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it *may* do so without violating the Establishment Clause." Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 144-45 (1987) (emphasis added). But

> The principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause. It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'

Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 302 (2000) (citation omitted). As discussed herein, Maddonna has failed to establish that the blanket waiver violates the Establishment Clause, so the blanket waiver cannot be limited by it. See discussion supra Sections B1, B2. Further,

---

[17]    Maddonna posits the legal standard for religious accommodation as follows: "[t]o be constitutional, religious accommodations (1) must alleviate substantial, government imposed burdens on the exercise of religion and (2) must not impose undue burdens on third parties." (Id. at 25 (citing, among other cases, Est. of Thornton v. Caldor, Inc., 472 U.S. 703, 709-10 (1985)).) That said, no such standard exists. Instead, these "elements" are considerations that the Supreme Court used in their analysis in different contextual situations.

Maddonna's attempt to implicate an impermissible religious accommodation is foreclosed by Fulton v. City of Philadelphia, an analogous case in which the Supreme Court found the denial of a similar religious accommodation for foster care agencies burdened the Free Exercise Clause. See Fulton, 141 S. Ct. at 1881-1882 (Alito, J., concurring) (regarding similar "harms" alleged by Maddonna, "protecting against this form of harm is not an interest that can justify the abridgement of First Amendment rights").

Accordingly, Maddonna has not shown she is entitled to summary judgment as a matter of law against the Federal or State Defendants regarding her Establishment Clause claim. Therefore, Maddonna's motion for summary judgment (DE 110) is denied, and given the reasons provided here, the Federal and State Defendants' motions for summary judgment (DE 108, DE 111) are granted.

## CONCLUSION

The Court denies Maddonna's motion for summary judgment (DE 110) and grants the Federal and State Defendants motions for summary judgment (DE 108, DE 111) for the reasons stated above.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

Florence, South Carolina
September 29, 2023